# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA Title III<br><br>Case No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as a representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Debtor. | PROMESA Title III<br><br>Case No. 17-BK-4780-LTS |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

| | |
|---|---|
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | Adv. Proc. No. 19-00391-LTS |
| as representative of | PROMESA Title III |
| PUERTO RICO ELECTRIC POWER AUTHORITY, | |
| Plaintiff/ Counterclaim-Defendant, | |
| PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALL TITLE III DEBTORS, UNION DE TRABAJADORES DE LA INDUSTRIA ELECTRICA Y RIEGO INC., AND SISTEMA DE RETIRO DE LOS EMPLEADOS DE LA AUTORIDAD DE ENERGIA ELECTRICA, | |
| Plaintiff-Intervenors, | |
| v. | |
| U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, | |
| Defendant/ Counterclaim-Plaintiff, | |
| THE AD HOC GROUP OF PREPA BONDHOLDERS, ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION, AND SYNCORA GUARANTEE, INC., | |
| Defendant-Intervenors/ Counterclaim-Plaintiffs. | |

| | |
|---|---|
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | Adv. Proc. No. 19-00391-LTS |
| as a representative of | PROMESA Title III |

PUERTO RICO ELECTRIC POWER AUTHORITY,

      Movant,

v.

U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE,

               Defendant/
               Counterclaim-
               Plaintiff,

THE AD HOC GROUP OF PREPA BONDHOLDERS,
ASSURED GUARANTY CORP., ASSURED GUARANTY
MUNICIPAL CORP., NATIONAL PUBLIC FINANCE
GUARANTEE CORPORATION, AND SYNCORA
GUARANTEE, INC.,

               Defendant-Intervenors/
               Counterclaim-Plaintiffs.

## MEMORANDUM OF THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD OF PUERTO RICO, AS TITLE III REPRESENTATIVE OF THE PUERTO RICO ELECTRIC POWER AUTHORITY, IN SUPPORT OF MOTION PURSUANT TO BANKRUPTCY RULE 7056 FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................................ 1

RELEVANT BACKGROUND ............................................................................................... 5

I.     PREPA and the PREPA Bonds........................................................................................ 5

       A.     The Authority Act ....................................................................................... 6

       B.     The Trust Agreement ................................................................................. 7

       C.     Other Portions of the Trust Agreement and Bond Related Documents............... 21

II.     Article 9 of the Uniform Commercial Code in Puerto Rico ............................................ 22

III.     The Trustee and Its Proof of Claim.............................................................................. 25

       A.     The Defendant .......................................................................................... 25

       B.     Financing Statements ................................................................................ 25

       C.     Proof of Claim of Master PREPA Bond Claim and Defendant's Pleadings ........ 27

LEGAL STANDARD............................................................................................................. 28

ARGUMENT ......................................................................................................................... 30

I.     PREPA IS ENTITLED TO SUMMARY JUDGMENT DISALLOWING THE
MASTER PREPA BOND CLAIM TO THE EXTENT IT ASSERTS A
SECURED CLAIM IN REVENUES BEYOND THOSE DEPOSITED TO THE
CREDIT OF THE SINKING FUND AND SELF-INSURANCE FUND
BECAUSE PREPA DID NOT GRANT DEFENDANTS SUCH A SECURITY
INTEREST.................................................................................................................... 30

II.     PREPA IS ENTITLED TO SUMMARY JUDGMENT DISALLOWING THE
MASTER PREPA BOND CLAIM TO THE EXTENT IT ASSERTS A
SECURED CLAIM IN REVENUES BEYOND THOSE DEPOSITED TO THE
CREDIT OF THE SINKING FUND AND SELF-INSURANCE FUND
BECAUSE THE TRUSTEE FAILED TO PERFECT ANY SUCH SECURITY
INTEREST AND AVOIDING AND PRESERVING ANY SUCH SECURITY
INTEREST FOR THE BENEFIT OF PREPA PURSUANT TO BANKRUPTCY
CODE §§ 544 AND 551. ................................................................................................ 37

       A.     The Trustee's Purported Security Interest in Revenues Deposited to the
Credit of Any PREPA Deposit Account, Other Than The Trustee-Held Deposit
Accounts Comprising the Sinking Fund and Self-Insurance Fund, Is Unperfected. ........ 38

i

B.      Pursuant to Bankruptcy Code § 544, the Trustee's Purported Security
Interests in Revenues Deposited to the Credit of Any PREPA Property, Aside
From The Trustee-Held Deposit Accounts, Should Be Disallowed and Avoided
and Such Property Should Be Recovered and/or Preserved for PREPA's Benefit. ......... 40

III.    PREPA IS ENTITLED TO SUMMARY JUDGMENT DISALLOWING THE
MASTER PREPA BOND CLAIM TO THE EXTENT IT ASSERTS A
SECURED CLAIM BEYOND AMOUNTS DEPOSITED TO THE CREDIT OF
THE TRUSTEE-HELD DEPOSIT ACCOUNTS INDEPENDENT OF
BANKRUPTCY CODE § 544 AND SUBORDINATING SUCH SECURITY
INTEREST TO PREPA'S INTEREST IN SUCH PROPERTY. .................................... 41

IV.     PREPA IS ENTITLED TO SUMMARY JUDGMENT DISALLOWING THE
MASTER PREPA BOND CLAIM TO THE EXTENT IT ASSERTS SECURITY
INTERESTS IN THE COVENANTS AND REMEDIES................................................ 43

A.      The Covenants and Remedies are *Not* PREPA's Property and, therefore,
PREPA Could Not Have Granted a Security Interest in Them. ...................................... 44

B.      Even If PREPA Could Grant a Security Interest in the Covenants and
Remedies, PREPA Did Not Do So. .............................................................................. 48

C.      In Any Case, PREPA Was Not Authorized to Grant a Security Interest in
the Covenants and Remedies. ....................................................................................... 49

V.      PREPA IS ENTITLED TO SUMMARY JUDGMENT DISALLOWING THE
MASTER PREPA BOND CLAIM TO THE EXTENT IT ASSERTS SECURITY
INTERESTS IN THE COVENANTS AND REMEDIES AND AVOIDING AND
PRESERVING FOR THE BENEFIT OF PREPA ANY SUCH SECURITY
INTERESTS PURSUANT TO BANKRUPTCY CODE §§ 544 AND 551. ................... 50

VI.     PREPA IS ENTITLED TO SUMMARY JUDGMENT DISALLOWING THE
MASTER PREPA BOND CLAIM TO THE EXTENT IT ASSERTS PRIORITY,
PERFECTED SECURITY INTERESTS AGAINST THE COVENANTS AND
REMEDIES INDEPENDENT OF BANKRUPTCY CODE § 544 AND
SUBORDINATING THE TRUSTEE'S CLAIMED SECURITY INTEREST TO
PREPA'S INTEREST.................................................................................................... 51

VII.    PREPA IS ENTITLED TO SUMMARY JUDGMENT AS TO COUNT II OF
DEFENDANTS' COUNTERCLAIM. .......................................................................... 52

VIII.   PREPA IS ENTITLED TO SUMMARY JUDGMENT DISALLOWING
MASTER PREPA BOND CLAIM TO THE EXTENT IT CLAIMS A RIGHT TO
PAYMENT BEYOND MONEYS CREDITED TO THE DEPOSIT OF THE
SINKING FUND AND SELF-INSURANCE FUND. ..................................................... 53

A.      The Unambiguous Terms of the PREPA Bonds and Trust Agreement
Limit the PREPA Bondholders' Right to Payment to the Sinking Fund and
Subordinate Funds. ....................................................................................................... 53

ii

B.      Bankruptcy Code § 927 Applies to the PREPA Bonds and Deprives
Defendants' Claim of Recourse Treatment Pursuant to Bankruptcy Code §
1111(b). .................................................................................................... 60

C.      Defendants Cannot Escape the Non-Recourse Nature of the PREPA Bonds
By Asserting Breaches of PREPA's Covenants. ............................................. 63

IX.     PREPA IS ENTITLED TO SUMMARY JUDGMENT AS TO COUNT I OF
DEFENDANTS' COUNTERCLAIM. .............................................................. 65

CONCLUSION .................................................................................................... 69

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*1st Farm Credit Services, PCA v. Phillips (In re Phillips)*,
No. 05-87521, 2007 WL 4179845 (Bankr. C.D. Ill. Nov. 20, 2007) .....................................47

*Americredit Fin. Servs. v. Nichols (In re Nichols)*,
440 F.3d 850 (6th Cir. 2006) .................................................................................................46

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).................................................................................................................29

*Armstrong Bank v. Shraiberg, Landau & Page, P.A. (In re Tuscany Energy, LLC)*,
581 B.R. 681 (Bankr. S.D. Fla. Jan. 25, 2018) ......................................................................39

*Aurelius Cap. Master, Ltd. v. Commonwealth of P.R. (In re Fin. Oversight and Mgmt. Bd. for P.R.)*,
919 F.3d 638 (1st Cir. 2019)..................................................................................................29

*Ayala Hernandez v. Consejo de Titulares*,
190 D.P.R. 547 (2014) ..........................................................................................................49

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999).................................................................................................................53

*Bank of N.Y. (In re Treco)*,
240 F.3d 148 (2d Cir. 2001)....................................................................................................46

*Boatmen's Nat'l Bank of St. Louis v. Sears, Roebuck & Co.*,
106 F.3d 227 (8th Cir. 1997) ..................................................................................................50

*Branch Banking & Tr. Co. v. Jesse (In re Creger)*,
403 B.R. 381 (Bankr. D. W. Va. 2009) ..................................................................................34

*Carrozza v. CVS Pharmacy, Inc.*,
992 F.3d 44 (1st Cir. 2021)......................................................................................................29

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).................................................................................................................29

*Cent. Transp. Co. v. Pullman's Palace Car Co.*,
139 U.S. 24 (1891)..................................................................................................................49

*Citizens Bank of Maryland v. Strumpf*,
516 U.S. 16 (1995)..................................................................................................................46

*Cobb v. City of Stockton (In re City of Stockton)*,
909 F.3d 1256 (9th Cir. 2018) .................................................................47

*Duluth Lighthouse for the Blind v. C. G Bretting Mfg. Co.*,
No. 99-1601, 2001 WL 1640079 (D. Minn. Sept. 25 2001)......................63

*E.I. du Pont de Nemours & Co. v. Shell Oil Co.*,
498 A.2d 1108 (Del. 1985) .......................................................................32

*Fajardo Home Care, Inc. v. Levitt*,
No. 04-2433, 2009 U.S. Dist. LEXIS 21569 (D.P.R. Mar. 16, 2009) ..............32, 33

*Fin. Oversight & Mgmt. Bd. for P.R. v. Altair Glob. Credit Opportunities Fund
(a), LLC*,
590 B.R. 577 (D.P.R. 2018),
*aff'd in part*, *vacated in part*, *rev'd in part on other grounds*, 914 F.3d 694
(1st Cir.),
*cert. denied*, 140 S. Ct. 47 (2019) ("*Altair*") .............................................40, 42, 50

*First Nat'l Bank of Colo. Springs v. Hamilton (In re Hamilton)*,
18 B.R. 868 (Bankr. D. Colo. 1982) .........................................................67

*Fortec Constructors v. United States*,
760 F.2d 1288 (Fed. Cir. 1985).................................................................32

*Gonzalez v. John Hancock Mut. Life Ins. Co.*,
927 F.2d 659 (1st Cir. 1991).....................................................................30

*In re Ashe*,
712 F.2d 864 (3d Cir. 1983).......................................................................47

*In re Briggs Transp. Co.*,
780 F.2d 1339 (8th Cir. 1985) ..................................................................46

*In re Fin. Oversight & Mgmt. Bd.*,
485 F. Supp. 3d 351 (D.P.R. 2020),
*aff'd,* 989 F.3d 170 (1st Cir. 2021) ..........................................................66

*In re Fin. Oversight and Mgmt. Bd. for P.R.*,
618 B.R. 619 (D.P.R. 2020) ("HTA") .................................................33, 34, 48, 62

*In re Las Vegas Monorail Co.*,
429 B.R. 317 (Bankr. D. Nev. 2010) ...................................................37, 47, 68

*In re Leiferman*,
No. 10-40718, 2011 WL 166170  (Bankr. D.S.D. Jan. 19, 2011) ...........47

v

*In re Robert Bogetti & Sons*,
    162 B.R. 289 (Bankr. E.D. 1993) ........................................................50

*In re Taberna Preferred Funding IV, Ltd.*,
    594 B.R. 576 (Bankr. S.D.N.Y. 2018) ..................................................53

*Infusaid Corp. v. Intermedics Infusaid, Inc.*,
    739 F.2d 661 (1st Cir. 1984) ...............................................................66

*Johnson v. Home State Bank*,
    501 U.S. 78 (1991).................................................................................53

*Kuehner v. Irving Trust Co.*,
    299 U.S. 445 (1937)..............................................................................47

*Lima v. City of E. Providence*,
    17 F.4th 202 (1st Cir. 2021).................................................................29

*McCarthy v. BMW Bank of N. Am.*,
    509 F.3d 528 (D.C. Cir. 2007)............................................................50

*Miller v. Wells Fargo Bank Int'l Corp.*,
    540 F.2d 548 (2d Cir. 1976)................................................................39

*Mississippi Cent. R. Co. v. Ratcliff*,
    59 So. 2d 311 (Miss. 1952)..................................................................34

*Musso v. Ostashko*,
    468 F.3d 99 (2d Cir. 2006)..................................................................40

*Myers v. Milton*,
    137 S.E.2d 441 (W. Va. 1964).............................................................34

*Nickels Midway Pier, LLC v. Wild Waves, LLC (In re Nickels Midway Pier, LLC)*,
    341 B.R. 486 (D.N.J. 2006),
    *aff'd*, 255 F. App'x 633 (3d Cir. 2007)..............................................67

*N. New England Tel. Ops. LLC v. Local 2327, Int'l Brotherhood of Elec. Workers, AFL-CIO*,
    735 F.3d 15 (1st Cir. 2013).............................................................33, 34

*Ohio v. Kovacs*,
    469 U.S. 274 (1985) .............................................................................66

*Olympic Mills Corp. v. Rivera Siaca (In re Olympic Mills Corp.)*,
    477 F.3d 1 (1st Cir. 2007)....................................................................32

*Pennock v. Coe*,
    64 U.S. 117 (1859) ........................................................................................67

*Popular Auto, Inc. v. Reyes-Colon (In re Reyes-Colon)*,
    922 F.3d 13 (1st Cir. 2019)........................................................................29

*Rahm v. Halpin (In re Halpin)*,
    566 F.3d 286 (2d Cir. 2009)..................................................................45, 49

*Raimundi Melendez v. Productora de Agregados, Inc.*,
    162 D.P.R. 215, 224 (P.R. 2004) ...............................................................49

*Rederford v. US Airways, Inc.*,
    589 F.3d 30, 36–38 (1st Cir. 2009) ............................................................66

*Smith v. C&S Wholesale Grocers, Inc. (In re Delano Retail Partners, LLC)*,
    No. 11-37711, 2017 Bankr. LEXIS 2397 (Bankr. E.D. Cal. Aug. 14, 2017)........................39

*Steslow v. Citicorp Mortgage, Inc. (In re Steslow)*,
    225 B.R. 883 (Bankr. E.D. Pa. 1998) ........................................................47

*Taite v. Bridgewater State Univ., Bd. of Trs.*,
    999 F.3d 86 (1st Cir. 2021).........................................................................29

*Texas v. New Jersey*,
    379 U.S. 674 (1965)....................................................................................46

*Theriault v. Genesis HealthCare LLC*,
    890 F.3d 342 (1st Cir. 2018).......................................................................29

*TKO Props., LLC v. Young (In re Young)*,
    214 B.R. 905 (Bankr. D. Idaho 1997)..........................................................2

*U.S. Bank Nat'l Ass'n, v. Triaxx Asset Mgmt. LLC*,
    No. 18-CV-4044, 2021 U.S. Dist. LEXIS 64017 (S.D.N.Y. Mar. 31, 2021) ........................63

*USX Corp. v. Prime Leasing, Inc.*,
    988 F.2d 433 (3d Cir. 1993).......................................................................64

*Wiscovitch-Rentas v. Banco Popular de P.R. (In re Cruz Rivera)*,
    600 B.R. 132 (B.A.P. 1st Cir. 2019)...........................................................38

## STATUTES

19 L.P.R.A. §§ 2211–2409 ..................................................................................22

19 L.P.R.A. § 2212 (UCC § 9-102) .......................................................... *passim*

19 L.P.R.A. § 2214 (UCC § 9-104) ..............................................................................24, 39

19 L.P.R.A. § 2218 (UCC § 9-108) ..............................................................................23, 30

19 L.P.R.A. § 2233 (UCC § 9-203) ................................................................22, 23, 30, 44

19 L.P.R.A. § 2251 (UCC § 9-301) .....................................................................................22

19 L.P.R.A. § 2258 (UCC § 9-308) .....................................................................................23

19 L.P.R.A. § 2260 (UCC § 9-310) ..............................................................................24, 50

19 L.P.R.A. § 2262 (UCC § 9-312) ..............................................................................23, 38,

19 L.P.R.A. § 2264 (UCC § 9-314) .....................................................................................23

19 L.P.R.A. § 2265 (UCC § 9-315) .....................................................................................38

19 L.P.R.A. § 2267 (UCC § 9-317) ................................................................................ *passim*

19 L.P.R.A. § 2301 (UCC § 9-401) .....................................................................................41

19 L.P.R.A. § 2322 (UCC § 9-502) ..............................................................................24, 50

22 L.P.R.A. §§ 191–240 ........................................................................................................5

22 L.P.R.A. § 193 ................................................................................................................54

22 L.P.R.A. § 196 ...................................................................................................6, 7, 40, 49

22 L.P.R.A. § 206 ..............................................................................................................6, 7

22 L.P.R.A. § 207 ............................................................................................................7, 20

22 L.P.R.A. § 208 ..............................................................................................................6, 7

31 L.P.R.A. § 3471 ..............................................................................................................29

31 L.P.R.A. § 3475 ..............................................................................................................32

11 U.S.C. § 101 ..................................................................................................2, 53, 65, 66

11 U.S.C. § 102 ....................................................................................................................53

11 U.S.C. § 364 ....................................................................................................................42

11 U.S.C. § 365 ....................................................................................................................42

11 U.S.C. § 502 ..................................................................................................2, 37, 49, 67

11 U.S.C. § 506 ................................................................................................ 44

11 U.S.C. § 544 ......................................................................................... *passim*

11 U.S.C. § 545 ................................................................................................ 42

11 U.S.C. § 547 ................................................................................................ 42

11 U.S.C. § 548 ................................................................................................ 42

11 U.S.C. § 549 ................................................................................................ 42

11 U.S.C. § 550 ......................................................................................... 41, 51

11 U.S.C. § 551 ......................................................................................... 41, 51

11 U.S.C. § 902 ................................................................................................ 61

11 U.S.C. § 927 .................................................................................. 60, 62, 64

11 U.S.C. § 928 ................................................................................................ 62

11 U.S.C. § 1111 ....................................................................................... 60, 62

48 U.S.C. §§ 2101–2241 ................................................................................... 1

48 U.S.C. § 2161 ............................................................................................. 40

48 U.S.C. § 2166 ............................................................................................... 1

48 U.S.C. § 2167 ............................................................................................... 1

PROMESA § 301 ........................................................... 7, 40, 41, 42, 60

PROMESA §§ 301–316 ................................................................................... 7

OTHER AUTHORITIES

Fed. R. Bankr. P. 7056 ................................................................................... 28

Fed. R. Civ. P. 56 ........................................................................................... 28

Permanent Editorial Board for the Uniform Commercial Code Commentary, Final
Report, No. 6, § 9-301(1) (Mar. 10, 1990) ............................................... 50

Restatement (First) of Property § 1 (1936) .................................................... 45

Restatement (First) of Property § 5 (1936) ........................................................................45

Restatement (Second) of Contracts § 203 (1981) ..........................................................32

Eldon H. Reiley, 1 Sec. Interests in Pers. Prop. § 7.3 (Dec. 2021)................................50

**To the Honorable United States District Judge Laura Taylor Swain:**

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board" or "Plaintiff"), as Title III representative of Puerto Rico Electric Power Authority ("PREPA" or the "Debtor"), pursuant to § 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2] submits this memorandum ("Memorandum") in support of its motion for summary judgment (the "Motion")[3] against U.S. Bank National Association (the "Trustee" or "Defendant") and Counterclaim Plaintiffs/Defendant-Intervenors (together with the Trustee, "Defendants") on all counts in PREPA's First Amended Complaint Objecting to Defendant's Claims and Seeking Related Relief [ECF No. 26] (the "FAC") and Counts I–II of Defendant's and Intervenor-Defendants' Answer, Affirmative Defenses, and Counterclaims [ECF No. 47] ("Defendants' Answer, Affirmative Defenses, and Counterclaims").

## **PRELIMINARY STATEMENT**[4]

1.      The Master PREPA Bond Claim asserts security interests in, and a right to payment from, all PREPA's present and future revenues and, without qualification, all present and future funds held by PREPA.  As demonstrated in the FAC and in this Memorandum, however, the sole perfected security interest of Defendants is held by the Trustee for the benefit of the Bondholders in the Sinking Fund and Self-Insurance Fund, and their sole rights to payment are from those funds, not any other asset and not PREPA generally.  These disputes are particularly susceptible to summary judgment because they are governed by two documents, both of which have clear meanings: the Trust Agreement and the Bonds.  Straight forward application of the Uniform

---

[2]   PROMESA has been codified at 48 U.S.C. §§ 2101–2241.

[3]   This Court has jurisdiction over the Motion pursuant to 48 U.S.C. §§ 2166(a) and 2166(b), and venue of this proceeding and the Motion is proper under § 2167.

[4]   Capitalized terms not defined immediately above are defined in the sections that follow.

Commercial Code, the Authority Act, and PROMESA to the Trust Agreement and the Bonds determines each count at issue.

2.       Four provisions of the Bonds and Trust Agreement, as corroborated by many other documents, dictate the outcomes here.  *First*, the Bonds contain the only promises to pay and provide PREPA "promises to pay, solely from the special fund provided therefor . . . ."  As shown below, that "special fund" is the Sinking Fund.  SUMF[5] ¶ 59.  *Second*, § 804 of the Trust Agreement provides the single monetary remedy available to the Trustee upon on any default, whether a payment or covenant default, including a default of a covenant to raise rates or to transfer money into the special fund:  the Trustee may collect amounts due "but solely from moneys in the Sinking Fund and any other moneys available for such purpose . . . ."[6]  SUMF ¶ 46.  As shown below, the "other moneys available for such purpose" are moneys deposited to the credit of the Subordinate Funds and, pursuant to § 602 of the Trust Agreement, the Trustee's investments of and earnings on moneys in the Sinking Fund and Subordinate Funds.[7]  *Third*, § 805 of the Trust Agreement governs how the Sinking Fund should be allocated to principal, interest, and so forth,

---

[5]   The "SUMF" is *The Financial Oversight and Management Board for Puerto Rico's, as Title III Representative of the Puerto Rico Electric Power Authority, Statement of Undisputed Material Facts in Support of Motion Pursuant to Bankruptcy Rule 7056 for Summary Judgment*, filed contemporaneously herewith.

[6]   Section 804 of the Trust Agreement also provides the Trustee may seek specific performance of any covenant.  Outside bankruptcy, that would help add more money to the Sinking Fund if and when rates were raised and net revenues became available.  In bankruptcy, however, Bankruptcy Code §§ 101(5) and 502(b) provide rights to equitable remedies must be converted to claims denominated in United States currency if the debtor's breach of performance gives rise to a right to payment.  Defaults in the covenants contained in the Bonds or Trust Agreement give rise to an immediate right to payment from the Sinking Fund and Subordinate Funds, making all of Defendants' supposed rights to specific performance "claims" under 11 U.S.C. § 101(5).  *See TKO Props., LLC v. Young (In re Young)*, 214 B.R. 905, 912 (Bankr. D. Idaho 1997) (if "the non-breaching party has a right to obtain a money judgment, even though that party may also have a right to obtain an equitable judgment . . . the remedy is treated as a contingent claim under Section 101(5)(B), which claim can be discharged in bankruptcy."); *see infra* Sections VIII.C; IX.

[7]   Pursuant to the Trust Agreement and PREPA Bonds, Defendants agreed their only right to payment would be out of their collateral: the Sinking Funds and *Subordinate* Funds.  As the Trustee's only perfected security interest is in the Trustee-Held Deposit Accounts (which comprise the Sinking Funds and *Self-Insurance Fund*), not in all of the Subordinate Funds, any security interest in any deposit accounts other than the Trustee-Held Deposit Accounts can be avoided and recovered by the estate, *see infra* Section II, and thus Defendants do not have recourse to anything other than the deposit accounts in which they perfected their security interest (the Sinking Fund and *Self-Insurance Fund*).

2

when the funds are insufficient to pay the full amount due.  Nothing provides another source of funds to pay the Bonds.  *Fourth*, § 601 of the Trust Agreement provides "[a]ll moneys received by [PREPA] under the provisions of the [Trust] Agreement . . . shall not be subject to lien or attachment by any creditor of the Authority [PREPA]."  SUMF ¶ 41.  Section 601 proves that revenues received by PREPA are not encumbered by any lien securing the Bonds and disproves Defendants' claim that revenues received by PREPA are proceeds of encumbered accounts receivable securing the Bonds (which accounts receivable are not pledged and encumbered in the first place).  As shown below, all Trust Agreement provisions pledging revenues expressly provide the revenues are pledged to the extent provided in the Trust Agreement, and the Trust Agreement only provides for a pledge of the Sinking Fund and Subordinate Funds.  Correspondingly, nothing in the Trust Agreement pledges accounts receivable or any other intangible.

3.      In any event, the Trustee did not perfect any security interest in Revenues beyond the Sinking Fund and Self-Insurance Fund.  A security interest in Revenues could be perfected only by control.  The secured party must have control either by being the bank with which the account is maintained, by being the bank's customer if the account is held at another bank, or through a deposit account control agreement (or "DACA").  The Trustee is the depositary bank for certain PREPA deposit accounts (the "Trustee-Held Deposit Accounts"), which constitute the Sinking Fund and the Self-Insurance Fund.  The Trustee has the requisite control for those Trustee-Held Deposit Accounts.  The Trustee *is not* the depositary bank for any other deposit accounts of PREPA.  Nor does the Trustee have a DACA or any other form of control over any other deposit account of PREPA, and the Trustee is unperfected as to any other of PREPA's deposit accounts. The Trustee's financing statements do not help it because a financing statement cannot perfect a security interest in money or deposit accounts.  Unperfected security interests are voidable under

the UCC and Bankruptcy Code § 544(a).  Unperfected security interests are, separately, also subordinate to the Oversight Board's interest under Article 9 of the UCC.  The Trustee's financing statements for the 2013A Bond Series only purport to perfect security interests in "Revenues of the System" and other moneys as defined in the Trust Agreement, which defines Revenues as revenues received.  Another financing statement (FS4304) "for all holders of bonds issued and to be issued under the Trust Agreement" describes the Trustee's collateral as "Revenues of the System" and "other moneys and accounts to the extent provided in such Trust Agreement."  SUMF ¶¶ 66, 67.  To the extent the word "accounts" was intended to mean anything other than bank accounts, the Trust Agreement simply does not grant a security interest in them.  That is logical because it would contradict § 601 of the Trust Agreement, which provides no money received by PREPA is subject to a lien.

4.     The Master PREPA Bond Claim must also be disallowed to the extent it asserts a security interest in PREPA's Covenants and Remedies because those Covenants and Remedies are not PREPA's property but are, instead, liabilities of PREPA and contractual rights *of the Defendants* that they may be able to enforce outside Title III, but which PREPA cannot pledge as collateral.  In any event, nothing in the Trust Agreement grants a security interest in the Covenants and Remedies—and even if it did, it would not be a grant of a security interest cognizable by the Uniform Commercial Code and, anyway, Defendants failed to perfect a security interest in them.

5.     The Trustee's contractually agreed-to limited payment rights upon an event of default combined with its limited perfected security interests together mean the Master PREPA Bond Claim must be disallowed to the extent it claims a right to payment from any source other than the Sinking Fund or the Self-Insurance Fund because the Trustee's claim is (i) non-recourse to PREPA itself or any of its other assets, and is limited to moneys in which the Trustee has a

4

perfected security interest, and (ii) payable solely from special revenues held in the Trustee-Held Deposit Accounts.   As is clear from the face of the Bonds, and corroborated by the Trust Agreement and the other related documents, the Trustee has no recourse to PREPA or any of its assets other than the Revenues deposited to the credit of the Trustee-Held Deposit Accounts (which comprise the Sinking Fund and Self-Insurance Fund).

6.       As such, the Master PREPA Bond Claim should be disallowed except as to a secured claim against the Trustee-Held Deposit Accounts, which comprise the two funds in which the Trustee has perfected its security interest (*i.e.*, the Sinking Fund and the Self-Insurance Fund).

## RELEVANT BACKGROUND

### I.      PREPA and the PREPA Bonds

7.       PREPA is a public corporation established by the Commonwealth of Puerto Rico by Act No. 83-1941, codified at 22 L.P.R.A. §§ 191–240 (as amended, the "Authority Act").[8]

8.       PREPA supplies substantially all the electricity consumed in the Commonwealth. *See* PREPA's *Statement of Undisputed Material Facts in Support of Motion Pursuant to Bankruptcy Rule 7056 for Summary Judgment* ¶ 2 ("SUMF"), filed concurrently herewith.

9.        Between 1974 and 2016, PREPA issued several series of bonds (together, the "PREPA Bonds") pursuant to a Trust Agreement between PREPA and the Trustee, dated as of January 1, 1974, as amended and supplemented (the "Trust Agreement").  SUMF ¶ 6.

10.      On May 21, 2018, the Trustee filed a master proof of claim in the PREPA Title III case, which was logged as claim number 18449, in the amount of $8,477,156,729.56 consisting of principal in the aggregate amount of $8,258,614,158.00, and accrued and unpaid interest in the

---

[8]   PREPA's original name was Puerto Rico Water Resources Authority, and it was changed to PREPA in 1979.

aggregate amount of $218,542,581.56 (plus additional amounts accruing post-petition) (the "Master PREPA Bond Claim"). SUMF ¶¶ 72, 74.

### A. The Authority Act

11. The Authority Act imposes limitations on PREPA's ability to contract with, and grant security interests to or for the benefit of, trustees and holders of the PREPA Bonds and authorizes certain remedies in favor of bondholders.

12. The Authority Act grants PREPA "all rights and powers necessary or convenient to" make and issue bonds for its corporate purposes but restricts the ability of PREPA to grant a security interest, even if the purpose is "to secure payment of its bonds and of any and all other obligations." 22 L.P.R.A § 196(o). Specifically, PREPA is authorized to "pledg[e] or plac[e] a lien on all or any of its contracts, revenues, and income only." 22 L.P.R.A § 196(o).[9]

13. Section 16 of the Authority Act provides any bond resolution authorizing bonds may include provisions that "shall be a part of the contract with the holders of the bonds," 22 L.P.R.A. § 206(e), including as to the pledge of revenues and income to secure payment of the bonds, *id.* § 206(e)(1).

14. A bond resolution *may* also contain provisions "vesting in a trustee or trustees the right to enforce any covenants made to secure, to pay, or in relation to the bonds" and provisions setting the powers, duties, and limitations of the trustee as well as the terms and conditions upon which the bondholders may enforce such covenants or duties. 22 L.P.R.A. § 206(e)(12). It may contain provisions "as to rates to be charged for . . . electric energy, and the application, use, and disposition of the amounts that may be raised by the collection of such rates and from other receipts

---

[9] This provision was amended in 2019 by Act 17-2019 to delete the word "only." Act 17-2019, § 2.6. At the time the PREPA Bonds were issued, however, the word "only" was present in the Authority Act. The analysis is the same under either version.

of" PREPA, and "as to the manner of collecting the rates, fees, rentals, or other charges for the services" of PREPA.  *Id.* §§ 206(e)(2), (13).[10]

15.     As to the holders and trustee of PREPA Bonds, § 18 of the Authority Act grants "the right and power," through mandamus or other suit, action, or proceeding at law or in equity, to "enforce his rights against the Authority . . . to perform and carry out its and their duties and obligations," and to "bring suit upon the bonds."  22 L.P.R.A. § 208(a).  These remedies, however, are subject to "any contractual limitations binding upon the holders of any issue of bonds, or trustees therefor, including but not limited to the restriction of the exercise of any remedy to a specified proportion or percentage of such holders."  22 L.P.R.A. § 208(a).

16.     Section 17(a) of the Authority Act also provides for the right of a trustee or bondholders, under certain conditions, to "apply in an appropriate judicial proceeding to any court of competent jurisdiction in Puerto Rico for the appointment of a receiver."  22 L.P.R.A. § 207(a).

**B.     The Trust Agreement**

17.     The Bonds and Trust Agreement are the governing instruments for the PREPA Bonds and, as detailed below, contain clear provisions governing (i) the issuance and redemption of PREPA Bonds, (ii) the pledge of collateral to secure them, (iii) the use of PREPA Bond proceeds, (iv) the obligations of PREPA regarding revenues it receives, and (v) the application of those revenues, including for debt service.  The law of the Commonwealth governs the Trust Agreement.  SUMF ¶ 55.  As PREPA is a Title III debtor, the rights and obligations of the parties are also subject to PROMESA Title III and the Bankruptcy Code provisions it incorporates.  PROMESA § 301(a); PROMESA §§ 301–316.

---

[10] The Authority Act gives PREPA the power "to determine, fix, alter, charge, and collect reasonable rates . . . ."  22 L.P.R.A. § 196(l).

7

18.     The Bonds authorized by the Trust Agreement provide PREPA's promise to pay. They provide:  PREPA "hereby promises to pay, solely from the special fund provided therefor . . . ." the principal and interest on the PREPA Bonds.   SUMF ¶ 57; Exhibit W to the Morales Declaration.   That is the Trustee's bargained-for right to payment.   It is expressly limited to payment from the special fund, which is defined in the PREPA Bonds to mean the "Sinking Fund."  *Id*.  The Trustee received no other promise to pay.

19.     The Trust Agreement was executed in 1974.  SUMF ¶ 3.  Between 1974 and 2017, the Trust Agreement was amended nineteen times.  *See id.* ¶ 7.  No "consolidated" or "amended and restated" version of the Trust Agreement was ever adopted as the official version of the Trust Agreement.  *Id.* ¶ 8.  As such, the governing document for the PREPA Bonds is the original Trust Agreement, as amended by nineteen supplemental agreements.

      i.     ***The Trust Agreement's Lien Granting and Payment Provisions***

20.     Following the recitals in the Trust Agreement, there is a paragraph having a notation in the margin that reads "Agreement of parties."  We refer to that paragraph as the "Words of Agreement" clause.  It provides in relevant part:

> [I]n order to secure the payment of all the bonds at any time issued and outstanding hereunder and the interest and the redemption premium, if any, thereon according to their tenor, purport, and effect, and in order to secure the performance and observance of all the covenants, agreements and conditions therein and herein contained, the Authority . . . has pledged and does hereby pledge to the Trustee the revenues of the System . . . and other moneys **to the extent provided in this Agreement** as security for the payment of the bonds and the interest and redemption premium, if any, thereon and as security for the satisfaction of any other obligation assumed by it in connection with such bonds . . . . as follows:"

SUMF ¶ 11 (emphasis added).[11]  This "Words of Agreement" clause thus pledges "revenues" and

"other moneys" to the extent provided in the Trust Agreement.  The precise extent of the pledge

is provided, as follows in subsequent sections.

21.     Section 701 of the Trust Agreement provides, in pertinent part:

> After the 1947 Indenture Bonds have been paid or provision has been made for their
> payment and the release of the 1947 Indenture, [] principal, interest and premium
> [on the PREPA Bonds] will be payable *solely from the Revenues and said
> Revenues are hereby pledged to the payment thereof in the manner and to the
> extent hereinabove particularly specified*. Nothing in the bonds or in this
> Agreement shall be deemed to constitute the bonds a debt or obligation of the
> Commonwealth of Puerto Rico or any of its municipalities or other political
> subdivisions, and neither the Commonwealth of Puerto Rico nor any such
> municipalities or other political subdivisions shall be liable for the payment of the
> principal of or the interest on the bonds.

SUMF ¶ 19 (emphasis added).

22.     The term "Revenues" is defined by the Trust Agreement as moneys *received* by

PREPA as a result of its owning or operating the electric system.[12]  "Revenues" does not include

---

[11] The Trust Agreement defines "System" to "mean all the properties presently owned and operated by the Authority as
a single integrated system, together with all works and properties which may be hereafter acquired or constructed by
the Authority in connection with the production, distribution or sale of electric energy and the acquisition or
construction of which shall be financed in whole or in part from the proceeds of bonds issued under the provisions of
the 1947 Indenture or this Agreement or from moneys deposited to the credit of the 1947 Construction Fund, the
Construction Fund, the Capital Improvement Fund or the Renewal and Replacement Fund or from Subordinate
Obligations to the extent such works and properties have been included by the Authority as part of the System as
provided in Section 516 hereof."  SUMF ¶ 21.

[12] Under the Trust Agreement, § 101:

> *The word "Revenues" shall mean all moneys received by [PREPA] in connection with or as a
> result of its ownership or operation of the System*, including the income derived by the Authority
> from the sale of electricity generated or distributed by the System, any proceeds of use and
> occupancy insurance on the System or any part thereof and income from investments made under
> the provisions of the 1947 Indenture and this Agreement, except income from the investment of
> moneys in the 1947 Construction Fund, the Construction Fund, the Capital Improvement Fund, the
> Subordinate Obligations Fund to the extent such income has been derived from the investment of
> moneys in such Fund to be used to pay Subordinate Obligations incurred to pay the cost of any work
> or properties which have not been included by the Authority as part of the System as provided in
> Section 516 hereof and the Reserve Maintenance Fund which shall be deemed to be a part of said
> Funds, respectively.  Except for the purpose of determining the amount of the Revenues in the
> covenant as to rates contained in Section 502 hereof, Revenues shall not include any amounts paid
> to the Authority by a SWAP party in connection with Variable Rate Bonds.

SUMF ¶ 13 (emphasis added)

9

accounts receivable or other rights to payment, whether or not earned by prior performance.  *See id.* ¶ 13.

23.      The flow of Revenues into various accounts maintained by PREPA and the manner and extent to which Revenues are to be applied to the payment of the PREPA Bonds is governed by Article V of the Trust Agreement, entitled "Revenues and Funds."

24.      Section 503 provides that, upon receipt, all Revenues are to be deposited to the credit of the General Fund:[13]

> The Authority covenants that … ***all Revenues***, other than income from investments made under the provisions of this Agreement, will be deposited as received ***in the name of the Authority*** with a qualified depositary or depositaries ***to the credit of the General Fund*** and ***applied in accordance with the provisions of this Article***.

SUMF ¶ 25 (emphasis added).

25.      Section 503 does not include any grant to the Trustee or any other person or entity of a security interest in any Revenues or the General Fund.  Section 503 does not provide for the payment of the PREPA Bonds out of the General Fund.

26.      Section 505 applies the funds in the General Fund:

> The Authority covenants that moneys in the General Fund will be used first for the payment of the Current Expenses of the System, that such expenses will not exceed an amount which is reasonable and necessary for maintaining, repairing and operating the System in an efficient and economical manner, and that the total amount of Current Expenses in any fiscal year will not exceed the amount provided therefor in the Annual Budget for such fiscal year or any amendment thereof or supplement thereto unless such expenses shall be required by conditions beyond the control of the Authority happening during such fiscal year and which could not reasonably have been contemplated at the time of the adoption of the Annual Budget.

---

[13] Under the Trust Agreement, § 101: "The term 'General Fund' shall mean the Puerto Rico Electric Power Authority General Fund, a special fund created and designated by the provisions of Section 503 of this Agreement."   SUMF ¶ 15.

SUMF ¶ 27.[14]

27.     Section 505 does not include any grant to the Trustee or any other person or entity of a security interest in any Revenues or the General Fund.  Section 505 does not provide for the payment of the PREPA Bonds out of the General Fund.

28.     Section 506 provides that after Current Expenses are paid, PREPA may reserve an aggregate amount of two months' worth of Current Expenses.  The remaining Revenues are to then be transferred from the General Fund to the "Revenue Fund"[15]:

> [T]he Treasurer shall transfer, on or before the 15th day of each month, from the General Fund to the credit of the Revenue Fund an amount equal to the amount of all moneys held for the credit of the General Fund on the last day of the preceding month less such amount to be held as reserve for Current Expenses as the Treasurer may determine but not more than one-sixth (1/6) of the amount shown by the Annual Budget to be necessary for Current Expenses for the current fiscal year . . . .

SUMF ¶ 29.

29.     Section 506 does not include any grant to the Trustee or any other person or entity of a security interest in any Revenues or the Revenue Fund.  Section 506 does not provide for the payment of the PREPA Bonds out of the Revenue Fund.

---

[14] The Trust Agreement defines "Current Expenses," in relevant part, to "mean the Authority's reasonable and necessary current expenses of maintaining, repairing and operating the System and shall include, without limiting the generality of the foregoing, all administrative expenses, insurance premiums, expenses of preliminary surveys not chargeable to Capital Expenditures, engineering expenses relating to operation and maintenance, fees and expenses of the Trustee, the 1947 Trustee, the Paying Agents and of the paying agents under the 1947 Indenture, legal expenses, any payment to pension or retirement funds, and all other expenses required to be paid by the Authority under the provisions of the 1947 Indenture, this Agreement or by law, or permitted by standard practices for public utility systems, similar to the properties and business of the Authority and applicable in the circumstances but shall not include any deposits to the credit of the Sinking Fund, the Reserve Maintenance Fund, the Self-Insurance Fund, the Capital Improvement Fund or the 1947 Sinking Fund or deposits under the provisions of Sections 511, 512 and 513 of the 1947 Indenture, and the Subordinate Obligation Fund."  SUMF ¶ 23.

[15] Under the Trust Agreement, § 101: "The term 'Revenue Fund' shall mean the Puerto Rico Electric Power Authority Power Revenue Fund, a special fund created and designated by the provisions of Section 506 of this Agreement." SUMF ¶ 17.

11

30.     Section 507 creates the "special fund" referred to in the Bonds, which is designated the "Sinking Fund."  SUMF ¶ 31 (Trust Agreement § 507).  Pursuant to § 507, "[a] special fund is hereby created and designated . . . the 'Sinking Fund.'"  *Id*.  The Sinking Fund is comprised of three "separate accounts" designated the "Bond Service Account," the "Redemption Account," and the "Reserve Account."  *Id*.  Trust Agreement § 507 then provides that excess Revenues deposited to the credit of the Revenue Fund are to be withdrawn and deposited into the Sinking Fund on a monthly basis.  *Id.*  Section 507 specifies that each month "it shall be the duty of the Treasurer to withdraw from the Revenue Fund, all of the moneys then held to the credit of such Fund . . . and deposit the moneys so withdrawn" to the credit of one of the three constituent accounts that make up the Sinking Fund pursuant to a specified formula: (a) the Bond Service Account, (b) the Redemption Account, and (c) the Reserve Account.  *Id*.

31.     Trust Agreement § 507 also creates three additional funds: the "Reserve Maintenance Fund," the "Self-Insurance Fund," and the "Capital Improvement Fund,"[16] which, together with the "Construction Fund" created under § 401 to contain bond proceeds pending their use to fund improvements, are collectively referred to herein as the "Subordinate Funds."  *Id.* Section 507 further provides, as relevant here, that to the extent any Revenues remain in the Revenue Fund after amounts are transferred to the Sinking Fund, such Revenues are transferred to the Subordinate Funds: first to the Reserve Maintenance Fund (§ 507(d)), then to a Subordinate Obligations Fund (§ 507(e)), next to a Self-Insurance Fund (§ 507(g)); and, finally, to a Capital Improvement Fund (§ 507(h)).  *Id.*

---

[16] Trust Agreement § 507 also creates a "Subordinate Obligations Fund."  SUMF ¶ 31.  The Subordinate Obligations Fund is created to hold Revenues deposited to pay certain subordinate obligations not relevant here.

12

32.     With one exception noted below regarding the proceeds of bond issuances, the "Words of Agreement" clause and § 507 together contain the Trust Agreement's *only* language providing the security interest referred to in § 701 of the Trust Agreement.  Section 507 specifies the "manner" and "extent" of the security interest granted to the Trustee in favor of the Trustee. The "Words of Agreement" clause following the Trust Agreement's recitals pledges revenues of the System and other moneys to the extent provided in the Trust Agreement.  Section 507 specifies that "extent."  It provides:

> The moneys in the Sinking Fund shall be held by the Trustee in trust, and the moneys in the Reserve Maintenance Fund, the Self-insurance Fund and the Capital Improvement Fund shall be held by the Authority in trust, separate and apart from all other funds of the Authority, and shall be applied as ***hereinafter provided*** with respect to such Funds and, pending such application, ***shall be subject to a lien and charge in favor of the holders of the bonds issued and outstanding*** under this Agreement and for the further security of such holders until paid out or transferred as herein provided.

*Id*. (emphasis added).  Section 507 shows the security interest held by the Trustee in "Revenues" extends only to the Sinking Fund and Subordinate Funds.

33.     As referenced in § 507, Trust Agreement §§ 509–511 provide how moneys in the deposit accounts comprising the Sinking Fund are to be used.  Nowhere does the Trust Agreement provide the Bondholders are to be paid from the General Fund or any other Funds or Revenues other than Sinking Fund and Subordinate Funds.

34.     Trust Agreement § 509 provides moneys deposited to the credit of the Bond Service Account (part of the Sinking Fund) are to be used to pay interest on the PREPA Bonds as it becomes due.  SUMF ¶ 33.

35.     Trust Agreement § 510 provides that if moneys in the Bond Service Account are insufficient for the purpose of paying the PREPA Bonds, moneys and other "amounts available" in the Reserve Account "shall first be used for the purpose of paying interest on the bonds."  SUMF

13

¶ 35.  "If at any time the moneys held for the credit of the Reserve Account . . . shall exceed interest payable within the next ensuing twelve (12) months on the bonds of each Series issued and then outstanding hereunder, such excess moneys shall be transferred to the credit of the Bond Service Account or" certain other accounts "may be reduced to the extent of such excess, at the option of the Authority."  *Id.*

36.    Trust Agreement § 511 provides moneys in the Redemption Account are to be used for redeeming PREPA Bonds.  SUMF ¶ 37.

37.    Trust Agreement § 513 provides for the different terms of payment and redemption of the PREPA Bonds and reiterates that "subject to the terms and conditions set forth in this Agreement" the Revenues deposited to the credit of the deposit accounts comprising the Sinking Fund are to be used to make payment on PREPA Bonds and are "pledged" for that purpose.  SUMF ¶ 40.

38.    Article V also specifies how the Subordinate Funds are to be used.  The Trust Agreement provides they are to be used first for certain business purposes of PREPA, but, to the extent the moneys in the Sinking Fund are "insufficient" to pay interest and principal on PREPA Bonds as they come due, the moneys in these Subordinate Funds will be used instead to make bond payments.

39.    Specifically, § 512 provides that moneys in the Reserve Maintenance Fund are to "be disbursed only for the purpose of paying the cost of unusual or extraordinary maintenance or repairs" unless "moneys held for the credit of the Bond Service Account and the Reserve Account shall be insufficient for the purpose of paying the interest on all bonds and the principal" on said bonds, in which case PREPA is required to "transfer from any moneys held for the credit of the Reserve Maintenance Fund to the credit of the Bond Service Account an amount sufficient to make

14

up any such deficiency." SUMF ¶ 39. Similarly, § 512A provides Revenues in the Self-Insurance Fund are to be used to insure extraordinary losses incurred by PREPA, unless "moneys held for the credit of the Bond Service Account and the Reserve Account (including moneys transferred from the Reserve Maintenance Fund to the credit of the Bond Service Account pursuant to the provisions of the first sentence of the second paragraph of § 512 of this Agreement) shall be insufficient for the purpose of paying the interest on all bonds and the principal" on said bonds, in which case PREPA is required to "transfer from any moneys held for the credit of the Self-insurance Fund to the credit of the Bond Service Account an amount sufficient to make up such deficiency." *Id*. Finally, and likewise, § 512B provides the Revenues deposited in the Capital Improvement Fund are to be used to fund capital improvements of PREPA's system, unless "moneys held for the credit of the Bond Service Account and the Reserve Account (including moneys transferred from the Reserve Maintenance Fund or the Self-Insurance Fund to the credit of the Bond Service Account pursuant to the provisions of the first sentence of the second paragraph of §§ 512 and 512A of this Agreement, respectively)" are insufficient to make bond payments, in which case PREPA is required to "transfer from any moneys held for the credit of the Capital Improvement Fund to the credit of the Bond Service Account an amount sufficient to make up such deficiency." *Id*.

40.     Article V therefore does two things: (i) it grants to the Trustee a security interest in Revenues to the extent they are received by PREPA and deposited to the credit of deposit accounts comprising the Sinking Fund and Subordinate Funds, and (ii) it provides that only Revenues on deposit to the credit of those funds (Sinking and Subordinate) are permitted or required to be used to pay PREPA Bonds. Revenues deposited to the credit of the deposit accounts comprising the

15

General Fund and Revenue Fund are neither made subject to a security interest in favor of the holders of PREPA Bonds, nor are they permitted to be used to pay PREPA Bonds.

41.    Trust Agreement § 401 also provides for the PREPA Bonds to be secured by a security interest in bond proceeds until those bond proceeds are used to fund capital improvements. Specifically, Trust Agreement § 401 provides for the creation of a "special fund" called the "Construction Fund."  SUMF ¶ 43.  The Trust Agreement provides as follows with regard to the Construction Fund:

> A special fund is hereby created and designated "Puerto Rico Electric Power Authority Power System Construction Fund" (herein sometimes called the "Construction Fund"), to the credit of which such deposits shall be made as are required by the provisions of Section 208 of this Agreement. There shall also be deposited to the credit of the Construction Fund any moneys received from any other source for paying any portion of the cost of any Improvements. One or more separate accounts may be created in the Construction Fund for use for specified projects.

> The moneys in the Construction Fund shall be held by the Authority in trust, separate and apart from all other funds of the Authority, and shall be applied to the payment of the cost of any Improvements and, except for any moneys in separate accounts in the Construction Fund received from the United States Government or any agency thereof or from the Commonwealth of Puerto Rico or any agency thereof, pending such application, ***shall be subject to a lien and charge in favor of the holders of the bonds issued and outstanding under this Agreement and for the further security of such holders until paid out or transferred as herein provided***.

*Id.* (emphasis added).  As such, with the exception of § 513, §§ 401 and 507 are the only provisions in the Trust Agreement providing assets of PREPA shall be subject to a lien (without reference to another provision of the Trust Agreement) and thus contain the only grants of security interests in PREPA's Revenues, *i.e.*, funds deposited to the credit of the accounts specified in these sections. As it turns out, the Trustee never perfected a security interest in anything other than the Sinking Fund and Self-Insurance Fund (because it does not have control over any other Subordinate Funds).  The moneys in the Sinking Fund are encumbered by § 507, and when those monies are

16

allocated to the Bond Service Account, the Reserve Account, and the Redemption Account, § 513 pledges those monies in their new accounts.[17]

42.     Significantly, § 601 of the Trust Agreement[18] provides "[a]ll moneys received by the Authority under . . . this Agreement . . . shall not be subject to lien or attachment by any creditor of the Authority."  SUMF ¶ 41. Section 601 demonstrates none of PREPA's revenues are encumbered for the benefit of the Trustee on PREPA's receipt of them, and the only revenues and other moneys ultimately encumbered are those identified in §§ 401 and 507 of the Trust Agreement as moneys that "shall be subject to a lien and charge in favor of the holders of the bonds . . . ." SUMF ¶¶ 43, 31 (Trust Agreement §§ 401, 507).

43.     The Trust Agreement also governs the Bondholders' rights upon the occurrence of an event of default.  As described below, under Trust Agreement § 804, Bondholders are not permitted to collect money judgments against PREPA from any moneys other than those deposited to the credit of the Sinking Fund and Subordinate Funds.

---

[17]  Sections 401 (as to the Construction Fund) and 507 (as to the Sinking Fund and Subordinate Funds) each specify that their grants of security interests are "for the further security of" the bondholders "until" the relevant funds "are paid out or transferred as herein provided."  *See* SUMF ¶¶ 43 (§ 401), 31 (§ 507).  Article V of the Trust Agreement provides for PREPA to raise rates sufficient to pay the Bonds and to transfer sufficient sums to pay Bonds as they come due.  Outside of bankruptcy, those covenants provide the Bondholders with contractual rights to enforce payment on the Bonds.  The grant of the aforementioned security interests in the Sinking Fund and Subordinate Funds provides "further security" (in its ordinary, non-technical meaning) of payment by giving Defendants present property rights in the Sinking Fund and Subordinate Funds.  If either the "Words of Agreement" clause or § 701 were read to grant a security interest in all revenues and moneys of PREPA, neither §§ 401 nor 507 would provide for "further security" of the bondholders, as they would already have a security interest on those moneys before they are deposited in those funds.

[18]  In its totality, the first paragraph of § 601 provides:

> All moneys received by the Authority under the provisions of this Agreement shall be deposited with a Depositary or Depositaries, shall be held in trust, shall be applied only in accordance with the provisions of this Agreement and shall not be subject to lien or attachment by any creditor of the Authority.

SUMF ¶ 41.

44.     Trust Agreement § 802 provides an "event of default" occurs under the Trust Agreement if, among other things, "payment of the principal and of the redemption premium, if any, of any of the bonds shall not be made when the same shall become due and payable," SUMF ¶ 45 (Trust Agreement § 802(a)), "payment of any installment of interest on any of the bonds shall not be made when the same shall become due and payable," *id.* (Trust Agreement § 802(b)), PREPA files for bankruptcy relief, *id.* (Trust Agreement § 802(g)), or PREPA defaults in "the due and punctual performance of any other of the covenants, conditions, agreements and provisions contained in the bonds or in this Agreement." *Id.* (Trust Agreement § 802(h)).

45.     Manifestly, payment and covenant defaults under Trust Agreement § 802 have occurred and have not been cured.

46.     Trust Agreement § 803 entitles the Trustee to accelerate the debt on default.  Trust Agreement § 804 governs the Trustee's bargained-for remedies on an event of default.  In short, the Trustee can sue for legal and equitable remedies including specific performance of covenants. In pertinent part, Trust Agreement § 804 provides:

> Upon the happening and continuance of any event of default specified in Section 802 of this Article, then and in every such case the Trustee may proceed, and upon the written request of the holders of not less than ten per centum (10%) in aggregate principal amount of the bonds then outstanding hereunder shall proceed, subject to the provisions of Section 902 of this Agreement, to protect and enforce its rights and the rights of the bondholders under applicable laws or under this Agreement by such suits, actions or special proceedings in equity or at law, or by proceedings in the office of any board or officer having jurisdiction, either for the appointment of a receiver as authorized by the Authority Act or for the specific performance of any covenant or agreement contained herein or in aid or execution of any power herein granted or for the enforcement of any proper legal or equitable remedy, as the Trustee, being advised by counsel, shall deem most effectual to protect and enforce such rights; provided, however, that the Trustee shall not be required to proceed for the appointment of a receiver of the System unless it shall receive the written request of the holders of not less than twenty-five centum (25%) in principal amount of the bonds then outstanding under the provisions of this Agreement.

SUMF ¶ 46.

18

47.     Consistent with Trustee's limited recourse and the discrete security interest granted to the Trustee, Trust Agreement § 804 expressly limits the Trustee's power to collect to the Sinking Fund and "other moneys available for such purpose."   The "other moneys available for such purpose" is limited to the Subordinate Funds (which are held separately from the Sinking Fund, but are made available for paying debt under Article V) and the proceeds of investments of moneys held to the credit of the Sinking Fund and Subordinate Funds in § 602.   Specifically, Trust Agreement § 804 provides in pertinent part:

> In the enforcement of any remedy under this Agreement the Trustee shall be entitled to sue for, enforce payment of and receive any and all amounts then or during any default becoming, and at any time remaining, due from the Authority for principal, interest or otherwise under any of the provisions of this Agreement or of the bonds and unpaid, with interest on overdue payments of principal at the rate or rates of interest specified in such bonds, together with any and all costs and expenses of collection and of all proceedings hereunder and under such bonds, without prejudice to any other right or remedy of the Trustee or of the bondholders, and to recover and enforce any judgment or decree against the Authority, but solely as provided herein and in such bonds, for any portion of such amounts remaining unpaid and interest, costs and expenses as above provided, and ***to collect (but solely from moneys in the Sinking Fund and any other moneys available for such purpose) in any manner provided by law, the moneys adjudged or decreed to be payable***.

*Id.* (emphasis added).[19]   Trust Agreement § 805 contains provisions governing how the moneys deposited in the Sinking Fund and Subordinate Funds should be apportioned if they are insufficient to make all required payments on the PREPA Bonds.   Specifically, Trust Agreement § 805 provides:

> Anything in this Agreement to the contrary notwithstanding, if at any time the moneys in the Sinking Fund shall not be sufficient to pay the interest on or the

---

[19] Pursuant to Trust Agreement § 804, the right of the Trustee to recover and enforce any judgment or decree against PREPA for any amounts remaining unpaid on the Bonds following default is caveated "but solely as provided [in the Trust Agreement and in the Bonds]." That is a clear reference to the non-recourse provisions elsewhere contained in the Trust Agreement. Therefore, the source from which those moneys can be collected is also limited by the non-recourse provisions of the Trust Agreement and, as a consequence, in the parenthetical "but solely from moneys in the Sinking Fund and any other moneys available for such purpose," the "other moneys" are those in the Self-Insurance Fund (which is the only fund, other than the Sinking Fund, in which the Trustee has a perfected security interest).

19

> principal of the bonds as the same shall become due and payable (either by their
> terms or by acceleration of maturities under the provisions of Section 803 of this
> Article), such moneys, together with any moneys then available or thereafter
> becoming available for such purpose, whether through the exercise of the remedies
> provided for in this Article or otherwise, shall be applied as follows . . . .

SUMF ¶ 47.  As in § 804, the reference in § 805 to "any moneys then available" for payment of

Bonds is a reference to money in the Subordinate Funds.  Similarly, the reference in § 805 to

moneys "thereafter becoming available for such purpose" is a reference to moneys thereafter

becoming available in the Sinking Fund and Subordinate Funds.  Section 805, then, provides for

the ratable division of the Revenues deposited to the credit of the Sinking Fund and Subordinate

Funds between PREPA Bondholders.  *Id.*

### ii.   *The Trust Agreement's Ancillary Covenants and Bondholder Remedies*

48.   The Trust Agreement includes various covenants of PREPA relating to PREPA's

operations.  Each covenant imposes an obligation on PREPA to take or perform certain actions

under certain circumstances.  Section 501 includes a covenant that PREPA will continue to render

bills for the services it furnishes:

> The Authority covenants that it will continue to render bills for the services and
> facilities furnished by the System on a monthly or bi-monthly basis until such time
> as the Authority shall deem it advisable to change the period covered by such bills,
> and that it will establish and enforce reasonable regulations in relation to the
> collection of such bills.

SUMF ¶ 48 (the "Collection Covenant").

49.   Section 502 includes a covenant that PREPA will "at all times fix, charge and

collect reasonable rates and charges for the use of the services and facilities furnished by the

System" and that PREPA will "adjust such rates and charges so that the Revenues will at all times

be sufficient" to pay both Current Expenses and "(120%) of the aggregate Principal and Interest

Requirements for the next fiscal year" on account of all the bonds then outstanding.  SUMF ¶ 49

(the "Rate Covenant").   If PREPA defaults in performing its obligations under the Trust

20

Agreement, § 17(a) of the Authority Act provides the Trustee or holders of PREPA Bonds comprising at least 25% of the then-total outstanding principal with a right to seek the appointment of a receiver.  22 L.P.R.A. § 207(a) (the "<u>Receiver Remedy</u>").  Section 804 of the Trust Agreement contains contractual limitations on Bondholder rights to seek the appointment of a receiver.  SUMF ¶ 46.

50.    Each of the foregoing constitutes an obligation or liability of PREPA, or a corresponding right of the Trustee and/or holders of the PREPA Bonds to take certain actions against PREPA if there is an event of default (collectively, the "<u>Covenants and Remedies</u>").

51.    The Covenants and Remedies are neither rights nor property of PREPA.

52.    The Trust Agreement does not grant and, as discussed below, could not have granted, security interests in any of the Covenants or Remedies.

### C.    Other Portions of the Trust Agreement and Bond Related Documents

53.    Other documents referenced in the Trust Agreement corroborate security interests are granted to the Trustee only in moneys actually deposited to the credit of the Sinking Fund and the Subordinate Funds.  For example, the Trust Agreement provides that an "Opinion of Counsel" is to be issued as a condition to the issuance of the PREPA Bonds (*see, e.g.*, Trust Agreement §§ 208(e), 209(d)). SUMF ¶ 50 (definition of "Opinion of Counsel") (emphasis added).

54.    The legal opinion from PREPA's bond counsel, Sidley Austin LLP, appended to the August 15, 2013 Official Statement for the 2013A bond issuance, states the PREPA Bonds are "payable solely from the Sinking Fund" and the Sinking Fund "is pledged to and charged with the payment of the principal of and interest on such bonds . . . ."  SUMF ¶ 60.

55.    The Form of the Coupon Bonds (the "<u>Template Bond</u>") authorized by the Trust Agreement confirms that only the moneys deposited to the credit of the Sinking Fund, as provided in the Trust Agreement, are encumbered for payment of the PREPA Bonds, and that the sole source

of payment for the PREPA Bonds are the moneys deposited to the credit of the Sinking Fund.  The second paragraph of the Template Bond states "this bond shall be payable as to both principal and interest solely from the special fund provided therefor as hereinafter set forth."  SUMF ¶ 57.  The Template Bond goes on to refer to the provisions in the Trust Agreement specifying the "fund charged with and pledged to the payment of the interest on and the principal of the bonds" and further identifies and defines the Sinking Fund as the "special fund . . . pledged to and charged with the payment of and the interest on the bonds."  SUMF ¶ 59.  The physical bonds issued by PREPA incorporate the same terms as the Template Bond in the Trust Agreement.  *See, e.g.,* Exhibit W to the Morales Declaration.

## II.      Article 9 of the Uniform Commercial Code in Puerto Rico

56.      The Commonwealth adopted revised Article 9 of the Uniform Commercial Code (the "UCC"), which governs the creation, perfection and priority of security interests, effective January 17, 2013.  *See* 19 L.P.R.A. §§ 2211–2409 (hereinafter, revised Article 9 is referred to as "Article 9").

57.      Article 9 governs the existence, validity and perfection of security interests in PREPA's property.  *See* 19 L.P.R.A. § 2251 (UCC § 9-301).

58.      Under Article 9, a security interest can attach only to "collateral" described in a security agreement, in which collateral "the debtor has rights in . . . or the power to transfer rights in . . . ."  19 L.P.R.A. § 2233(b)(2) (UCC § 9-203(b)(2)).  Under Article 9, "Collateral" means "***property*** subject to a security interest" and includes "[p]roceeds to which a security interest attaches"; "accounts, chattel paper, payment intangibles, and promissory notes that have been sold"; or "goods that are the subject of a consignment."  19 L.P.R.A. § 2212(a)(12) (UCC § 9-102(a)(12) (emphasis added).  "Property" is not collateral unless the property is described in a security agreement. 19 L.P.R.A. § 2233(b)(3)(A) (UCC § 9-203(b)(3)(A)).

22

59. With respect to the PREPA Bonds, to the extent the Trust Agreement serves as a security agreement, it does not describe any collateral other than the Sinking Fund and Subordinate Funds. *See* 19 L.P.R.A. §§ 2218, 2233(b)(3)(A) (UCC §§ 9-108, 9-203(b)(3)(A)). No other agreement executed by PREPA purports to grant any security interest or lien, in favor of the Trustee and PREPA Bondholders, in any property of PREPA. Thus, the security interest created under the Trust Agreement only creates a security interest in and attaches to the Sinking Fund and the Subordinate Funds.

60. A security interest can be "perfected" only in collateral in which a security interest has attached. *See* 19 L.P.R.A. § 2258(a) (UCC § 9-308).

61. Under Article 9, the General Fund, the Revenue Fund, the Sinking Fund, and the Subordinate Funds are comprised of "deposit accounts." 19 L.P.R.A. § 2212(a)(29) (UCC § 9-102(a)(29)).

62. Under Article 9, subject to one exception for "proceeds" not applicable here (*see infra* Argument II.A), the *only* way to perfect a security interest in a deposit account is by "control" of the deposit account. 19 L.P.R.A. § 2262(b)(1) (UCC § 9-312(b)(1)) ("a security interest in a deposit account may be perfected *only* by control" (emphasis supplied)); *see also* 19 L.P.R.A. § 2264(a) (UCC § 9-314(a)) ("A security interest in . . . deposit accounts . . . may be perfected by control of the collateral under § 2214[.]").

63. Under Article 9, a secured party has "control" of a deposit account only if (a) the secured party is the bank with which the deposit account is maintained, (b) the secured party is the customer of the bank where the deposit account is maintained (and the holder of the deposit account), or (c) the debtor, the secured party and the bank have executed a DACA that gives the secured party requisite "control" of the deposit account (by providing the bank will comply with

instructions originated by the secured party directing disposition of the funds in the deposit account without further consent by the debtor). *See* 19 L.P.R.A. § 2214(a)(1)–(3) (UCC § 9-104(a)(1)–(3)).

64. No DACA exists between the Trustee and the holders of any of PREPA's other depositary banks.[20] SUMF ¶ 83.

65. The Covenants and Remedies are not PREPA's property. Therefore, they cannot not be subject to a security interest under Article 9.

66. Under Article 9, a financing statement must be filed to perfect certain security interests. 19 L.P.R.A. § 2260(a), (b) (UCC § 9-310(a), (b)). Under Article 9, a "financing statement is sufficient only if it . . . indicates the collateral covered by the financing statement." 19 L.P.R.A. § 2322(a) (UCC § 9-502(a)).

67. Under Article 9, the rights of a "lien creditor" have priority over unperfected security interests. 19 L.P.R.A. § 2267(a)(2) (UCC § 9-317(a)(2)).

68. Under Article 9, "lien creditor" means, among other things, "a trustee in bankruptcy from the date of the filing of the [bankruptcy] petition." 19 L.P.R.A. § 2212(a)(52) (UCC § 9-102(a)(52)).

---

[20] The Defendants' Answer, Affirmative Defenses, and Counterclaims establishes that this fact is undisputed, because the Trustee should know whether it has entered into DACAs with PREPA's other depositary banks. In the Amended Complaint, the Oversight Board pleaded that no DACAs exist between PREPA, the Trustee, and any other depository bank with regard to a PREPA deposit account. In the Defendants' Answer, Affirmative Defenses, and Counterclaims, the Defendants (including the Trustee) respond that they lack knowledge as to whether any such agreement exists. *See* Defendants' Answer, Affirmative Defenses, and Counterclaims ¶ 64. In other words, the Trustee asserts that it lacks knowledge or information as to whether the Trustee ***itself*** entered into any DACA. This constitutes an admission no DACA exists. *See, e.g., Mesirow v. Duggan*, 240 F.2d 751, 756 (8th Cir. 1957) (appellee deemed to admit allegation "[t]hat was a matter of record in appellee's control and peculiarly within his knowledge" despite averment that appellee "was without knowledge or information sufficient to form a belief"); *Greenbaum v. United States*, 360 F. Supp. 784, 787–88 (E.D. Pa. 1973) (stating "fact which is denied for lack of knowledge or information may be deemed admitted if the matter is one to which the party does have knowledge or information" and holding defendant should be deemed to admit fact that, if it had consulted its own records, it would have had no basis to deny).

### III.   The Trustee and Its Proof of Claim

#### A.   The Defendant

69.   Defendant is a national banking association under the laws of the United States of America with an office in New York.  SUMF ¶ 4.

70.   Pursuant to the Trust Agreement, Defendant serves as the current Trustee.  SUMF ¶ 5.

71.   As Trustee, Defendant (i) performs the functions of collateral agent, (ii) authenticates PREPA Bonds (*see* Article II of the Trust Agreement), (iii) selects PREPA Bonds for redemption (*see* Article III), (iv) holds the security interest in the Sinking Fund and the Subordinate Funds (*see* Article V), (v) pays PREPA Bondholders from the Sinking Fund (*see* Article V), (vi) invests Revenues deposited to the credit of the Sinking Fund (*see* Article VI), and (vii) serves as the legal representative of all PREPA Bondholders with respect to the subject matter of this proceeding, among other things.

72.   The deposit accounts held by the Trustee—the Trustee-Held Deposit Accounts— constitute the Sinking Fund and the Self-Insurance Fund.  SUMF ¶ 82.

#### B.   Financing Statements

73.   As of July 2, 2017, four potentially unexpired financing statements had been filed in connection with the PREPA Bonds.  SUMF ¶ 61.

74.   *First*, on August 21, 2013, the Trustee filed a financing statement that names as the secured party "US Bank National Association, on behalf of the bondholders of Power Revenue Bonds, Series 2013A."  SUMF ¶ 62 (P.R. Dep't of State Doc. No. 2013004449) ("FS 4449").  FS 4449 describes the Trustee's collateral, in material part, as "the Revenues of the System (as each such term is defined in the [Trust] Agreement) and other moneys to the extent provided in the Agreement."  SUMF ¶ 63.  While FS 4449 states the terms "Revenues" and "System" will have

25

the meanings given in the Trust Agreement, no copy of the Trust Agreement is attached to FS 4449.[21]

75.      *Second*, on August 12, 2014, the Trustee filed a financing statement that names as the secured party "U.S. Bank National Association, as Trustee and successor Trustee for all holders of bonds issued and to be issued under Trust Agreement dated January 1, 1974."  SUMF ¶ 66 (P.R. Dep't of State Doc. No. 2014004304) ("FS 4304").  FS 4304 describes the Trustee's collateral, in material part, as "[a]ll the Revenues of the System (as defined in the Trust Agreement dated January 1, 1974, between the Debtor and U.S. Bank National Association, as trustee and successor trustee), and other moneys and accounts to the extent provided in such Trust Agreement."  *Id.* ¶ 67.  FS 4304 attaches a copy of the Trust Agreement as an exhibit.

76.      *Third*, on June 30, 2015, the Trustee filed a financing statement that names as the secured party "US Bank National Association, as Trustee and successor Trustee for all holders of bonds issued and to be issued under Trust Agreement dated January 1, 1974."  SUMF ¶ 68 (P.R. Dep't of State Doc. No. 2015004173) ("FS 4173").  FS 4173 describes the Trustee's collateral, in material part, as "all of the Debtor's rights, title, and interest in and to now-owned or acquired collateral to the extent provided under the Trust Agreement . . . in all Revenues of the System and all other moneys granted under the Trust Agreement, including without limitation, all of such rights of the Debtor in and to any "Funds" and any proceeds, deposit accounts, security entitlements, other investment property, accounts, payment intangibles, 'Time Deposits,' supporting obligations, and general intangibles of any of the foregoing and all related rights arising

---

[21] Two financing statement amendments were filed by the Trustee in connection with FS 4449.  Both were filed on August 12, 2014.  SUMF ¶¶ 64–65.  The first amendment altered the secured party's name from "US Bank National Association, on behalf of the bondholders of Power Revenue Bonds, Series 2013A" to "US Bank National Association, as Trustee and successor Trustee for all holders of bonds issued and to be issued under Trust Agreement dated as of January 1, 1974, as amended."  The second amendment added a note stating that "[f]or the avoidance of doubt, this financing statement covers a Transmitting Utility."  *Id.*

from or now or hereafter held in or required to be held in [certain funds created by the Trust Agreement] and any earnings therein, wherever the same shall be held, and any and all property of any kind from time to time pledged, assigned, or transferred as additional security for the bonds by the Debtor or by anyone on its behalf." *Id.* ¶ 69. While FS 4173's collateral description is stated to cover collateral only "to the extent provided under the Trust Agreement" and only as far as such collateral is "granted under the Trust Agreement," no copy of the Trust Agreement is attached to FS 4173.

77.     *Fourth*, also on June 30, 2015, the Trustee filed a financing statement that is in all material respects identical to FS 4173, but was filed using the Debtor's Spanish name, "Autoridad de Energia Electrica de Puerto Rico." *See* SUMF ¶ 70 (P.R. Dep't of State Doc. No. 2015004174) ("FS 4174," and with FS 4449, FS 4304, and FS 4173, the "Financing Statements"). FS 4174 has the same collateral description as FS 4173. *Id.* ¶ 71. While FS 4174's collateral description is stated to cover collateral only "to the extent provided under the Trust Agreement" and only as far as such collateral is "granted under the Trust Agreement," no copy of the Trust Agreement is attached to FS 4174.

### C.     Proof of Claim of Master PREPA Bond Claim and Defendant's Pleadings

78.     Pursuant to the Court's bar date orders at ECF No. 2521 and ECF No. 3160, the Trustee filed the Master PREPA Bond Claim in the amount of $8,477,156,729.56 consisting of principal in the aggregate amount of $8,258,614,158.00, and accrued and unpaid interest in the aggregate amount of $218,542,581.56 (plus additional amounts accruing post-petition). SUMF ¶¶ 72, 74.

79.     The Master PREPA Bond Claim asserts the PREPA Bonds are secured by, among other things:

(i) a lien and charge on, pledge of and security interest in present and future revenues including, without limitation, all Revenues of the System; (ii) certain intangibles provided for in the Trust Agreement and Resolutions or provided for in the Authority Act, including, without limitation, certain covenants, obligations and undertakings; and (iii) moneys and investments to the extent provided in the Trust Agreement, the Resolutions and the Authority Act, including all monies and investments held in trust or required to be held in trust by the Authority at Depositories or otherwise in special accounts or funds under the Trust Agreement including, without limitation, in the General Fund, the Construction Fund, the Reserve Maintenance Fund, and the Capital Improvement Fund, all of which are subject to the rights of the Trustee and the Bondholders to the extent provided in the Trust Agreement, Resolutions, and the Authority Act. Federally Subsidized Bonds are further secured by applicable Federal Subsidy Payments to the extent set forth in the Trust Agreement and applicable Resolutions.

SUMF ¶ 76.

80.     The Trustee has asserted during the course of this Title III case that the PREPA Bonds are secured by "special revenues." *See Preliminary Statement and Reservation of Rights of U.S. Bank National Association as PREPA Bond Trustee With Respect to 9019 Motion of Government Parties Relating to PREPA Restructuring Support Agreement*, Case No. 17-BK-4780-LTS, ECF No. 1696 ¶ 2 ("The indebtedness evidenced by the [PREPA] Bonds is secured by . . . PREPA's past, present, and future revenues as set forth in the Trust Agreement.  This pledged constitutes a continuing pledge of PREPA's postpetition special revenues . . . .").  The other Defendants have represented the same.  Case No. 17-BK-4780-LTS, ECF No. 975 at 3 (stating that PREPA's bondholders' security interest is subject to "the special revenue provisions incorporated into [PROMESA].").

## **LEGAL STANDARD**

81.     Under Federal Rule of Civil Procedure 56(a), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7056 and PROMESA § 310, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material

facts are those that have "the potential of affecting the outcome of the cases," and there is a genuine

factual dispute where "the evidence 'is such that a reasonable jury could resolve the point in the

favor of the non-moving party.'" *Taite v. Bridgewater State Univ., Bd. of Trs.*, 999 F.3d 86, 93

(1st Cir. 2021) (citations omitted).

82.     When a properly supported motion for summary judgment is made, "the

nonmoving party must . . . 'set forth specific facts showing that there is a genuine issue for trial.'"

*Carrozza v. CVS Pharmacy, Inc.*, 992 F.3d 44, 56–57 (1st Cir. 2021) (quoting *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986)).   While the Court must review the record "in a light most

favorable to the non-moving party," *Lima v. City of East Providence*, 17 F.4th 202, 206 (1st Cir.

2021), the non-moving party can avoid summary judgment only by providing properly supported

evidence of a genuine dispute about a material fact.   *See Theriault v. Genesis HealthCare LLC*,

890 F.3d 342, 348 (1st Cir. 2018).   Rule 56 "mandates the entry of summary judgment . . . against

a party who fails to make a showing sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial."   *Popular Auto,

Inc. v. Reyes-Colon (In re Reyes-Colon)*, 922 F.3d 13, 20 (1st Cir. 2019) (alteration in original)

(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

83.     The material facts necessary to resolve the claims at issue in this Motion are not in

dispute. [22]   As shown above, the facts arise out of a plain reading of the Trust Agreement and the

---

[22]   In the Defendants' Answer, Affirmative Defenses, and Counterclaims, Defendants purport to cast doubt on the Court's
subject matter jurisdiction to adjudicate this claim objection, contending it is unripe because (1) amounts could be
deposited to the credit of the Sinking Fund in the future and/or (2) Defendants could, hypothetically and outside of
Title III, enforce the Covenants and Remedies to expand their collateral.   *See* Defendants' Answer, Affirmative
Defenses, and Counterclaims at 20–21.   On Defendants' theory, claim objections would always be unripe and never
could be adjudicated by any court, because hypothetical future actions could always impact the size of the claim.   Such
a proposition is self-refuting.   In any event, the First Circuit has specifically recognized that a claim objection against
holders of revenue bond claims is a "current concrete dispute" susceptible for adjudication under Article III of the
Constitution.   *See Aurelius Cap. Master, Ltd. v. Commonwealth of P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*,
919 F.3d 638, 646 (1st Cir. 2019).

Bonds. *See, e.g.*, 31 L.P.R.A. § 3471 ("If the terms of a contract are clear and leave no doubt as

to the intentions of the contracting parties, the literal sense of its stipulations shall be observed.");

*Gonzalez v. John Hancock Mut. Life Ins. Co.*, 927 F.2d 659, 660 (1st Cir. 1991) (if the terms of

the contract are unambiguous, "the court should 'confine itself' to a literal application of the

unambiguous terms of the contract.").

## **ARGUMENT**

**I.     PREPA IS ENTITLED TO SUMMARY JUDGMENT DISALLOWING THE
MASTER PREPA BOND CLAIM TO THE EXTENT IT ASSERTS A SECURED
CLAIM IN REVENUES BEYOND THOSE DEPOSITED TO THE CREDIT OF
THE SINKING FUND AND SELF-INSURANCE FUND BECAUSE PREPA DID
NOT GRANT DEFENDANTS SUCH A SECURITY INTEREST.**

84.     Contrary to the Trustee's assertion that the PREPA Bonds are secured by *all* of

PREPA's "present and future revenues" SUMF ¶ 76, the Trust Agreement only grants a security

interest in Revenues to the limited extent they are both actually (i) received by PREPA *and* (ii)

deposited to the credit of the deposit accounts that make up the Sinking Fund and the Subordinate

Funds.[23]

85.     A security interest is not effective against the borrower if the security agreement

does not describe the asserted collateral. *See* 19 L.P.R.A. § 2233(a) and (b)(3)(A) (UCC § 9-

203(a) and (b)(3)(A).[24]   A security agreement must "reasonably identif[y]" the collateral.   19

L.P.R.A. § 2218(a) (UCC § 9-108(a))

---

[23] Section 401 also provides for the grant of a security interest in bond proceeds and certain, but not all, other funds
deposited into deposit accounts comprising the Construction Fund pending their use to fund capital improvements.
The Trustee did not perfect a security interest in the Construction Fund, because the Trustee-Held Deposit Accounts
are the only deposit accounts the Trustee has "control" over, and those constitute the Sinking Fund and Self-Insurance
Fund.

[24] As further discussed below (*see infra* Section II), while the Trustee *could* have perfected a security interest in the
Sinking Fund and each of the Subordinate Funds, the Trustee failed to perfect a security interest in all but one of the
Subordinate Funds (*i.e.*, the Trustee failed to perfect a security interest in the Reserve Maintenance Fund, the
Subordinate Obligations Fund, the Capital Improvement Fund, and the Construction Fund).  As such, the Trustee only
has a perfected security interest in the moneys deposited to the credit of the Trustee-Held Deposit Accounts that
comprise the Sinking Fund and the Self-Insurance Fund.

86.     The Trust Agreement provides Revenues are to be deposited into the General Fund (§ 505) and then, following payment of Current Expenses, the Reserve Amount (§ 506) must be transferred into the Revenue Fund.  It does not contain any language granting a security interest in the General Fund or Revenue Fund.  Section 507 provides the Revenues in the Revenue Fund are to be transferred to the deposit accounts that constitute the Sinking Fund pursuant to a specified formula.  SUMF ¶ 30 (Trust Agreement § 507).  If any Revenues remain in the Revenue Fund after making the required transfers to the Sinking Fund, they are to be transferred to the Subordinate Funds.  *Id.*

87.     Sections 507 and 513 contain the only grant of a security interest in Revenues (without reference to another provision of the Trust Agreement).[25]  Section 507 provides that the Sinking Fund and the Subordinate Funds "shall be subject to a lien and charge in favor of the holders of the bonds issued and outstanding under this Agreement." SUMF ¶ 31 (Trust Agreement § 507).  Section 507, therefore, grants a security interest in Revenues—***but only to the extent Revenues are received by PREPA and actually deposited into the Sinking Fund or Subordinate Funds***.[26]  The Trust Agreement does not utilize this pledge language when discussing any other PREPA Revenues or funds.  The Trust Agreement does not identify (let alone "reasonably identif[y]") any other property as collateral.

88.     Article V of the Trust Agreement therefore makes clear the Trustee's security interest in Revenues extends only to funds deposited to the credit of the Sinking Fund and the Subordinate Funds, not any other moneys.  The Trust Agreement pledges a specified subset of

---

[25] Section 401 also provides for the grant of a security interest in bond proceeds deposited into deposit accounts comprising the Construction Fund pending their use to fund capital improvements, separate from the flow of funds in Article V.

[26] The grant of a security interest is reiterated in § 513 of the Trust Agreement.

Revenues as security (*i.e.*, moneys actually deposited in the Sinking Fund and Subordinate Funds after payment of Current Expenses).  Interpreting the Trust Agreement to grant a broader security interest as the Trustee suggests is totally contrary to the words of the Trust Agreement and would impermissibly render superfluous the specific grant of a security interest in the specified Revenues in § 507.  *See, e.g.*, 31 L.P.R.A. § 3475 ("The stipulations of a contract should be interpreted in relation to one another, giving to those that are doubtful the meaning which may appear from the consideration of all of them together.").[27]

89.     Sections  401, 507 and 513 contain specific pledge language regarding the Sinking Fund and Subordinate Funds, which would be redundant and nonsensical if all Revenues were already pledged as the Trustee claims.  No other provision of the Trust Agreement widens the Trustee's security interest beyond the Sinking Fund and Subordinate Funds.  Section 701 of the Trust Agreement provides the PREPA Bonds are "payable solely from the Revenues," and "said Revenues are hereby pledged to the payment thereof *in the manner and to the extent hereinabove particularly specified*."  SUMF ¶ 19 (Trust Agreement § 701) (emphasis added).  By its plain terms, the Trust Agreement provides the moneys pledged to pay the PREPA Bonds are limited to (i) Revenues that are (ii) pledged in a manner and extent particularly specified in a preceding (*i.e.*, "*hereinabove*") section of the Trust Agreement.  Article V is that "hereinabove" section and, as discussed above, Article V limits that security interest to Revenues actually deposited to the credit of the Sinking Fund and Subordinate Funds.  Any other reading of this provision would nullify the

---

[27] *See also Fajardo Home Care, Inc. v. Levitt*, No. 04-2433, 2009 U.S. Dist. LEXIS 21569 at *26 (D.P.R. Mar. 16, 2007) ("It is well-established that contracts should be construed so as to give all provisions meaning."); Restatement (Second) of Contracts § 203(a) ("an interpretation which gives a reasonable, lawful, and *effective meaning to all the terms* is preferred.") (emphasis added); *Fortec Constructors v. United States*, 760 F.2d 1288, 1292 (Fed. Cir. 1985) (referring to "the well accepted and basic principle that an interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless."); *Olympic Mills Corp. v. Rivera Siaca (In re Olympic Mills Corp.)*, 477 F.3d 1, 14 (1st Cir. 2007) ("In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein.") (quoting *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985)).

32

phrase "*in the manner and to the extent hereinabove particularly specified.*"  The specific pledge language in §§ 401, 507, and 513 would be rendered superfluous.[28]

90.     The lien-creating language in § 507 would be meaningless on the Defendants' reading because, after all, if a lien attached to all Revenues, there would be no need to specifically delineate that such a lien attached to Revenues actually deposited to the Sinking Funds and Subordinate Funds.   "It is well-established that contracts should be construed so as to give all provisions meaning."  *See Fajardo Home Care, Inc. v. Levitt*, No. 04-2433, 2009 U.S. Dist. LEXIS 21569 at *26 (D.P.R. Mar. 16, 2007).

91.     Similarly, the "Words of Agreement" clause specifies that PREPA "has executed and delivered this Agreement and has pledged and does hereby pledge to the Trustee the revenues of the System . . .[29] and other moneys **to the extent provided in this Agreement** as security for the payment of the bonds . . . **as follows**."  SUMF ¶ 11 (emphasis added).  This introductory provision provides a summary of the content of the Trust Agreement and, like § 701, specifies that the Trust Agreement, somewhere "follow[ing]" the "Words of Agreement" clause, pledges PREPA's Revenues to a certain "extent."  That takes place in Article V, as discussed above.  Only

---

[28]  *See, e.g.*, *N. New England Tel. Ops. LLC v. Local 2327, Int'l Brotherhood of Elec. Workers, AFL-CIO*, 735 F.3d 15, 22 (1st Cir. 2013) (noting that "a basic rule of contract interpretation" is to avoid reading a contract in a manner that would render other provisions of the contract superfluous).

[29]  The phrase "subject to the pledge of such revenues to the payment of the principal of and the interest on the 1947 Indenture Bonds (hereinafter mentioned)," has been removed from the quote in the main text. *Id.*  This proviso clause is set apart as a parenthetical mention of a pledge of revenues under an earlier agreement from 1947 (and not relevant here).  The remaining text specifies that the Trust Agreement pledged "to the Trustee the revenues of the System . . . and other moneys *to the extent provided in this Agreement* as security for the payment of the bonds." *Id.* (emphasis added).  The phrase "to the extent provided in this Agreement" qualifies both "revenues" and "other moneys," as the qualifying language is equally applicable to both "revenues" and "other moneys."  *See, e.g.*, *In re Fin. Oversight and Mgmt. Bd. for P.R.*, 618 B.R. 619, 639 (D.P.R. 2020) ("HTA") ("Pursuant to [the series qualifier] canon, '[w]hen several words are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all.'") (citation omitted).  And, indeed, the qualifying material coming after the phrase "to the extent provided in this Agreement" ("as security for the payment of the bonds") clearly qualifies both "revenues" and "other moneys,"—if it did not qualify both "other moneys" and "revenues" then nothing specifies that the "revenues of the System" are pledged to the Trustee "as security for the payment of the bonds."

Article V contains a pledge of PREPA's Revenues in a place that "follows" the "Words of Agreement" clause and yet is "hereinabove" § 701.[30] The "Words of Agreement" clause does what it says, namely it pledges revenues of the System to the extent provided in subsequent provisions of the Trust Agreement.[31]

92.     This Court, under strikingly similar circumstances, has already reached this natural conclusion in HTA's Title III case. The Trustee's assertion of a broader security interest despite the plain language of the Trust Agreement is no different from the HTA bondholders' assertions this Court rejected in the HTA Lift Stay Order.[32] In *HTA*, the HTA Bondholders asserted they had a lien against all revenues of HTA, including the right to receive revenues, because § 601 of the HTA bond resolutions referred to "pledging" of "Revenues" to pay the HTA bonds, using wording almost exactly the same as Trust Agreement § 701 here:

> Except as in this Resolution otherwise provided, the principal, interest and premiums are payable solely from Revenues and from any funds received by the Authority for that purpose from the Commonwealth which Revenues and funds are hereby pledged to the payment thereof in the manner and to the extent hereinabove particularly specified.

*HTA*, 618 B.R. at 627. The Oversight Board disagreed, noting that § 401 of the HTA bond resolutions contained the only grant of a security interest in certain, specified funds:

---

[30] In any event, recital and prefatory material cannot alter the operative, substantive provisions of the Trust Agreement. *See, e.g., Myers v. Milton*, 137 S.E.2d 441, 449 (W.Va. 1964) ("a recital cannot control over plain words of the granting part of the deed, and a grant in a deed cannot be diminished or qualified by a recital therein.") (internal quotes and citations omitted); *Mississippi Cent. R. Co. v. Ratcliff*, 59 So. 2d 311, 314 (Miss. 1952) ("If, however, importance is to be attached to the use of the words 'right of way' in the recital clause, the most that could be said is that it creates a repugnant and irreconcilable conflict between the granting clause and the recital clause, in which situation the granting clause controls."); *Branch Banking & Tr. Co. v. Jessee (In re Creger)*, 403 B.R. 381, 385 (Bankr. D. W.Va. 2009) ("A particular description of property in the granting clause should prevail over a later, conflicting recital.").

[31] If the "Words of Agreement" clause were read to grant a security interest in all "revenues" it would ignore the qualification in the clause that the pledge is to the extent provided in later provisions and would render the later grants of a security interest in the Sinking Fund and Subordinate Funds entirely superfluous, because those funds are funded entirely by PREPA's Revenues under the Trust Agreement. The Court should avoid an interpretation that renders the more specific provisions of the contract meaningless. *See N. New England Tel. Ops. LLC*, 735 F.3d at 22.

[32] *See In re Fin. Oversight and Mgmt. Bd. for P.R.*, 618 B.R. 619 (D.P.R. 2020) ("HTA").

34

>The moneys in said Funds and Accounts . . . shall be subject to a lien and charge in favor of the holders of the bonds issued and outstanding under this Resolution and for the further security of such holders until paid out or transferred as herein provided.

*Id.* at 626.  Section 601 of those Resolutions, in turn, only pledged revenues "in the manner and to the extent hereinabove particularly specified," referring back to the security interest granted in § 401 and not expanding that security interest in the process.  *Id.* at 638.

93.     The Court agreed with the Oversight Board's "more limited reading of Section 601" as not granting an expansive security interest in all "revenues" of HTA.  *Id.*  The Court found § 401 delineated the "specific scope of the security interests established by the [HTA] Bond Resolutions," *id.*, and that "the limiting phrase 'hereby pledged to the payment thereof in the manner and to the extent hereinabove particularly specified' in § 601 of each Bond Resolution logically imports the scope of the pledge, mechanics, and detailed limitations contained elsewhere in the Bond Resolutions."  *Id.* at 639.  The expansive reading proposed by the HTA Bondholders, in contrast, would "render section 401 superfluous."  *Id.*

94.     The Court should adopt the same analysis here.  The Trust Agreement is structured in almost exactly the same way as the HTA Bond Resolutions, with a payment covenant later in the document (*compare* Trust Agreement § 701, *with* HTA Bond Resolutions § 601) referencing a "pledge" of "revenues" made in a manner "hereinabove specified."  Here, again, the only language actually granting a security interest "hereinabove" mirrors the language from HTA: moneys in the Sinking Fund and the Subordinate Funds "shall be subject to a lien and charge in favor of the holders of the bonds issued and outstanding under this Agreement and for the further security of such holders until paid out or transferred as herein provided."  SUMF ¶ 31 (Trust Agreement § 507).  Likewise, the "pledge" of certain moneys to pay the PREPA Bonds in § 701 of the Trust Agreement refers back to the grant of a security interest just as in HTA, providing that

"such principal, interest and premium will be payable solely from the Revenues and said Revenues are hereby pledged to the payment thereof in the manner and to the extent hereinabove particularly specified."  *Id.* ¶ 19.  Just as in *HTA*, the limiting phrase "in the manner and to the extent hereinabove particularly specified" imports the scope of the pledge, mechanics, and limitations in § 507 of the Trust Agreement, and a broader reading would render § 507 superfluous.

95.    The limitation of the Trustee's security interest to the Sinking Fund and Subordinate Funds is confirmed by many provisions including the Template Bond set forth in the Trust Agreement.  The second paragraph of the Template Bond states "this bond shall be payable as to both principal and interest solely from the special fund provided therefor as hereinafter set forth."  Trust Agreement at 4.  The Template Bond goes on to refer to the provisions in the Trust Agreement specifying the "fund charged with and pledged to the payment of the interest on and the principal of the bonds," *id.* at 5, and further identifies that "special fund" as the "Sinking Fund," "which special fund is pledged to and charged with the payment of and the interest on the bonds." *Id.* at 6.  The opinion of counsel attached to the 2013A official statement confirms the same, stating that the "Sinking Fund" "is pledged to and charged with the payment of the principal and interest on such bonds . . . ."  SUMF ¶ 60.

96.    This reading makes even more sense in the context of the Trust Agreement, as it provides PREPA Bondholders only with a "net pledge" (*i.e.*, a pledge of revenues after payment of "Current Expenses" and deposited in the applicable funds), whereas in HTA, no provision specifically authorized HTA to use its revenues to pay current expenses before paying bonds, mimicking the structure of a "gross pledge" in certain respects.  It thus makes sense that the security interest only attaches after payment of Current Expenses and transfers of moneys to the

36

Sinking Fund and other Subordinate Funds. *Cf. In re Las Vegas Monorail Co.*, 429 B.R. 317, 337 (Bankr. D. Nev. 2010).

97.     Moreover, as discussed in Section II below, the Trustee only perfected a security interest in the Trustee-Held Deposit Accounts held at the Trustee, which comprise the Sinking Fund and Self-Insurance Fund.

98.     For these reasons, the Oversight Board is entitled to summary judgment as to Count I of the FAC.  Specifically, judgment should be entered in the Oversight Board's favor disallowing, pursuant to Bankruptcy Code § 502(a), the Master PREPA Bond Claim to the extent it asserts a claim secured by any of PREPA's property beyond Revenues actually deposited to the credit of the Trustee-Held Deposit Accounts.

**II.     PREPA IS ENTITLED TO SUMMARY JUDGMENT DISALLOWING THE MASTER PREPA BOND CLAIM TO THE EXTENT IT ASSERTS A SECURED CLAIM IN REVENUES BEYOND THOSE DEPOSITED TO THE CREDIT OF THE SINKING FUND AND SELF-INSURANCE FUND BECAUSE THE TRUSTEE FAILED TO PERFECT ANY SUCH SECURITY INTEREST AND AVOIDING AND PRESERVING ANY SUCH SECURITY INTEREST FOR THE BENEFIT OF PREPA PURSUANT TO BANKRUPTCY CODE §§ 544 AND 551.**

99.     The Master PREPA Bond Claim asserts perfected security interests in all funds received by PREPA in connection with or as a result of its ownership or operation of the System. *See* SUMF ¶ 75.  As discussed above, the Trustee was not granted and does not have a security interest in any funds except moneys actually deposited to the credit of the Sinking Fund and the Subordinate Funds.  *See supra* Section I.  Even if it were granted the security interests it claims, the Trustee only perfected its security interest in the Trustee-Held Deposit Accounts—the only PREPA deposit accounts actually held by the Trustee as depositary bank—and the Trustee does not have "control" perfecting a security interest in any other Revenues or deposit accounts.  The

Trustee-Held Deposit Accounts constitute the Sinking Fund and Self-Insurance Fund.[33] Accordingly, any security interest in deposit accounts outside the Trustee-Held Deposit Accounts is unperfected and must be avoided pursuant to Bankruptcy Code § 544, and the Master PREPA Bond Claim must be disallowed to the extent it asserts a secured claim against such amounts.

### A. The Trustee's Purported Security Interest in Revenues Deposited to the Credit of Any PREPA Deposit Account, Other Than The Trustee-Held Deposit Accounts Comprising the Sinking Fund and Self-Insurance Fund, Is Unperfected.

100. The *only* way to perfect a security interest in a deposit account as original collateral is by "control" of the deposit account.[34] 19 L.P.R.A. § 2262(b)(1) (UCC § 9-312(b)(1)) ("a security interest in a deposit account may be perfected only by control"); *Wiscovitch-Rentas v. Banco Popular de P.R.* (*In re Cruz Rivera*), 600 B.R. 132, 148 (B.A.P. 1st Cir. 2019) (explaining that under Article 9 of Puerto Rico's Uniform Commercial Code, to perfect a security interest in a deposit account given as original collateral in a commercial transaction, "the secured party must obtain 'control.'"). A secured party has "control" of a deposit account only if (i) the secured party is the bank with which the deposit account is maintained, (ii) the secured party is the customer of the bank where the deposit account is maintained (and the holder of the deposit account), or (iii)

---

[33] PREPA believes that the Trustee-Held Deposit Accounts constitute the Sinking Fund and Self-Insurance Fund. The identification of the Trustee-Held Deposit Accounts as the Sinking Fund and Self-Insurance Fund is not, however, necessary for the Court to grant summary judgment in favor of Plaintiff. Plaintiff does not challenge that the Trustee has a security interest in the Trustee-Held Deposit Accounts, and perfected that interest. For the reasons explained in the this section, the Trustee did not and could not have perfected any security interest in any other deposit accounts, funds or Revenues. As a result, the Trustee's perfected security interest is limited to the Trustee-Held Deposit Accounts regardless of the "fund" name given them by PREPA.

[34] While inapplicable here, there is an exception to the "control" requirement of 19 L.P.R.A. § 2262(b) (UCC § 9-312(b)), where the secured party has a perfected security interest in another asset and identifiable "proceeds" of that asset are traceable into the deposit account. 19 L.P.R.A. § 2265(c), (d) (UCC § 9-315(c), (d)). Here, PREPA pledged only "Revenues" as defined in the Trust Agreement, limited to moneys actually *received* by PREPA and deposited to the credit of the Sinking Fund and Subordinate Funds. It does not include future revenues, or any right to receive revenues, or any other original collateral that could yield cash proceeds. The moneys actually received by PREPA are not proceeds of any other property of PREPA in which the Trustee has a perfected security interest; as a result, the limited exception to the "control" requirement in 19 L.P.R.A. § 2262(b) (UCC § 9-312(b)) does not apply here. This is corroborated and required by Trust Agreement § 601 which provides the revenues received by PREPA are not subject to any lien of any creditor.

38

the borrower/debtor, the secured party and the bank have executed a DACA.  *See* 19 L.P.R.A. § 2214(a)(1)–(3).[35]

101.    The Trustee has control over the Trustee-Held Deposit Accounts because the Trustee is the bank with which the deposit accounts are maintained.  SUMF ¶ 82.  These accounts comprise the Sinking Fund and Self-Insurance Funds.  *Id.*  The Trustee is not, however, the bank at which the remainder of PREPA's deposit accounts are maintained, nor is it the customer with respect to those deposit accounts (as they are held in PREPA's name).  Moreover, there are no DACAs in place in favor of the Trustee over any of PREPA's deposit accounts.  *Id.*  As a result, the Trustee does not have control over any of PREPA's deposit accounts other than the Trustee-Held Deposit Accounts comprising the Sinking Fund and Self-Insurance Fund.  As such, the only perfected security interest in favor of the Trustee is in the moneys deposited to the credit of the Trustee-Held Deposit Accounts, not any other Revenues or property of PREPA.[36]

---

[35] Even prior to the implementation of the former Article 9, the prevailing view of courts was that to perfect a security interest in a deposit account, the secured party had to have "dominion" over the deposit account.  *See, e.g.*, *Miller v. Wells Fargo Bank Int'l Corp.*, 540 F.2d 548, 558–60 (2d Cir. 1976).  "Dominion," as used in *Miller*, was functionally the same thing as control.

[36] To the extent the Trustee argues its security interest in PREPA deposit accounts has been perfected by filing the Financing Statements, the Trustee is incorrect.  A financing statement does not perfect a security interest in deposit accounts.  *See, e.g.*, *Smith v. C&S Wholesale Grocers, Inc. (In re Delano Retail Partners, LLC)*, 2017 Bankr. LEXIS 2397 at *18 (Bankr. E.D. Cal. Aug. 14, 2017) ("A financing statement is not effective to perfect a security interest in a deposit account."); *Armstrong Bank v. Shraiberg, Landau & Page, P.A. (In re Tuscany Energy, LLC)*, 581 B.R. 681, 688 (Bankr. S.D. Fla. Jan. 25, 2018) ("A security interest in a deposit account cannot be perfected by the filing of a financing statement.  A security interest in a deposit account may only be perfected by control over that deposit account.").

**B.      Pursuant to Bankruptcy Code § 544, the Trustee's Purported Security Interests in Revenues Deposited to the Credit of Any PREPA Property, Aside From The Trustee-Held Deposit Accounts, Should Be Disallowed and Avoided and Such Property Should Be Recovered and/or Preserved for PREPA's Benefit.**

102.      Under § 544 of the Bankruptcy Code,[37] a trustee (here, the Oversight Board)[38] may avoid unperfected security interests because it stands in the shoes of a hypothetical lien creditor and a creditor with an unsatisfied execution.  Under § 9-317(a)(2) of the UCC (19 L.P.R.A. § 2267(a)(2)), a lien creditor has priority over unperfected security interests.  *See Musso v. Ostashko*, 468 F.3d 99, 104 (2d Cir. 2006) ("The trustee hypothetically extends credit to the debtor at the time of filing and, at that moment, obtains a judicial lien on all property in which the debtor has any interest that could be reached by a creditor.").  This Court previously held a hypothetical lien creditor (in this case, the Oversight Board) has a judicial lien on property in which a Title III debtor has an interest.  *See Fin. Oversight Mgmt. Bd. for P.R. v. Altair Glob. Credit Opportunities Fund (a), LLC*, 590 B.R. 577, 596 (D.P.R. 2018), *aff'd in part*, *vacated in part*, *rev'd in part on other grounds*, 914 F.3d 694 (1st Cir.), *cert. denied*, 140 S. Ct. 47 (2019) ("*Altair*") (holding a judgment creditor could have obtained a lien against ERS's assets).  That judicial lien creditor would have priority over the Trustee's interest in any of PREPA's property other than the Trustee-Held Deposit Accounts.[39]

---

[37] PROMESA § 301(a) and 301(c)(7) incorporate Bankruptcy Code § 544 and render the Oversight Board the trustee for purposes of avoiding and preserving security interests.

[38] Pursuant to PROMESA § 301(c)(7) (48 U.S.C. § 2161(c)(7)), the Oversight Board is a trustee for purposes of Bankruptcy Code § 544.

[39] 22 L.P.R.A. § 196(o) and Trust Agreement § 601 have no impact on this analysis. 22 L.P.R.A. § 196(o) provides "[n]o lien whatsoever may be placed on the assets of the Authority insofar as the Trust Agreement with the bondholders or other agreements with the creditors of the Authority do not allow." That means that no lien exists in favor of Bondholders except the security interest granted in the Trust Agreement. It does not prohibit the existence of other liens. Moreover, Trust Agreement § 601 provides "[a]ll moneys received by the Authority under the provisions of this Agreement . . . shall not be subject to lien or attachment by any creditor of the Authority." The effect of this provision is to specify that moneys received by PREPA are not subject to any security interests when received, and can therefore be transferred to the Sinking Fund and Subordinate Funds free and clear of any security interests. It does not prohibit a lien existing on the moneys once they are transferred by PREPA to other accounts. If

40

103.    As discussed above, any security interest in PREPA's property other than the Trustee-Held Deposit Accounts is unperfected.

104.    For these reasons, the Oversight Board is entitled to summary judgment as to Count II of the FAC.  Specifically, judgment should be entered in the Oversight Board's favor, pursuant to Bankruptcy Code § 544(a) and 19 L.P.R.A. § 2267(a) (UCC § 9-317(a)), avoiding any and all security interests in Revenues other than Revenues actually deposited to the credit of the Trustee-Held Deposit Accounts.  Any asserted security interest in all such assets should be ordered recovered for PREPA and automatically preserved for its benefit, pursuant to Bankruptcy Code §§ 550 and 551, respectively.

## III.    PREPA IS ENTITLED TO SUMMARY JUDGMENT DISALLOWING THE MASTER PREPA BOND CLAIM TO THE EXTENT IT ASSERTS A SECURED CLAIM BEYOND AMOUNTS DEPOSITED TO THE CREDIT OF THE TRUSTEE-HELD DEPOSIT ACCOUNTS INDEPENDENT OF BANKRUPTCY CODE § 544 AND SUBORDINATING SUCH SECURITY INTEREST TO PREPA'S INTEREST IN SUCH PROPERTY.

105.    As noted above, the Master PREPA Bond Claim asserts the PREPA Bonds are secured by a perfected security interest in all Revenues received by PREPA, including amounts not deposited to the credit of the Trustee-Held Deposit Accounts.  *See* SUMF ¶ 78.  As established above, the Trustee does not have "control" over any PREPA deposit account with the exception of the Trustee-Held Deposit Accounts.  *See supra* Section II.A.

106.    Without "control," there can be no perfected security interest in funds credited to a deposit account.  *See id.*  The Trustee thus lacks a perfected security interest in Revenues credited to any PREPA deposit accounts except for those that comprise the Trustee-Held Deposit Accounts.

---

it did, PREPA could not grant a security interest in the Sinking Fund and Subordinate Funds to the Trustee. This provision ensures that funds are transferred to these accounts free and clear of liens.  In any event, under 19 L.P.R.A. § 2301(b) (UCC § 9-401(b)), "[a]n agreement between the debtor and secured party which prohibits a transfer of the debtor's rights in collateral or makes the transfer a default does not prevent the transfer from taking effect."  19 L.P.R.A. § 2301(b) (UCC § 9-401(b)).

107.     Under Article 9, the Trustee's purported and unperfected security interest in such Revenues is subordinate to the Oversight Board's interest in the same.  Pursuant to 19 L.P.R.A. § 2267(a)(2) (UCC § 9-317(a)(2)), a lien creditor has priority over unperfected security interests. Puerto Rico law provides that a "lien creditor" includes a trustee in bankruptcy from the date of the filing of the petition, whether or not a judicial lien could be created under applicable law.  *See* 19 L.P.R.A. § 2212(a)(52).  PROMESA states "the term 'trustee,' when used in [the Bankruptcy Code provisions incorporated into PROMESA Title III], means the Oversight Board . . . ." PROMESA § 301(c)(7); *see also Altair*, 590 B.R. at 593   ("Section 301(c)(7) of PROMESA provides that the term 'trustee,' as used in Section 544 of the Bankruptcy Code, means the Oversight Board, which represents the debtor in the Title III proceeding.").  And many Bankruptcy Code provisions are incorporated into PROMESA Title III putting the Oversight Board into the shoes of a bankruptcy trustee.  *See* PROMESA § 301(a) (incorporating, *inter alia*, 11 U.S.C. §§ 364(c)–(f), 365(a), 544, 545, 547, 548, 549, providing powers to "trustee").  Here, the Oversight Board is invoking its bankruptcy trustee powers under Bankruptcy Code § 544(a)(1) as a judicial lien creditor, under Bankruptcy Code § 544(a)(2) as a creditor with an unsatisfied execution, and also as a lien creditor under 19 L.P.R.A. § 2267(a)(2) (UCC § 9-317(a)(2)).  *See also* 19 L.P.R.A. § 2212(a)(52) (UCC § 9-102(a)(52) (defining "judicial lien creditor" to include "trustee in bankruptcy").  Thus, the Oversight Board has priority as a trustee under 19 L.P.R.A. § 2267(a)(2) (UCC § 9-317(a)(2)) and can assert priority, on PREPA's behalf, over all unperfected security interests in PREPA's property irrespective of its powers as a judicial lien creditor under Bankruptcy Code § 544.

108.     For these reasons, the Oversight Board is entitled to summary judgment on Count III of the FAC.  Specifically, judgment should be entered in the Oversight Board's favor

subordinating the security interest of the Trustee in Revenues other than those deposited to the credit of the Trustee-Held Deposit Accounts to PREPA's interest in such property pursuant to 19 L.P.R.A § 2267(a)(2) (UCC § 9-317(a)(2)), and disallowing the Master PREPA Bond Claim to the extent it asserts the Trustee has a perfected security interest in Revenues other than those actually deposited to the credit of the Trustee-Held Deposit Accounts.

## IV.  PREPA IS ENTITLED TO SUMMARY JUDGMENT DISALLOWING THE MASTER PREPA BOND CLAIM TO THE EXTENT IT ASSERTS SECURITY INTERESTS IN THE COVENANTS AND REMEDIES.

109.    The Court should grant summary judgment in favor of the Oversight Board as to Count IV of the FAC because the Covenants and Remedies (including the Rate Covenant, Collection Covenant, and Receiver Remedy) are not PREPA's *property*, and thus PREPA could not have granted and did not grant a security interest in them.

110.    The Trustee asserts in the Master PREPA Bond Claim that, among other things, payment of the Master PREPA Bond Claim is secured by "certain intangibles provided for in the Trust Agreement and Resolutions or provided for in the Authority Act, including, without limitation, certain covenants, obligations and undertakings." SUMF ¶ 76.

111.    The Trustee further asserts that payment of the Master PREPA Bond Claim is secured by "a number of property rights established by the Authority Act that have duly vested in the Trustee and the Bondholders," by §§ 16 and 18 of the Authority Act.  SUMF ¶ 79.

112.    The Trustee also asserts that payment of the Master PREPA Bond Claim is secured by "a number of vested property rights established by the Trust Agreement, the Resolutions and the Authority Act, in the form of covenants, obligations and undertakings of the Authority including, without limitation, the Authority's obligations under § 501 of the Trust Agreement to collect revenues, the Authority's obligations under § 502 of the Trust Agreement to set electricity rates sufficient to cover Bond debt service, and the Authority's obligation under various provisions

43

to hold all revenues in trust and to use and turn over the revenues to the Trustee as provided in the Trust Agreement."  SUMF ¶ 77.

113.    Referring to these "covenants, obligations and undertakings" as "property rights," the Trustee asserts they "flow from Section 804 of the Trust Agreement, which, among other things, permits Bondholders or the Trustee to redress events of default under the Trust Agreement through the appointment of a receiver."  *Id.*

114.    None of the Covenants and Remedies, however, are property of PREPA in which PREPA could grant a security interest and thus the Trustee cannot have a security interest in them. Moreover, the Trust Agreement does not purport to grant a security interest in anything other than the Sinking Fund and Subordinate Funds.  Therefore, the Master PREPA Bond Claim must be disallowed to the extent it asserts a secured claim in the Covenants and Remedies.

### A.    The Covenants and Remedies are *Not* PREPA's Property and, therefore, PREPA Could Not Have Granted a Security Interest in Them.

115.    Defendants' claim of a security interest in the Covenants and Remedies is unsupportable because the Covenants and Remedies are not PREPA's property and so PREPA cannot have granted a security interest in them.

116.    Under Article 9, a security interest can attach only to "collateral" described in a security agreement and in which "the debtor has rights in . . . or the power to transfer rights in . . . ."  19 L.P.R.A. § 2233(b)(2) ((UCC § 9-203(b)(2))).  "Collateral" is defined to mean "property." *See* 19 L.P.R.A. § 2212(a)(12) (UCC § 9-301(a)(12)).  As a result, PREPA could only grant a security interest in property in which it has rights.  Similarly, for a secured claim to be allowed under the Bankruptcy Code, the secured creditor must have a "lien on property in which [PREPA] has an interest."  11 U.S.C. § 506(a).

117.    The Trustee asserts the Covenants and Remedies as ***property rights*** "vested in the Trustee and the Bondholders," SUMF ¶ 79, but fails to realize that a creditor's rights do not equate to debtor's property.  Otherwise, any promise to pay would have been a secured obligation and there will be no unsecured claims, clearly an absurd result.

118.    A contractual obligation is not an asset or property of the *obligor*, but instead is the obligor's ***liability***.  The covenants the Trustee alleges secure the Master PREPA Bond Claim are promises by PREPA to perform certain acts, such as: (i) to periodically withdraw from and deposit moneys to the credit of certain accounts and funds (Trust Agreement § 507); (ii) to render bills for services and enforce regulations to collect bills (Trust Agreement § 501, the Collection Covenant); and (iii) to fix, charge and collect reasonable rates and charges and adjust charges (Trust Agreement § 502, the Rate Covenant).  However, from PREPA's viewpoint, they are obligations, not rights (let alone property interests).  The Restatement (First) of Property provides one's "property" is comprised of one's rights, not of one's obligations. *See* Restatement (First) of Property § 5 (1936) at Comment e (a person's "complete ***property*** in such . . . a thing other than land" is constituted of the "totality of the[] ***rights***, privileges, powers and immunities which it is legally possible for a person to have . . . with regard to a thing other than land . . . .") (emphasis added).

119.    Something that is PREPA's contractual liability, on the one hand, is Defendants' contractual right, on the other hand, due to the correlative nature of rights.  Restatement (First) of Property § 1 (1936) ("A right . . . is a legally enforceable claim of one person against another, that the other shall do a given act or shall not do a given act."); *id.* at Comment a ("The relation indicated by the word 'right' may also be stated from the point of view of the person against whom that right exists.  This person has a duty, that is, is under a legally enforceable obligation to do or

45

not to do an act."); *see also Rahm v. Halpin (In re Halpin)*, 566 F.3d 286, 290 (2d Cir. 2009) (explaining under "ordinary notions of property rights," courts consider a debtor's debt and the creditor's right to collect to "represent the same thing when viewed from opposite sides" so that an obligation of the debtor is not the debtor's property).

120.    That the covenants are obligations of PREPA (or rights of Defendants) therefore *means* they are not *PREPA's* assets or property.  *See Texas v. New Jersey*, 379 U.S. 674, 680 (1965) ("it would be strange to convert a [debtor's] liability into [a debtor's] asset . . . .").  They are, if anything, the Trustee's contractual rights or property interest.  PREPA could not grant a security interest in the Trustee's property to secure obligations owed to the Trustee.  To state the proposition is to refute it.

121.    The same analysis is true of the right of the Trustee and holders of PREPA Bonds to seek certain remedies, including the Receiver Remedy or the right to institute a legal proceeding to compel PREPA to perform.  Such rights are not *PREPA's* rights, and thus are not PREPA's property.

122.    Courts do not treat a contractual obligation as "property"—or a breach of contractual obligation as a taking of "property"—in a dispute between the obligor and the obligee. *See Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 21 (1995) (citation omitted) (the filing of bankruptcy "stays 'any act to obtain possession of *property* of the estate'" but an obligor's "refusal to pay was neither taking of possession of [obligee's] *property* nor an exercising of control over it, but *merely a refusal to perform its promise*.") (emphasis added).[40]

---

[40]  Moreover, the Title III case could not "take" the Trustee's property in violation of the Takings Clause.  Supreme Court jurisprudence relating to the Bankruptcy Code clearly distinguishes between property rights and contractual obligations.  While a substantive right in specific property (such as a security interest in the debtor's property) can be used and depreciated, within certain limits, without amounting to an unconstitutional taking, it cannot be extinguished and taken away in bankruptcy without just compensation.  By contrast, contract rights are not considered property protected by the Takings Clause in bankruptcy.  If contract rights were considered collateral, as Defendants contend, then those rights could not be impaired and discharged by bankruptcy.  Yet all applicable jurisprudence establishes

46

123.    Multiple courts have explained the distinction between a covenant and collateral.

In *Steslow v. Citicorp Mortgage, Inc. (In re Steslow)*, 225 B.R. 883, 886 n.4 (Bankr. E.D. Pa.

1998), the court explained a "covenant without a pledge granting additional security is simply a

promise, not a security interest." Based on this distinction, the court held the covenant at issue (to

obtain hazard insurance) was not collateral, emphasizing the difference between the purpose of the

covenant as protection of the underlying collateral and "additional collateral" (emphasis in

original). *Id*. at 883–86.

124.    In *In re Las Vegas Monorail Co.*, 429 B.R. 317 (Bankr. D. Nev. 2010), the debtor

had issued bonds secured by a security interest in, among other things not relevant here, certain

deposit accounts. Importantly, the debtor was not obligated to transfer funds to those accounts until

after paying certain operational expenses. In the event of a default, the debtor was obligated (by a

covenant in the indenture) to transfer all funds to the indenture trustee, but the lenders had not

required their security interest to attach to gross revenues and "opted instead to have their security

interest follow the Indenture's cash flow covenants." *Las Vegas Monorail Co.*, 429 B.R. at 338.

The court explained that while the debtor's failure to comply with these cash flow covenants may

have been a default, the default did not render the lenders secured by the funds.  *See also 1st Farm

Credit Services, PCA v. Phillips (In re Phillips)*, No. 05-87521, 2007 WL 4179845, at *3 (Bankr.

---

they can be.  *See, e.g., Americredit Fin. Servs. (In re Nichols)*, 440 F.3d 850, 854 (6th Cir. 2006) (the Takings Clause
protects only a "property right . . . in the collateral that secures the debt" not an unsecured right to payment); *Bank of
N.Y. (In re Treco)*, 240 F.3d 148, 161 (2d Cir. 2001) (unsecured claim not protected from impairment in bankruptcy
because "[i]f the claim is unsecured, it is not 'property' for purposes of the Takings Clause."); *In re Briggs Transp.
Co.*, 780 F.2d 1339, 1342 (8th Cir. 1985) ("adequate protection is a safeguard which is provided to protect the rights
of secured creditors, throughout the proceedings, to the extent of the value of their property, and there is no
constitutional claim of the creditor to more than that."); *In re Ashe*, 712 F.2d 864, 869 (3d Cir. 1983) (creditor without
attached lien in specific property not protected by the U.S. Takings Clause in bankruptcy); *see also Kuehner v. Irving
Trust Co.*, 299 U.S. 445, 451–52 (1937) (unsecured claims not protected by Fifth Amendment from impairment);
*Cobb v. City of Stockton (In re City of Stockton)*, 909 F.3d 1256, 1266 (9th Cir. 2018) ("[t]he Takings Clause is only
implicated in bankruptcy if the creditor has actual property rights . . . .  If the purported property interest is, in reality,
just a contractual or statutory right for monetary relief, then the debt can be adjusted in bankruptcy.").

C.D. Ill. Nov. 20, 2007) (a covenant "is only as valuable as [the debtor's] compliance with it.");
*In re Leiferman*, No. 10-40718, 2011 WL 166170 at *2 (Bankr. D.S.D. Jan. 19, 2011) ("Debtor's performance of those covenants and agreements is secured by the mortgage; those covenants and agreements are not [themselves] additional security for Wells Fargo's claim.").

125.    In connection with the PRIFA bonds, this Court has already rejected the notion that covenants provided to bondholders in PRIFA's enabling act were themselves a pledge of security. *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 618 B.R. 362, 374 (D.P.R. 2020) ("*PRIFA*") ("Although the Commonwealth covenanted with future PRIFA bondholders in the PRIFA Enabling Act not to alter PRIFA's rights, that covenant is not itself a pledge of security.").[41]

126.    Because the Covenants and Remedies are not PREPA's property, and under Article 9 a security interest can only attach to the debtor's "property," PREPA could not grant a security interest in them.

**B.      Even If PREPA Could Grant a Security Interest in the Covenants and Remedies, PREPA Did Not Do So.**

127.    Even if it were possible for PREPA to grant a security interest in the Covenants and Remedies (it is not), PREPA did not grant a security interest in them.  As discussed above, *see supra* Section I, the only property in which the Trust Agreement grants a security interest is the Sinking Fund and Subordinate Funds (including the Construction Fund).  No provision grants a security interest in the Covenants and Remedies.

---

[41] The Court similarly held that the PRIFA bondholders' security interest was limited to the Sinking Fund.  *Id.* at 377 (while the PRIFA trust agreement required PRIFA to "make withdrawals from the Infrastructure Fund for deposit into the Sinking Fund," the Court concluded "it is the Sinking Fund only that is required to be held in trust, and therefore the Sinking Fund only which could give rise to a security interest in favor of PRIFA's bondholders.").  *Id.* at 375.

### C. In Any Case, PREPA Was Not Authorized to Grant a Security Interest in the Covenants and Remedies.

128. PREPA lacks and has always lacked statutory authority to grant a security interest in the Covenants and Remedies. When the PREPA Bonds were issued, PREPA was authorized to "pledg[e] or plac[e] a lien on all or any of its contracts, revenues, and income *only*." 22 L.P.R.A § 196(o) (emphasis added).

129. The Covenants and Remedies are, at best, PREPA's promise to perform certain acts or the rights of holders of PREPA bonds to certain remedies and are not *PREPA's* contracts, revenues, or income. Therefore, PREPA was not and is not authorized to pledge or place a lien on the Covenants and Remedies.[42] *See* 22 L.P.R.A § 196(o). And it did not.[43]

130. For these reasons, the Oversight Board is entitled to summary judgment as to Count IV of the FAC. Specifically, judgment should be entered in the Oversight Board's favor, pursuant to Bankruptcy Code § 502(a), disallowing the Master PREPA Bond Claim to the extent it asserts a claim secured by the Covenants and Remedies (including the Rate Covenant, Collection Covenant, and Receiver Remedy).

---

[42] Furthermore, PREPA's breach of its covenants does not convert such covenants to collateral. *See In re Halpin*, 566 F.3d at 290 ("'The chose in action is the right of the creditor to be paid, while the debt is the obligation of the debtor to pay.' Accordingly, the unpaid amounts are [debtor's] debts; they are not assets held in trust for the benefit of the creditor.") (internal citations omitted). And the remedy for alleged breach of contract by PREPA is subject to the non-recourse terms of the Trust Agreement and limited to money judgment "solely from moneys in the Sinking Fund and any other moneys available for such purpose" in accordance with § 804 of the Trust Agreement. *See infra* Section VII.C.

[43] Even if, *arguendo*, PREPA had granted to Defendants a security interest in the Covenants and Remedies (it did not) in the absence of statutory authority afforded to it by the Authority Act, such a grant would be ineffective and void. *See Raimundi Melendez v. Productora de Agregados, Inc.*, 162 D.P.R. 215, 224 (P.R. 2004) (an "administrative agenc[y] *only* ha[s] those powers *expressly granted [to] them* by their enabling law and those that are *essential* to carrying out the powers granted [to] them."); *Ayala Hernandez v. Consejo de Titulares*, 190 D.P.R. 547, 547–48 (P.R. 2014) (administrative agencies in Puerto Rico "cannot act beyond what was delegated to them, so that any administrative action that does not obey the power conferred by legislation must be classified as *ultra vires*, and therefore null."); *Cent. Transp. Co. v. Pullman's Palace Car Co.*, 139 U.S. 24, 48 (1891) ("All contracts made by a corporation beyond the scope of those powers are unlawful and void.").

V.     **PREPA IS ENTITLED TO SUMMARY JUDGMENT DISALLOWING THE MASTER PREPA BOND CLAIM TO THE EXTENT IT ASSERTS SECURITY INTERESTS IN THE COVENANTS AND REMEDIES AND AVOIDING AND PRESERVING FOR THE BENEFIT OF PREPA ANY SUCH SECURITY INTERESTS PURSUANT TO BANKRUPTCY CODE §§ 544 AND 551.**

131.     As discussed above, the Trustee does not and could not have a security interest in the Covenants and Remedies.  *See supra* Section IV.  But even if the Trustee had a security interest in the Covenants and Remedies (and it does not), it would be unperfected because the Financing Statements do not identify the Trustee's rights under the Trust Agreement, including the rights to enforce or exercise the Covenants and Remedies, as collateral.

132.     "Except as otherwise provided" (and no exception is applicable with respect to the Covenants and Remedies), a financing statement must be filed to perfect a security interest.  *See* 19 L.P.R.A. § 2260(a) (UCC § 9-310(a)).  For a financing statement to be sufficient, it must, among other things "indicate[] the collateral covered by the financing statement."  19 L.P.R.A. § 2322(a)(1)–(3) (UCC § 9-202(a)(1)–(3)); *see also Altair*, 914 F.3d at 709–10 (discussing the similar "identification of collateral" requirement under the former version of Puerto Rico's UCC).[44]

133.     None of the Financing Statements filed by the Trustee identifies the Covenants and Remedies, or any of the **Trustee's** rights, as the Trustee's collateral.  *See* SUMF ¶¶ 63, 67, 69, 71,

---

[44] Under 19 L.P.R.A. § 2260(a)(3) ((UCC § 9-310(a)(3)), a financing statement can only perfect a security interest in collateral granted by a security agreement when the financing statement sufficiently identifies the collateral and the Uniform Commercial Code authorizes perfection by use of financing statement.  "A fundamental purpose of Article 9 is to create commercial certainty and predictability by allowing creditors to rely on the specific perfection and priority rules that govern collateral within the scope of Article 9."  *Boatmen's Nat'l Bank of St. Louis v. Sears, Roebuck & Co.*, 106 F.3d 227, 230–31 (8th Cir. 1997); *see also McCarthy v. BMW Bank of N. Am.*, 509 F.3d 528, 530 (D.C. Cir. 2007) ("[O]ne of the principal purposes of UCC Article 9 [is] to 'enforce the policy against secret liens' by demanding strict compliance with 'filing or recording requirements.'" (quoting Permanent Editorial Board for the Uniform Commercial Code Commentary, Final Report, No. 6, § 9-301(1) (Mar. 10, 1990))).  In view of this purpose, it is hardly surprising that where, as here, a financing statement does not identify the purported collateral at all, there can be no perfected security interest in that purported collateral.

75.[45] Any security interest in the Covenants and Remedies is therefore unperfected and avoidable under Bankruptcy Code § 544.  *See supra* Point II.

134.    For these reasons, the Oversight Board is entitled to summary judgment as to Count V of the FAC.  Specifically, judgment should be entered in the Oversight Board's favor, pursuant to Bankruptcy Code § 544(a) and 19 L.P.R.A. § 2267(a) (UCC § 9-317(a)), avoiding any and all security interests in the Covenants and Remedies.  Any asserted security interest in the Covenants and Remedies should be recovered for PREPA and/or automatically preserved for its benefit, pursuant to Bankruptcy Code §§ 550 and 551, respectively.

## VI.    PREPA IS ENTITLED TO SUMMARY JUDGMENT DISALLOWING THE MASTER PREPA BOND CLAIM TO THE EXTENT IT ASSERTS PRIORITY, PERFECTED SECURITY INTERESTS AGAINST THE COVENANTS AND REMEDIES INDEPENDENT OF BANKRUPTCY CODE § 544 AND SUBORDINATING THE TRUSTEE'S CLAIMED SECURITY INTEREST TO PREPA'S INTEREST.

135.    For the same reasons discussed above, (*see supra* Section V), any security interest in the Covenants and Remedies is unperfected.  As such, the Oversight Board has priority over unperfected security interests as a hypothetical lien creditor.  *See supra* Point III.  For these reasons, the Oversight Board is entitled to summary judgment on Count VI of the FAC.  Specifically, judgment should be entered in the Oversight Board's favor subordinating the security interest of the Trustee in the Covenants and Remedies to PREPA's interest in such property

---

[45] The failure of the PREPA bondholders to articulate clearly in the Financing Statements the Covenants and Remedies as collateral only further demonstrates they are not collateral.  However, even if the Financing Statements indicated the Covenants and Remedies as collateral, there still would be no perfected security interest in them.  When the collateral indications in a security agreement and a related financing statement differ, the scope of the perfected security interest is controlled solely by the narrower collateral indication, which in this case is the Trust Agreement. *See In re Robert Bogetti & Sons*, 162 B.R. 289, 295–96 (Bankr. E.D. 1993); *see also* Eldon H. Reiley, 1 Sec. Interests in Pers. Prop. § 7.3 (Dec. 2021) ("The security agreement not the financing statement is the contract between the parties. The collateral may be enlarged by subsequent agreements or by reference to other writings, but a description in a financing statement alone should not confer additional rights on the secured party."). The collateral grants contained in the Trust Agreement therefore control over any broader indications that may exist in the Financing Statements.

pursuant to 19 L.P.R.A § 2267(a)(2) (UCC § 9-317(a)(2)), and disallowing the Master PREPA Bond Claim to the extent it asserts the Trustee has a perfected security interest in the Covenants and Remedies.

## VII. PREPA IS ENTITLED TO SUMMARY JUDGMENT AS TO COUNT II OF DEFENDANTS' COUNTERCLAIM.

136.    Through Count II of their Counterclaim, Defendants seek a declaration stating the Trustee possesses valid, perfected, and priority security interests in all PREPA revenues (not just "Revenues" as defined and to the extent provided in the Trust Agreement) and a further declaration stating the Trustee's security interests are not subject to avoidance or subordination.  As a threshold matter, Defendants appear to ignore their main problem is their lack of a security interest in the first place in anything beyond the Sinking Fund and Subordinate Funds, not avoidance or subordination. As discussed in Sections I and IV above, the Trustee's security interest is limited to Revenues deposited to the credit of the Sinking Fund and the Subordinate Funds and the Trustee has only perfected a security interest in Revenues deposited to the credit of the Trustee-Held Deposit Accounts.  Moreover, as discussed in Sections II, III, V, and VI, even if the Trustee's security interest extended beyond this scope, the Trustee failed to perfect any further security interest, meaning any such interest is subordinate to PREPA's interest in such property under Bankruptcy Code § 544(a) and 19 L.P.R.A. § 2267(a)(2) (UCC § 9-317(a)(2)), and can be preserved for the benefit of PREPA.

137.    Accordingly, the Oversight Board is entitled to summary judgment as to Count II of Defendants' Counterclaim.

VIII.   **PREPA IS ENTITLED TO SUMMARY JUDGMENT DISALLOWING MASTER PREPA BOND CLAIM TO THE EXTENT IT CLAIMS A RIGHT TO PAYMENT BEYOND MONEYS CREDITED TO THE DEPOSIT OF THE SINKING FUND AND SELF-INSURANCE FUND.**

138.    Through Count VII of the FAC, Plaintiff seeks judgment disallowing (a) the Master PREPA Bond Claim to the extent it asserts a right to payment other than a secured claim against the monies deposited to the credit of the Sinking Fund and Self-Insurance Fund, and (b) any and all unsecured deficiency claims against PREPA.  Summary judgment should be granted because the unambiguous terms of the Trust Agreement, PREPA Bonds, and the Bankruptcy Code demonstrate the PREPA Bonds are payable solely from their collateral and any recourse claim against PREPA, by holders of the PREPA Bonds or the Trustee, must be disallowed because it does not exist.

A.      **The Unambiguous Terms of the PREPA Bonds and Trust Agreement Limit the PREPA Bondholders' Right to Payment to the Sinking Fund and Subordinate Funds.**

139.    A creditor only has a claim to the extent the creditor has a "right to payment" against the debtor or its assets.  *See* 11 U.S.C. § 101(5).  A right to payment limited to a claimholder's collateral is a "non-recourse" claim in that its recourse is limited to certain assets and does not exist against the entity generally.  *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 438, n.3 (1999) ("A nonrecourse loan requires the [creditor] to look only to the [d]ebtor's collateral for payment."); *Johnson v. Home State Bank*, 501 U.S. 78, 86 (1991) (referring to "nonrecourse loan agreements where the creditor's only rights are against property of the debtor, and not against the debtor personally."); *In re Taberna Preferred Funding IV, Ltd.*, 594 B.R. 576, 587–88 (Bankr. S.D.N.Y. 2018) (debt stated to be "payable solely" from collateral is non-recourse).  In such a circumstance, the debtor lacks personal liability on the debt and the creditor only has a claim—a right to payment—"against property of the debtor" under Bankruptcy

Code §§ 101(5) and 102(2). *See* 11 U.S.C. § 101(5) (claim means "right to payment"); 11 U.S.C. § 102(2) ("'claim against the debtor' includes a claim against property of the debtor"); *Johnson*, 501 U.S. at 86 ("the mortgage holder still retains a 'right to payment' in the form of its right to the proceeds from the sale of the debtor's property."). Here, the Trust Agreement and PREPA Bonds make clear Defendants' only right to payment is from the Trustee's collateral: the Sinking Fund and Self-Insurance Fund (the only collateral in which the Trustee has a perfected security interest). The Trustee has no "right to payment" from, and therefore no recourse to, any other payment source, and therefore no claim to anything but the Sinking Fund and Self-Insurance Fund.

140.    The only promise to pay the Trustee bargained for in respect of the PREPA Bonds is contained in the PREPA Bonds themselves, as evidenced by the Template Bond (and confirmed by the specimen bond, an example of which is attached as Exhibit W to the Morales Declaration), which provides "[PREPA] . . . hereby promises to pay, ***solely*** from the special fund provided therefor as hereinafter set forth . . . the principal sum of [the PREPA Bond] and to pay, solely from said special fund, interest thereon . . . ." *See* SUMF ¶ 57 (emphasis added); Exhibit W to the Morales Declaration. In short, the Bonds broadcast and advertise up front they are non-recourse bonds. The Bondholders' own references to them as special revenue bonds make the point. *See supra* ¶ 80. The PREPA Bonds go on to provide they "shall not be deemed to constitute a debt or obligation of the Commonwealth of Puerto Rico or any of its municipalities or other political subdivisions . . . but . . . shall be payable as to both principal and interest solely from the special fund provided therefor as hereinafter set forth." *Id.* The Bonds then define this "special fund" "creat[ed]" by the Trust Agreement as the "Sinking Fund," "which special fund is pledged to and charged with the payment of the principal of and the interest on the bonds." *Id.* The PREPA Bonds therefore clearly specify (1) Defendants' only right to payment is from the Sinking Fund,

in which the Trustee was granted a security interest, and, to emphasize the point, (2) no "political subdivision" of the Commonwealth—a term that includes PREPA (*see* 22 L.P.R.A. § 193(a))—has personal liability on the PREPA Bonds.

141.    All relevant provisions of the Trust Agreement confirm Defendants' right to payment is limited to the Trustee's collateral.  Article V of the Trust Agreement makes plain Defendants' only "right to payment" is out of the Sinking Fund and Subordinate Funds.  Article V specifies Defendants do not have recourse to all PREPA Revenues to pay the PREPA Bonds, but rather its recourse is limited to Revenues deposited to the credit of the Sinking Fund and Subordinate Funds.  Article V neither requires nor even permits PREPA to pay PREPA Bondholders from the General Fund or Revenue Fund.  Rather, the only right to payment the PREPA Bonds have under Article V of the Trust Agreement is from the Sinking Fund and Subordinate Funds.

142.    Specifically, as discussed above, Article V provides Revenues are to be deposited when received into the General Fund.  Revenues deposited to the credit of the General Fund are to be used to pay PREPA's Current Expenses.  Trust Agreement § 505.  Once per month, PREPA is required to transfer the Revenues left over after subtracting Current Expenses and the Reserve Amount to the Revenue Fund.  Trust Agreement § 506.  Nothing in Article V requires or permits PREPA to pay Bonds from the Revenue Fund or General Fund.

143.    From the Revenue Fund, Revenues are then required to be transferred to a series of deposit accounts comprising the Sinking Fund (including the "Bond Service Account," the "Redemption Account," and the "Reserve Account"), in which PREPA granted a security interest to the Trustee for the benefit of the Bondholders.  Trust Agreement § 507.  Trust Agreement §§ 509–11 are the first provisions that discuss paying PREPA Bonds, and they only permit

55

payment to come out of the Sinking Fund.  Specifically, Trust Agreement §§ 509–511 provide: (a) moneys deposited to the credit of the Bond Service Account are to be used to pay interest as it becomes due (§ 509); (b) if moneys in the Bond Service Account are insufficient for the purpose of paying Bonds, moneys and "amounts available" in the Reserve Account "shall first be used for the purpose of paying interest on the bonds" (§ 510), and (c) moneys in the Redemption Account are to be used for redeeming bonds.  Trust Agreement § 511.  Article V thus confirms what the Bonds explicitly state:  Revenues are not payable to the Defendants unless and until they are actually deposited to the credit of the Sinking Fund.

144.    Article V also provides for the funding of the Subordinate Funds to the extent Revenues remain in the Revenue Fund after the Sinking Fund is funded.  As relevant here, § 507(d) provides for the transfer of Revenues to the Reserve Maintenance Fund, § 507(g) provides for the transfer of Revenues to the Self-Insurance Fund, and § 507(h) provides for the transfer of Revenues to the Capital Improvement Fund.[46]  The Trust Agreement provides these funds are to be used first for certain business purposes of PREPA but, to the extent the Revenues in the Sinking Fund are "insufficient" to pay interest and principal on bonds as they come due, the Revenues in these Subordinate Funds are to be used instead to make bond payments.

145.    Specifically, § 512 provides that Revenues in the Reserve Maintenance Fund are to "be disbursed only for the purpose of paying the cost of unusual or extraordinary maintenance or repairs" unless "moneys held for the credit of the Bond Service Account and the Reserve Account shall be insufficient for the purpose of paying the interest on all bonds and the principal" on said bonds, in which case PREPA is required to "transfer from any moneys held for the credit of the

---

[46] The Subordinate Obligations Fund (§ 507(e)) is not included as a "Subordinate Fund" because any moneys deposited to the credit of the Subordinate Obligations Fund are only subject to a security interest in favor of holders of subordinate obligations that are not relevant here.

56

Reserve Maintenance Fund to the credit of the Bond Service Account an amount sufficient to make up any such deficiency." Trust Agreement § 512. Similarly, § 512A provides Revenues in the Self-Insurance Fund are to be used to insure extraordinary losses incurred by PREPA, unless "moneys held for the credit of the Bond Service Account and the Reserve Account (including moneys transferred from the Reserve Maintenance Fund to the credit of the Bond Service Account pursuant to the provisions of the first sentence of the second paragraph of § 512 of this Agreement) shall be insufficient for the purpose of paying the interest on all bonds and the principal" on said bonds, in which case PREPA is required to "transfer from any moneys held for the credit of the Self-Insurance Fund to the credit of the Bond Service Account an amount sufficient to make up such deficiency." Trust Agreement § 512A. Finally, and likewise, § 512B provides that the Revenues deposited in the Capital Improvement Fund are to be used to fund capital improvements of PREPA's system, unless "moneys held for the credit of the Bond Service Account and the Reserve Account (including moneys transferred from the Reserve Maintenance Fund or the Self-Insurance Fund to the credit of the Bond Service Account pursuant to the provisions of the first sentence of the second paragraph of §§ 512 and 512A of this Agreement, respectively)" are insufficient to make bond payments, in which case PREPA is required to "transfer from any moneys held for the credit of the Capital Improvement Fund to the credit of the Bond Service Account an amount sufficient to make up such deficiency." Trust Agreement § 512B. There are no such provisions requiring payment of bond debt service from the General Fund or Revenue Fund. Trust Agreement §§ 505, 506.

146.    The Trust Agreement thus provides for the payment of the PREPA Bonds solely from the collateral in which the Trustee was granted a security interest: the Sinking Fund and Subordinate Funds. Only those funds are subject to a lien, and only those funds are made available

57

to pay the PREPA Bonds under Article V, confirming the PREPA Bonds are nonrecourse to PREPA and have recourse only to the Sinking Fund and Subordinate Funds.  Nothing in the Trust Agreement permits PREPA to pay Bonds from the General Fund or Revenue Fund or any other unencumbered "Revenues," or gives the Defendants recourse against them.

147.     The Trust Agreement's provisions governing default could also not be clearer that Defendants' recourse is limited to the Sinking Fund and Subordinate Funds.  If Defendants had recourse to PREPA, their default remedies would not be limited to their collateral.  That would make no sense.  Trust Agreement § 804 governs Defendants' remedies upon the occurrence of an event of default,[47] and it provides Defendants "shall be entitled to sue for, enforce payment of and receive any and all amounts . . . due from [PREPA] for principal, interest or otherwise under any of the provisions of this Agreement" and "to collect (*but solely from moneys in the Sinking Fund and any other moneys available for such purpose*) in any manner provided by law, the moneys adjudged or decreed to be payable."  Trust Agreement § 804 (emphasis added).  Section 805 then provides for the apportionment of the Sinking Fund "together with any moneys then available or thereafter becoming available for such purpose" "if at any time the moneys in the Sinking Fund shall not be sufficient to pay the interest on or the principal of the bonds."  Trust Agreement § 805. Together, these provisions make clear Defendants' claim can only be paid out of the Sinking Fund "and any other moneys available for such purpose"—*i.e.*, the Subordinate Funds, which are not part of the Sinking Fund but which are made available for debt service under Article V.  Such provisions only make sense if Defendants' right to payment is limited to the Sinking Fund and Subordinate Funds.  If its right to payment were greater, Defendants' remedy would extend beyond

---

[47] PREPA is currently in default under the Trust Agreement and has been in default for a number of years.  Trust Agreement § 802(a) ("event of default" if PREPA does not pay PREPA Bonds when due); § 802(g) ("event of default" if PREPA files case to adjust debts under "any federal . . .  statute . . . hereafter enacted . . . .").

those funds in § 804, and it would be pointless to specify how the Sinking Fund should be apportioned to pay Defendants when the Sinking Fund is insufficient to pay bond claims (§ 805) because Defendants could simply reach to other assets to satisfy its claims.  Sections 804 and 805 only make sense if Defendants' "right to payment" is limited to the Sinking Fund and Subordinate Funds.

148.    The PREPA Bonds being nonrecourse is further established by § 701, which provides the PREPA Bonds "will be payable solely from the Revenues and said Revenues are hereby pledged to the payment thereof *in the manner and to the extent hereinabove particularly specified*."  Exhibit W to the Morales Declaration; *see also* SUMF ¶ 59 (emphasis added);.  Section 701 then goes on to provide that PREPA is not personally liable on the PREPA Bonds, another marker of a non-recourse claim.  *Id.* ¶ 19 (Trust Agreement § 701) ("Nothing in the bonds or in this Agreement shall be deemed to constitute the bonds a debt or obligation of the Commonwealth of Puerto Rico or any of its municipalities *or other political subdivisions*, and neither the Commonwealth of Puerto Rico *nor any* such municipalities or *other political subdivisions shall be liable for the payment of the principal of or the interest on the bonds*.") (emphasis added).

149.    Together or separately, these provisions confirm what the PREPA Bonds unambiguously state: the PREPA Bonds are payable solely from the Trustee's collateral, the Sinking Fund (and certain other Subordinate Funds), whether PREPA is in default under the Trust Agreement or not, and Defendants do not have recourse to any other property of PREPA or to PREPA personally.

150.    This conclusion is only further confirmed by the opinion of Sidley Austin LLP promulgated pursuant to Article II of the Trust Agreement and attached to the offering statements issued in connection with the PREPA Bonds, *see, e.g.,* Exhibit V to the Morales Declaration at IV-

1–IV-4, which expressly states that "[t]he [PREPA] Bonds are valid and binding special obligations of [PREPA] *payable solely from the Sinking Fund* . . . which Fund is pledged to and charged with the payment of the principal of and interest on such bonds." *Id.* at IV-2 (emphasis added).

151.    Defendants thus agreed to have recourse solely against the Sinking Fund and Subordinate Funds.[48]  As discussed above, however the Trustee only perfected its security interest in the Trustee-Held Deposit Accounts which comprise the Sinking Fund and Self-Insurance Fund, and has neither an allowable secured claim nor unsecured claim against any other PREPA property.

**B.    Bankruptcy Code § 927 Applies to the PREPA Bonds and Deprives Defendants' Claim of Recourse Treatment Pursuant to Bankruptcy Code § 1111(b).**

152.    Bankruptcy Code § 1111(b) often provides non-recourse lenders to chapter 11 debtors with unsecured deficiency claims against the debtors' estates as if they had recourse under nonbankruptcy law.  Bankruptcy Code § 927, made applicable to this Title III case by PROMESA § 301(a), provides claimholders "payable solely" from "special revenues . . . shall not be treated as having recourse  . . . pursuant to section 1111(b)."   As the Bondholders have repeatedly

---

[48] Indeed, Defendants have repeatedly agreed "PREPA's Bonds are limited recourse bonds" and that "[u]nlike financings for privately-owned utilities, holders of revenue bonds in public utility financings generally have no recourse to general funds of the sponsoring state, territory or municipality, have no recourse to or mortgage or other lien on physical assets, and are secured solely by a pledge of revenues of the utility after payment of current operating expenses." *Motion of Ad Hoc Group of PREPA Bondholders, National Public Finance Guarantee Corporation, Assured Guaranty Corp,, Assured Guaranty Municpal Corp., and Syncora Guarantee Inc. for Relief from the Automatic Stay to Allow Movants to Enforce Their Statutory Right to Have a Receiver Appointed*, ECF No. 74 at 4; *Motion of National Public Finance Guarantee Corporation, Assured Guaranty Corp., Assured Guaranty Municpal Corp., and Syncora Guarantee Inc. for Relief from the Automatic Stay to Allow Movants to Enforce Their Statutory Right to Have a Receiver Appointed*, ECF No. 975 ¶ 13; *see also* ECF No. 74 at 1 ("The purpose of [the rate covenant] is to compensate PREPA's bondholders for the limited recourse nature of the Bonds and the inability of PREPA to grant a mortgage or other lien on its physical assets"); ECF No. 975, ¶ 14 ("PREPA Bonds are limited recourse bonds that are secured solely by the revenues pledged to secure the Bonds"); *Id.* ¶ 97 ("No other remedies at law are available to protect PREPA bondholders' property interests, as the PREPA bondholders do not have recourse to or mortgage or other lien on physical assets of PREPA.").

represented, their bonds are special revenue bonds.  This is because Defendants' claim is "payable

solely" from "special revenues . . . under applicable nonbankruptcy law." *Id.*

153.    The Master PREPA Bond Claim falls within Bankruptcy Code § 927.  As discussed

in the prior Section, *see supra* Section VIII.A, the Master PREPA Bond Claim is "payable solely"

from the Sinking Fund and the Self-Insurance Fund.  These funds are made up of deposit accounts

which, under the Trust Agreement, are funded by "Revenues" of PREPA (after payment of Current

Expenses and certain other transfers).  Trust Agreement, Article V.

154.    "Revenues," as defined in the Trust Agreement, constitute "special revenues" under

Bankruptcy Code § 902(2).  Indeed, the terms are defined almost identically: "Revenues" is

defined by the Trust Agreement to mean "all moneys received by [PREPA] in connection with or

as a result of its ownership or operation of [its electricity utility system]."  These Revenues are

"special revenues" as defined in Bankruptcy Code § 902(2) because they are "receipts derived

from the ownership, operation or disposition of . . . systems of the debtor that are primarily used .

. . to provide . . . utility . . . services," 11 U.S.C. § 902(2)(A), and  "revenues or receipts derived

from particular functions of the debtor."  11 U.S.C. § 902(2)(D).[49]  As a result, the "Revenues"

used to fund the Sinking Fund and Subordinated Funds are "special revenues" within the meaning

of 11 U.S.C. § 902(2)(A).

155.    That conclusion is not controversial—the Trustee has itself represented the PREPA

Bonds are secured by "special revenues."  *Preliminary Statement and Reservation of Rights of U.S.

Bank National Association as PREPA Bond Trustee With Respect to 9019 Motion of Government

Parties Relating to PREPA Restructuring Support Agreement*, Case No. 17-BK-4780-LTS, ECF

---

[49] The fact Defendants may have a security interest in  any bond proceeds received by PREPA under § 401 of the Trust
Agreement does not change the fact Defendants are secured solely by "special revenues," as Bankruptcy Code §
902(2)(A) includes "the proceeds of borrowings to finance the projects or systems."  11 U.S.C. § 902(2)(A).

No. 1696 ¶ 2 ("The indebtedness evidenced by the [PREPA] Bonds is secured by . . . PREPA's past, present, and future revenues as set forth in the Trust Agreement. This pledge constitutes a continuing pledge of PREPA's postpetition special revenues . . . ."). The other Defendants have represented the same. Case No. 17-BK-4780-LTS, ECF No. 975 at 3 (stating security interest is subject to "the special revenue provisions incorporated into [PROMESA].").[50]

156. As holders of a claim concededly "payable solely from special revenues of the debtor under applicable non-bankruptcy law," Defendants "shall not be treated as having recourse against the debtor on account of such claim pursuant to section 1111(b) of this title." 11 U.S.C. § 927. As such, any recourse deficiency claim extending beyond the Trustee's secured claim to the Trustee-Held Deposit Accounts comprising the Sinking Fund and Self-Insurance Fund[51] must be disallowed, as Defendants have no recourse beyond those deposit accounts which comprise their collateral.

---

[50] Under § 928(a), "special revenues acquired by the debtor after the commencement of the case shall remain subject to any lien *resulting from any security agreement* entered into by the debtor before the commencement of the case." 11 U.S.C. § 928(a) (emphasis added). Section 928(a) does not expand the scope of a prepetition security interest, which here is limited to funds deposited to the credit of the Sinking Fund and Subordinate Funds. Section 928(a) would simply mean that Revenues deposited to the credit of the Sinking Fund or Subordinate Funds postpetition remain subject to the security interest granted by the Trust Agreement. This situation is analogous to the situations of the bondholders in the HTA and PRIFA bonds, which were supported by liens against certain revenues transferred into certain funds after being received by HTA and PRIFA. *HTA*, 618 B.R. at 637–40; *PRIFA*, 618 B.R. 374–77. The value of their liens was much smaller than it would have been had their security agreements granted liens against the revenues when received by HTA and PRIFA and against the rights of HTA and PRIFA to receive the revenues. Here, the Trust Agreement grants the Trustee a lien against certain funds it controls, but not against the revenues when received by PREPA and not against PREPA's rights to receive the revenues. Therefore, the Trustee is not meaningfully helped by Bankruptcy Code § 928 because it has no lien against any revenues until and unless they come into existence and PREPA transfers them into the Sinking Fund and Subordinate Funds.

[51] Having not perfected its security interest in anything other than the Trustee-Held Deposit Accounts that comprise the Sinking Fund and Self-Insurance Fund, the Trustee does not have an allowable secured claim to, or recourse against, any property in which it failed to perfect its security interest. The Trustee's interest in that property is avoidable and should be recovered for the estate, *see supra* Sections II, III, thus depriving the Trustee of recourse against those unperfected deposit accounts.

### C.   Defendants Cannot Escape the Non-Recourse Nature of the PREPA Bonds By Asserting Breaches of PREPA's Covenants.

157.   Defendants cannot escape the non-recourse nature of the PREPA Bonds by asserting it has a breach of contract or other claim arising from alleged breaches by PREPA of the Trust Agreement or the terms of the PREPA Bonds.  Under Trust Agreement § 804, Defendants agreed any claim arising from the Trust Agreement or PREPA Bonds could only be paid out of the Sinking Fund and Subordinate Funds.  Specifically, Trust Agreement § 804 specifies that, upon the occurrence of an event of default, Defendants "shall be entitled to sue for, enforce payment of and receive *any and all amounts* . . . due from [PREPA] for principal, interest or otherwise *under any of the provisions of this Agreement*," but also provides that Defendants can only collect any such money judgment "*solely from moneys in the Sinking Fund and any other moneys available for such purpose*," which, as discussed above, includes only the Sinking Fund and Subordinate Funds.  Trust Agreement § 804 (emphasis added).

158.   This accords with settled law, which makes clear non-recourse creditors cannot escape the contractually agreed upon limits to their claims to collateral.  In *U.S. Bank Nat'l Ass'n, v. Triaxx Asset Mgmt. LLC*, No. 18-CV-4044, 2021 U.S. Dist. LEXIS 64017, at *79–81 (S.D.N.Y. Mar. 31, 2021), the plaintiff, acting as trustee in connection with a secured, non-recourse loan, filed a claim for breach of contract against the debtors, alleging that the debtors had breached the governing loan agreements, including by diverting collateral away from the trustee to other parties, and was thus liable to pay damages.  *Id.* at *79.  The loan agreements, however, contained a non-recourse provision similar to those contained in the Trust Agreement, limiting plaintiff's recourse to its collateral.  *Id.* at *79–80.  The plaintiff argued the non-recourse provision did not apply to a damage claim alleging breach of the very covenants that were supposed to ensure plaintiff received collateral.  *Id.* at *80.  But the court rejected that argument, holding the plaintiff's recovery was

limited to its collateral.  The court stated it was aware of "no authority, from any jurisdiction, that has permitted a damages claim against an issuer in the face of a similar no-recourse clause." *Id*. at *80–81.  The plaintiff was limited to the recourse it had agreed to—a claim against its collateral—and could not assert damages from the debtors payable from anything other than that collateral.  *Id*.; *see also Duluth Lighthouse for the Blind v. C. G Bretting Mfg. Co.*, No. 99-1601 JRT/ RLE, 2001 WL 1640079 at *2 (D. Minn. Sept. 25 2001) (non-recourse creditor's remedy for default is to proceed as a secured creditor against its collateral and other remedies for breach could not be invoked); *cf. USX Corp. v. Prime Leasing, Inc.*, 988 F.2d 433, 438 (3d Cir.1993) (breaches of agreement in which non-recourse provision is contained are subject to non-recourse clause).

159.    Here, the same result obtains.  Defendants agreed to have recourse against the Sinking Fund and Subordinate Funds alone to pay any money judgment against PREPA arising under any term of the Trust Agreement or the PREPA Bonds.  Such limitations on recourse apply equally to any breach by PREPA of the Trust Agreement, including any breach of covenants intended to preserve collateral.  Indeed, they must—every financing document contains a variety of covenants including to comply with certain financial performances and metrics, to pay debt in a timely matter, and not to file for bankruptcy.  If breach of covenants gave rise to a recourse claim against the debtor, § 927 would be read out of the Bankruptcy Code.  As the Trustee only perfected its security interest in the Trustee-Held Deposit Accounts which comprise the Sinking Fund and Self-Insurance Fund, and otherwise disclaimed recourse, Defendants are thus precluded from asserting anything other than a secured claim against the collateral in which it has a perfected security interest: the Trustee-Held Deposit Accounts, which comprise the Sinking Fund and Self-Insurance Fund.

160.    For these reasons, the Oversight Board is entitled to summary judgment on Count VII of the FAC.  Specifically, judgment should be entered disallowing the Master PREPA Bond Claim to the extent it asserts a right to payment other than a secured claim against Revenues deposited to the credit of the Sinking Fund and Self-Insurance Fund.  Judgment should further be entered disallowing any unsecured deficiency claim by the Trustee against PREPA.

## IX.    PREPA IS ENTITLED TO SUMMARY JUDGMENT AS TO COUNT I OF DEFENDANTS' COUNTERCLAIM.

161.    Through Count I of its Counterclaim, Defendants seek a declaration that the Trust Agreement provides the Trustee with recourse to the Sinking Fund and the right to obtain specific performance of covenants to fund the Sinking Fund, and in the event of default, the Trustee has recourse to all PREPA revenues and any other moneys.  Defendants' Answer, Affirmative Defenses, and Counterclaims at 55–56.  The Oversight Board does not dispute that the Trustee's has a right to payment in the form of a secured claim against Revenues deposited to the credit of the Sinking Fund and Self-Insurance Fund.  For the reasons discussed in the preceding Section, however, the Trustee's right to payment is expressly limited to those sources, and does not expand to all PREPA revenues upon the occurrence of an event of default or for any other reason.

162.    Nor do Defendants have a right to specific performance against PREPA in connection with the Rate Covenant and PREPA's covenant to put Revenues in the Sinking Fund to provide Defendants recourse.  Defendants' right to specific performance is determined by PROMESA Title III, not the Trust Agreement.  If credit agreements governed over the Bankruptcy Code, every credit agreement would provide the lender the right to specific performance to be paid and all bankruptcy statutes would be stripped of their purposes.  Defendants' supposed rights to specific performance constitute part of their bond claim because they are reducible to a "right to payment."  11 U.S.C. § 101(5).  That is obvious and not open to doubt: Defendants own Bonds

65

satisfied by money.  This is not a case of non-compete agremeents or contracts to sell unique real
property where money is not a substitute.  This case is all about money.  All of Defendants'
arguments aim at procuring money, and nothing but money.  If PREPA paid Defendants' bond
claim, their supposed right to specific performance of the ancillary covenants contained in the
Trust Agreement would disappear.  Breach of the covenants in the Trust Agreement gives
Defendants an immediate right to payment of all that is deposited to the credit of the Sinking Fund
and Subordinate Funds.  Trust Agreement §§ 804, 805; *see also* UCC § 9-102, cmt. 5.d ("A right
to the payment of money is frequently buttressed by ancillary rights, such as rights arising from
covenants in a purchase agreement, note, or mortgage requiring insurance on the collateral or
forbidding removal of the collateral, rights arising from covenants to preserve the creditworthiness
of the promisor, and the lessor's rights with respect to leased goods that arise upon the lessee's
default . . . This Article does not treat these ancillary rights separately from the rights to payment
to which they relate.").

163.   The words of Bankruptcy Code § 101(5) make clear that rights to equitable
remedies for breach of performance are claims if they give rise to rights to payment.  The
jurisprudence is equally clear that when money suffices, as opposed to being an additional remedy,
there is no right to specific performance.  *See, e.g.*, *Infusaid Corp. v. Intermedics Infusaid, Inc.*,
739 F.2d 661, 668 (1st Cir. 1984) ("Of course, the general rule is that if there is an adequate remedy
at law, equitable relief is unavailable.").  The Supreme Court ruled the debtor's prepetition cleanup
liability was dischargeable because it could be reduced to a money claim.  *Ohio v. Kovacs*, 469
U.S. 274 (1985).  The circuit courts routinely follow.  *See, e.g.*, *Rederford v. US Airways, Inc.*, 589
F.3d 30, 36–38 (1st Cir. 2009) (lawsuit seeking reinstatement for wrongful dismissal properly
discharged as "claim" in bankruptcy because payment of money was an alternate remedy).  Here,

66

a bond for payment of money is all that is in issue.  Indeed, Defendants' request for specific performance is for performance to deliver money.  No right of specific performance is remotely possible here.  This Court has even held as much when presented with similar claims made by HTA and PRIFA bondholders.  *See In re Fin. Oversight & Mgmt. Bd.*, 485 F. Supp. 3d 351, 361 (D.P.R. 2020) ("Movants' Proposed Claims plainly stem from their bond claims and, although styled as requests for declaratory relief, ultimately are vehicles for asserting rights to payment of amounts outstanding under various bond issues."), *aff'd*, 989 F.3d 170 (1st Cir. 2021).

164.    The fact Defendants would prefer to obtain specific performance of these covenants to add to their collateral does not change the fact that their collateral (and, therefore, their allowable claim) is limited to whatever is actually deposited to the credit of the Sinking Fund and Self-Insurance Fund.  *See, e.g.,* 11 U.S.C. § 502(b) ("if [an] objection to a claim is made, the court . . . shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount."); *Nickels Midway Pier, LLC v. Wild Waves, LLC (In re Nickels Midway Pier, LLC)*, 341 B.R. 486, 500 (D.N.J. 2006) ("The fact that a creditor's specific performance remedy is preferable to a damages remedy does not mean that a creditor's right to specific performance cannot be reduced to a claim in bankruptcy."), *aff'd*, 255 F. App'x 633 (3d Cir. 2007).  Defendants simply do not have a pledge of all revenues. Their security interest only attaches to monies put in the Sinking Fund and Subordinate Funds.

165.    Nor can Defendants' limited recourse claim be allowed in an amount exceeding the sums currently on deposit in the Sinking Fund and Self-Insurance Fund.  Defendants confuse a security interest in revenues with what they have.  If they had purchased bonds secured by PREPA's revenues and rights to revenues, the value of that security interest could possibly take

future revenues (as they come into existence[52]) into account.  But they purchased Bonds secured only by moneys in certain funds and no security interest in other net revenues or assets, backed instead by a contractual promise to transfer future net revenues into those funds.  PREPA has no postpetition obligation to make such transfers even if net revenues existed.

166.    Defendants contend this result is harsh.  Other courts have, however, explained that a party—especially a sophisticated party represented by sophisticated counsel—is bound to the contract terms to which it agreed, not the terms, in hindsight, it wishes it had obtained.  In *In re Las Vegas Monorail Co.*, 429 B.R. 317 (Bankr. D. Nev. 2010), a case that addressed strikingly similar facts, the debtor had issued bonds secured by, among other things not relevant here, funds deposited in certain deposit accounts held by the indenture trustee.  The debtor was not obligated to transfer funds to those accounts until after paying certain operational expenses. In the event of a default, however, the debtor was obligated (by a covenant in the indenture) to transfer all funds directly to the indenture trustee, who would make the required operational payments directly. If complied with, this covenant would ensure transfer of all of the debtor's revenues to the accounts held by the indenture trustee, which would "effect[] both attachment and perfection." *Id.* at 338. Of course, the debtor did not comply with this covenant, and in language reminiscent of the circumstances here, the court observed "[n]o one apparently seriously believed [the debtor] would

---

[52] To the extent Defendants assert a current security interest in future revenues, they do not have it.  They accepted promises to transfer net revenues into certain funds, which promises are not secured by anything other than what is in those funds.  Moreover, "[i]t is impossible on the face to have a vested property right in after-acquired property . . . because, by definition, after-acquired property is a mere contingency." *First Nat'l Bank of Colo. Springs v. Hamilton (In re Hamilton)*, 18 B.R. 868, 870 (Bankr. D. Colo. 1982).  Because a security interest is an interest in property, it cannot attach unless the property itself exists. Indeed, in the slightly different context of a transfer of ownership of future property, the Supreme Court has explained that "[a] person cannot grant a thing which he has not . . . The thing itself is an impossibility." *Pennock v. Coe*, 64 U.S. 117, 128 (1859) (emphasis added).  PREPA's future revenues, special or otherwise, are not currently property of PREPA (or anyone else).  PREPA has rights to collect revenues for electricity already used, but did not pledge those accounts receivable to the Trustee.  Although the Trustee might have a hope, or even an expectation, of PREPA transferring future net revenue into the funds the Trustee controls, this hope or expectation does not rise to the level of an existing property interest the Trustee holds.

upset this arrangement, breach its contract, and not deposit all revenues with the Trustee after default"—a "belief that seems odd in hindsight." *Id.* The court recognized that this was not the best agreement the trustee could have obtained, and that an "adroit and hardnosed bank lawyer would have insisted on a security interest in all revenues whenever acquired that would attach as soon as the debtor acquired the revenues . . . [a]nd [] would have insisted on procedures within its control to maintain perfection at all times." *Id.* at 339. "But the Indenture cannot be read to mean what the bondholders wish they could have or should have negotiated; this court can read it only as it is written." *Id.* (footnote omitted). The same considerations apply here. Moreover, PREPA's other creditors are entitled not to have their losses expand due to PREPA's payment of unallowable Bond claims.

167.    Therefore Defendants are not entitled to the declaration they seek in connection with Count I of their Counterclaim. Accordingly, the Oversight Board is entitled to summary judgment as to Count I of Defendants' Counterclaim.

## <u>CONCLUSION</u>

For the foregoing reasons, the Oversight Board requests that the Court enter judgment disallowing the Master PREPA Bond Claim except as to a secured claim against moneys actually deposited to the credit of the Trustee-Held Deposit Accounts (which comprise the Sinking Fund and the Self-Insurance Fund), and grant the Oversight Board such other and further relief as the Court deems just and proper.

*[Remainder of page intentionally left blank]*

69

Dated:    October 24, 2022                    Respectfully submitted,
          San Juan, Puerto Rico

                                              _Martin J. Bienenstock_

                                              Martin J. Bienenstock
                                              Ehud Barak
                                              Margaret A. Dale
                                              Jeff W. Levitan
                                              Michael T. Mervis
                                              Daniel S. Desatnik
                                              Elliot R. Stevens
                                              (Admitted _Pro Hac Vice_)
                                              **PROSKAUER ROSE LLP**
                                              Eleven Times Square
                                              New York, NY 10036
                                              Tel: (212) 969-3000
                                              Fax: (212) 969-2900

                                              Steven O. Weise
                                              (Admitted _Pro Hac Vice_)
                                              **PROSKAUER ROSE LLP**
                                              2029 Century Park East, Suite 2400
                                              Los Angeles, CA 90067
                                              Tel: (310) 557-2900
                                              Fax: (310) 557-2193

                                              Paul V. Possinger
                                              (Admitted _Pro Hac Vice_)
                                              **PROSKAUER ROSE LLP**
                                              70 West Madison, Suite 3800
                                              Chicago, IL 60602
                                              Tel: (312) 962-3550
                                              Fax: (312) 962-3551

                                              William D. Dalsen
                                              (Admitted _Pro Hac Vice_)
                                              **PROSKAUER ROSE LLP**
                                              One International Place
                                              Boston, MA 02110
                                              Tel: (617) 526-9600
                                              Fax: (617) 526-9899

                                              Mee Rina Kim
                                              (Admitted _Pro Hac Vice_)
                                              **PROSKAUER ROSE LLP**
                                              1001 Pennsylvania Avenue N.W.

Suite 600 South
Washington, DC 20004
Tel: (202) 416-6800
Fax: (202) 416-6899

Jared M. DuBosar
(Admitted *Pro Hac Vice*)
**PROSKAUER ROSE LLP**
2255 Glades Road, Suite 421 Atrium
Boca Raton, FL 33431
Tel: (561) 241-7400
Fax: (561) 241-7145

*Attorneys for the Financial
Oversight and Management Board
as sole Title III representative for PREPA*


<u>Luis F. del Valle-Emmanuelli</u>

Luis F. del Valle-Emmanuelli
USDC-PR No. 209514
P.O. Box 79897
Carolina, Puerto Rico 00984-9897
Tel. 787.647.3503
Fax. N/A
dvelawoffices@gmail.com

Of Counsel for A&S Legal Studio, PSC
434 Avenida Hostos
San Juan, PR 00918
Tel (787) 751-6764/763-0565
Fax (787) 763-8260

*Co-Attorney for the Financial
Oversight and Management Board
as Representative for PREPA*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notifications of such filing to all CM/ECF participants in this case.

*/s/ Luis F. del Valle-Emmanuelli*
Luis F. del Valle-Emmanuelli
