**Opposition due November 18, 2022.**
**Hearing date to be determined by the Court.**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA Title III<br><br>No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Debtor. | PROMESA Title III<br><br>No. 17-BK-4780-LTS |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**Opposition due November 18, 2022.**
**Hearing date to be determined by the Court.**

| | |
|---|---|
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>       Plaintiff/<br>       Counterclaim-<br>       Defendant,<br><br>PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALL TITLE III DEBTORS, CORTLAND CAPITAL MARKET SERVICES, SOLA LTD., SOLUS OPPORTUNITIES FUND 5 LP, ULTRA MASTER LTD, ULTRA NB LLC, UNION DE TRABAJADORES DE LA INDUSTRIA ELECTRICA Y RIEGO INC., AND SISTEMA DE RETIRO DE LOS EMPLEADOS DE LA AUTORIDAD DE ENERGIA ELECTRICA,<br><br>       Intervenor-Plaintiffs,<br><br>v.<br><br>U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE,<br><br>       Defendant/<br>       Counterclaim-<br>       Plaintiff,<br><br>THE AD HOC GROUP OF PREPA BONDHOLDERS, ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION, AND SYNCORA GUARANTEE, INC.,<br><br>       Intervenor-<br>       Defendants/<br>       Counterclaim-<br>       Plaintiffs. | PROMESA Title III<br><br>Adv. Proc. No. 19-391-LTS |

**MEMORANDUM IN SUPPORT OF DEFENDANT/COUNTERCLAIM-PLAINTIFF'S AND INTERVENOR-DEFENDANTS/COUNTERCLAIM-PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFFS/COUNTERCLAIM-DEFENDANTS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND ........................................................................................................................7

    A.    The Authority Act........................................................................................7

    B.    The Trust Agreement ...................................................................................9

    C.    PREPA's Breaches And Defaults ..............................................................14

    D.    The Adversary Proceeding........................................................................16

LEGAL STANDARD................................................................................................................17

ARGUMENT ...........................................................................................................................18

I.          The PREPA Bondholders And Trustee Are Entitled To Summary Judgment That
The Trustee's Claim Is Not Subject To Disallowance Beyond The Amount Of
Moneys Currently Credited To PREPA's Sinking Fund (Complaint Count VII;
Counterclaim Count I) ...............................................................................................19

    A.    The Trust Agreement Grants The Trustee Recourse To All Revenues And
Other Moneys Whether Or Not They Are Currently Credited To The
Sinking Fund ..........................................................................................21

        1.    PREPA's Covenants Require It To Make Sufficient Revenues
Available To Pay What It Owes To Bondholders ....................................23

        2.    The Trustee Has Multiple Rights And Remedies To Compel
PREPA To Perform Its Obligations To Ensure Payment Of The
Bonds ....................................................................................................24

        3.    The Trustee's Right To Collect Payment On Behalf Of
Bondholders Expressly Applies To Revenues And Other Moneys
That Become Available Through The Trustee's Exercise Of
Remedies Or Otherwise ..........................................................................26

    B.    The Trust Agreement Grants The Trustee Recourse To Other Moneys ...............28

    C.    The Trustee's Recourse To PREPA's Future Revenues Or Other Moneys
Is Not Limited By Bankruptcy Code Section 927 .................................................29

## <u>TABLE OF CONTENTS (cont'd)</u>

<u>Page</u>

II.   The PREPA Bondholders And Trustee Are Entitled To Summary Judgment That The Trustee's Claim Is Not Subject To Disallowance For Lack Of Valid, Perfected, Priority Security Interests In All PREPA Revenues And Despite Covenants And Remedies Assuring Bondholders' Payment From Those Revenues (Complaint Counts I-VI; Counterclaim Count II) .............................................32

    A.   The Trustee's And Bondholders' Undisputed, Perfected Lien On Moneys Credited To The Sinking Fund Continues On Future Special Revenues..............33

        1.   The Trustee And Bondholders Have A Lien On All Future Special Revenues Credited To The Sinking Fund ....................................33

        2.   The Court Should Avoid The Constitutional Problem That Would Arise If PROMESA Were Construed To Allow PREPA And The Oversight Board To Strip The Trustee And Bondholders Of Their Liens On Future Revenues Credited To The Sinking Fund......................36

    B.   The Trust Agreement Pledges Liens In All PREPA Revenues, With Covenants, Rights, And Remedies Guaranteeing Their Payment To Bondholders, And Those Liens Are Not Subject To Avoidance, Limitation, Or Subordination...............................................................38

        1.   The Trust Agreement's Granting Clause Pledges A Security Interest In The "revenues of the System" .................................38

        2.   The Trust Agreement Provides A Security Interest In "Revenues" ..........44

        3.   The Trust Agreement's Covenants, Rights, And Remedies Determine The Value Of The Trustee's Security Interests In PREPA's Revenues..................................................................50

        4.   The Trustee Perfected Its Security Interests In All PREPA Revenues, Which In Any Event Are Not Subject To Avoidance .............51

III.   The Amended Complaint's Claims Are Not Yet Ripe, And So Should Be Dismissed For Lack Of Subject Matter Jurisdiction........................................59

CONCLUSION....................................................................................................62

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re 3PL4PL, LLC,*
    619 B.R. 441 (Bankr. D. Colo. 2020) .......................................................................55

*Acevedo-García v. Vera-Monroig,*
    368 F.3d 49 (1st Cir. 2004) ......................................................................................58

*Adria Int'l Grp., Inc. v. Ferré Dev., Inc.,*
    241 F.3d 103 (1st Cir. 2001) ....................................................................................18

*In re Advanced Cellular Sys., Inc.,*
    483 F.3d 7 (1st Cir. 2007) ........................................................................................50

*In re Airadigm Commc'ns, Inc.,*
    519 F.3d 640 (7th Cir. 2008) ..................................................................................58

*AmeriNational Cmty. Servs. v. Ambac Assurance Corp. (In re Fin. Oversight &*
    *Mgmt. Bd. for Puerto Rico),*
    635 B.R. 216 (D.P.R. 2021) ....................................................................................22

*In re Amex-Protein Dev. Corp.,*
    504 F.2d 1056 (9th Cir. 1974) (per curiam) ............................................................53

*Amyndas Pharms., S.A. v. Zealand Pharma A/S,*
    48 F.4th 18 (1st Cir. 2022) ......................................................................................39

*Armstrong v. United States,*
    364 U.S. 40 (1960) ..................................................................................................36

*BlackRock Allocation Target Shares: Series S. Portfolio v. Wells Fargo Bank,*
    *Nat'l Ass'n,*
    247 F. Supp. 3d 377 (S.D.N.Y. 2017) ....................................................................45

*Burgos-Yantín v. Mun. of Juana Díaz,*
    909 F.3d 1 (1st Cir. 2018) (per curiam) ..................................................................58

*Caguas Plumbing, Inc. v. Continental Constr., Corp.,*
    155 D.P.R. 744 (2001) ............................................................................................28

*City of Dallas, Tex. v. F.C.C.,*
    118 F.3d 393 (5th Cir. 1997) ..................................................................................39

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*In re City of Detroit,*
    524 B.R. 147 (Bankr. E.D. Mich. 2014) ........................................................................ 36

*City of Santa Monica v. Grubb,*
    245 Cal. App. 2d 718 (Dist. Ct. App. 1966) ................................................................ 51

*Clark v. Martinez,*
    543 U.S. 371 (2005) ...................................................................................................... 36

*Commoloco de Caguas Inc. v. Benítez-Díaz,*
    126 D.P.R. 478 (1990) .................................................................................................. 58

*Cross Continent Dev., LLC v. Town of Akron, Colo.,*
    742 F. Supp. 2d 1179 (D. Colo. 2010) ........................................................................ 38

*Crowe v. Bolduc,*
    365 F.3d 86 (1st Cir. 2004) .......................................................................................... 29

*In re Darin,*
    631 B.R. 301 (Bankr. W.D. Mich. 2021) .................................................................... 55

*In re Delco Oil, Inc.,*
    599 F.3d 1255 (11th Cir. 2010) ................................................................................... 55

*Derry Fin. N.V. v. Christina Cos.,*
    797 F.2d 1210 (3d Cir. 1986) ...................................................................................... 44

*Dimino v. Sec'y of Commonwealth,*
    695 N.E.2d 659 (Mass. 1998) ...................................................................................... 51

*Feliciano-Muñoz v. Rebarber-Ocasio,*
    970 F.3d 53 (1st Cir. 2020) .......................................................................................... 17

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico,*
    485 F. Supp. 3d 351 (D.P.R. 2020) ............................................................................. 26

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico,*
    914 F.3d 694 (1st Cir. 2019) ........................................................................................ 54

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico,*
    948 F.3d 457 (1st Cir. 2020) ........................................................................................ 31

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico,*
    989 F.3d 170 (1st Cir. 2021) ........................................................................................ 48

## <u>TABLE OF AUTHORITIES (cont'd)</u>

**Page(s)**

*Fin. Oversight Mgmt. Bd. for Puerto Rico v. Altair Glob. Credit Opportunities Fund, LLC*,
590 B.R. 577 (D.P.R. 2018), *aff'd in part, vacated in part, rev'd in part*, 914 F.3d 694 (1st Cir. 2019), *cert. denied sub nom. Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Andalusian Glob. Designated Activity Co.,* 140 S. Ct. 47 (2019)....................................................................................................58

*In re Financial Oversight & Management Board for Puerto Rico*,
618 B.R. 619 (D.P.R. 2020)........................................................... *passim*

*First Nat'l Bank of Boston v. Maine Turnpike Auth.*,
136 A.2d 699 (Me. 1957).......................................................................51

*Florida v. City of Lakeland*,
16 So. 2d 924 (Fla. 1943).......................................................................43

*In re Fluge*,
57 B.R. 451 (Bankr. D.N.D. 1985) .........................................................58

*FTC. v. Mandel Bros., Inc.*,
359 U.S. 385 (1959)...............................................................................41

*Goreham v. Des Moines Metro. Area Solid Waste Agency*,
179 N.W.2d 449 (Iowa 1970) .................................................................43

*In re Hertz Corp.*,
637 B.R. 781 (D. Del. 2021)....................................................................44

*In re Hyperion Enters., Inc.*,
158 B.R. 555 (D.R.I. 1993)......................................................................54

*In re I80 Equip., LLC*,
938 F.3d 866 (7th Cir. 2019) ..................................................................54

*In re J. Silver Clothing, Inc.*,
453 B.R. 518 (Bankr. D. Del. 2011) ........................................................55

*Jones v. United States*,
529 U.S. 848 (2000)................................................................................36

*LMS Holding Co. v. Core-Mark Mid-Continent, Inc.*,
50 F.3d 1520 (10th Cir. 1995) ................................................................59

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Lockhart v. United States*,
  577 U.S. 347 (2016)....................................................................................41, 42

*Lynch v. United States*,
  292 U.S. 571 (1934)...........................................................................................38

*In re Mach I Aviation, Inc.*,
  No. Adv. SV-10-01225-VK, 2011 WL 5838520 (B.A.P. 9th Cir. Sept. 15,
  2011) ....................................................................................................................26

*Marmolejos v. United States*,
  283 F.R.D. 63 (D.P.R. 2012) ............................................................................49

*Melo v. City of Somerville*,
  953 F.3d 165 (1st Cir. 2020).............................................................................17

*Merit Mgmt. Grp. v. FTI Consulting, Inc.*,
  138 S. Ct. 883 (2018)........................................................................................28

*MicroStrategy Inc. v. Acacia Rsch. Corp.*,
  No. 5735-VCP, 2010 WL 5550455 (Del. Ch. Dec. 30, 2010).........................49

*Morton v. Kievit (In re Vallecito Gas, LLC)*,
  440 B.R. 460 (Bankr. N.D. Tex. 2010).............................................................59

*Omni MedSci, Inc. v. Apple Inc.*,
  7 F.4th 1148 (Fed. Cir. 2021) ..........................................................................47

*Oswald v. City of Blue Springs*,
  635 S.W.2d 332 (Mo. 1982) .............................................................................51

*Peaje Investments LLC v. García-Padilla*,
  845 F.3d 505 (1st Cir. 2017).......................................................................37, 43

*Peaje Invs. LLC v. García-Padilla*,
  No. 16-2365, 2016 WL 6562426 (D.P.R. Nov. 2, 2016), *aff'd in relevant part,
  vacated in part* 845 F.3d 505 (1st Cir. 2017)...............................................34, 39

*Pi Elecs. Corp. v. United States*,
  55 Fed. Cl. 279 (Fed. Cl. 2003) ........................................................................38

*Pierce Cnty. v. Washington*,
  148 P.3d 1002 (Wash. 2006).............................................................................43

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Reese Expl., Inc. v. Williams Nat. Gas Co.*,
   983 F.2d 1514 (10th Cir. 1993) ........................................................................45, 48

*Rosenthal-Zuckerman v. Epstein, Becker & Green Long Term Disability Plan*,
   39 F. Supp. 3d 1103 (C.D. Cal. 2014) ...................................................................49

*Ruckelshaus v. Monsanto Co.*,
   467 U.S. 986 (1984)................................................................................................38

*Russello v. United States*,
   464 U.S. 16 (1983)..................................................................................................49

*Sapp v. Indus. Action Servs., LLC*,
   No. 19-912-RGA, 2020 WL 2813176 (D. Del. May 29, 2020)................................44

*In re Se. Stud & Components, Inc.*,
   No. 14-32906-DHW, 2016 WL 2604535 (Bankr. M.D. Ala. May 3, 2016) ...........54

*Texas v. United States*,
   523 U.S. 296 (1998)................................................................................................60

*In re Trask*,
   462 B.R. 268 (B.A.P. 1st Cir. 2011) ......................................................................57

*U.S. Trust Co. of N.Y. v. New Jersey*,
   431 U.S. 1 (1977)....................................................................................................51

*UBS Fin. Servs., Inc. of P.R. v. XL Specialty Ins. Co.*,
   929 F.3d 11 (1st Cir. 2019).....................................................................................50

*Matter of Udell*,
   18 F.3d 403 (7th Cir. 1994) ...................................................................................27

*United States v. Cmty. Health Sys., Inc.*,
   666 F. App'x 410 (6th Cir. 2016) (per curiam) .....................................................41

*United States v. Hyde*,
   497 F.3d 103 (1st Cir. 2007)...................................................................................28

*United States v. Lahey Clinic Hosp., Inc.*,
   399 F.3d 1 (1st Cir. 2005).......................................................................................59

*United States v. Sec. Indus. Bank*,
   459 U.S. 70 (1982)..................................................................................................36

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*In re Vt. Toy Works, Inc.*,
    82 B.R. 258 (Bankr. D. Vt. 1987) ........................................................................57

*Whitfield v. Mun. of Fajardo*,
    No. 01-2647 2007 WL 6894782 (D.P.R. May 29, 2007) ...................................58

**Constitutions, Statutes & Rules**

3 L.P.R.A. § 9142 ....................................................................................................58

19 L.P.R.A. § 2260 ..................................................................................................52

19 L.P.R.A. § 2262 ..................................................................................................56

19 L.P.R.A. § 2265 ..............................................................................................54, 55

19 L.P.R.A. § 2267 ..................................................................................................59

19 L.P.R.A. § 2322 ..................................................................................................52

22 L.P.R.A. § 195 ....................................................................................................56

22 L.P.R.A. § 196 ....................................................................................8, 56, 57, 59

22 L.P.R.A. § 206 ......................................................................................................8

22 L.P.R.A. § 207 ..............................................................................................*passim*

22 L.P.R.A. § 208 ..............................................................................................*passim*

31 L.P.R.A. § 3 ........................................................................................................56

31 L.P.R.A. § 3471 ..................................................................................................39

31 L.P.R.A. § 6342 ..................................................................................................39

11 U.S.C. § 101 ........................................................................................................26

11 U.S.C. § 362 ..........................................................................................................7

11 U.S.C. § 506 ........................................................................................................61

11 U.S.C. § 544 ................................................................................................*passim*

11 U.S.C. § 549 ........................................................................................................59

## <u>TABLE OF AUTHORITIES (cont'd)</u>

**Page(s)**

11 U.S.C. § 902 ................................................................................................................33, 34, 56

11 U.S.C. § 927 ................................................................................................................ *passim*

11 U.S.C. § 928 ................................................................................................................ *passim*

11 U.S.C. § 1111 ........................................................................................................................30

11 U.S.C. § 1129 ........................................................................................................................62

28 U.S.C. § 959 ..........................................................................................................................24

Fed. R. Bankr. P. 7056 ................................................................................................................1

Fed. R. Civ. P. 56 ........................................................................................................1, 17, 18

PROMESA § 310 ..........................................................................................................................1

PROMESA § 314 ........................................................................................................................62

PROMESA § 405 ........................................................................................................................37

P.R. Const. art. II, § 9 ................................................................................................................36

U.S. Const. amend. V ................................................................................................................36

U.S. Const. amend. XIV ............................................................................................................51

**Other Authorities**

124 Cong. Rec. H. 11,095 (Apr. 24, 1978) ..............................................................................62

124 Cong. Rec. S. 17,411 (June 13, 1978) ..............................................................................62

5 COLLIER ON BANKRUPTCY ¶ 544.01 ........................................................................................59

6 COLLIER ON BANKRUPTCY ¶ 927.02 ........................................................................................31

MERRIAM-WEBSTER DICTIONARY ................................................................................................46

Gary D. Spivey, *Impact of U.C.C. Article Nine on Revenue Bond Investments*,
44 IND. L.J. 624 (1969) ........................................................................................................40

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Government Agencies Owe Millions to Luma Energy, Telemundo PR* (June 22, 2022), https://www.telemundopr.com/noticias/puerto-rico/agencias-del-gobierno-le-deben-millones-a-luma-energy/2351315 ............................................................15

H.R. Rep. No. 100-1011 (1988)............................................................................30

H. Rep. No. 95-59 (1977) ....................................................................................62

Rhonda C. Thomas, *The Hancock Amendment: The Limits Imposed on Local Governments*, 52 UMKC L. REV. 22 (1983) ...........................................................51

ROBERT I. LANDAU & ROMANO I. PELUSO, CORPORATE TRUST ADMINISTRATION AND MANAGEMENT (6th ed. 2008)............................................................................44

S. Rep. No. 95-989 (1978)....................................................................................62

S. Rep. No. 100-506 (1988)............................................................................30, 31

*Summary of Bank Account Balances for the Government of Puerto Rico and its Instrumentalities* (July 29, 2022), https://emma.msrb.org/P11669624.pdf ............................14

Pursuant to Section 310 of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), Federal Rule of Bankruptcy Procedure 7056, and Federal Rule of Civil Procedure 56, U.S. Bank National Association as Trustee (the "Trustee"), the Ad Hoc Group of PREPA Bondholders (the "Ad Hoc Group"), Assured Guaranty Corp. and Assured Guaranty Municipal Corp. ("Assured"), National Public Finance Guarantee Corporation ("National"), and Syncora Guarantee Inc. ("Syncora," and together with the Ad Hoc Group, Assured, and National, the "PREPA Bondholders") respectfully submit this motion for summary judgment on all claims asserted in the First Amended Complaint filed by the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as representative of the Puerto Rico Electric Power Authority ("PREPA"), and on Counterclaim Counts I and II asserted by the PREPA Bondholders and the Trustee against PREPA and the Oversight Board.  The PREPA Bondholders and the Trustee state as follows in support:

## **PRELIMINARY STATEMENT**

1.      Just ten days ago, the Oversight Board's chairman emphatically stated, at a public meeting, that "PREPA's debts can't simply be wiped out."  And yet erasing most of PREPA's debts is exactly what the Oversight Board is trying to do in its Amended Complaint.

2.      The Board's original complaint relied on the mistaken contention that PREPA's bondholders and their Trustee have only severely limited security interests, such that their claim is mostly unsecured.  Now, more than five years into this proceeding, the Oversight Board has tacked onto its complaint the remarkable and unfounded assertion that PREPA's bondholders and their Trustee *have no right to payment at all*—either secured *or* unsecured—on PREPA's $8.3 billion in unpaid revenue-bond principal, plus accrued interest and other amounts.  That is, the Oversight Board's new position is that PREPA repeatedly violated its statutory and contractual obligations to bondholders *without so much as generating an allowable claim* that the Trustee and

1

bondholders can lawfully assert against PREPA. That absurd result—which would eviscerate bondholders' recovery—is contradicted by the parties' Trust Agreement, prohibited by Puerto Rico law, and precluded by the U.S. and Puerto Rico constitutions.

3.      For over four decades, PREPA borrowed billions of dollars from bondholders to build and improve its electricity system, including its generation, transmission, and distribution assets. In exchange, PREPA promised to repay those bondholders, and pledged as security for that promise the revenues of the system that the borrowed funds had financed. To give meaning to that pledge, PREPA further promised to charge rates, send bills, and collect revenues necessary to service its debt. PREPA also promised that, after paying only necessary Current Expenses, it would credit the pledged revenues first and foremost to a "Sinking Fund," controlled by the Trustee, from which bondholders would receive regular payments.

4.      PREPA did not live up to its side of the bargain. It failed to adjust rates, failed to collect on governmental entities' unpaid balances, and failed to credit available revenues to the Sinking Fund. As a result, bondholders have not been paid principal and interest for nearly six years, including during the five years that this Title III case has been pending. Until March 2022, bondholders were expecting a substantial recovery on their claims under the terms of a 2019 restructuring support agreement negotiated and approved by both the Oversight Board and the Commonwealth (the "2019 RSA"). But, after inducing bondholders into a marathon standstill period, including by assuring this Court that they supported the agreement, the Oversight Board and AAFAF[2] (the "Government Parties") unexpectedly noticed a termination of the 2019 RSA.

5.      Now, the Oversight Board is seeking to cut the Trustee's and bondholders' secured and allowable claim down to just the paltry sums that PREPA has already credited to the Trustee-

---

[2] The Puerto Rico Fiscal Agency and Financial Advisory Authority, known as "AAFAF" for its Spanish acronym, is the Puerto Rico government's representative in PREPA's restructuring.

controlled Sinking Fund.  As the Oversight Board tells it, PREPA's Trust Agreement compels this result.  Under its theory, the Trust Agreement allows PREPA to erase nearly all of its bond debt, and to limit bondholders' collateral, simply by violating its contractual and statutory obligations to charge, collect, and credit to its Sinking Fund sufficient moneys to repay that debt.  Indeed, if the Oversight Board were right, then PREPA never needed this Title III case at all—rather, PREPA already wiped out the Trustee's recourse and liens, and escaped nearly all of its bond debt, as soon as it stopped crediting moneys to its Sinking Fund.  Otherwise, the Oversight Board must be arguing that the Trustee's and bondholders' liens and rights to compel PREPA's compliance with its obligations have permanently vanished *as part of this Title III proceeding*, and without just compensation (or, really, any compensation at all).  The Trust Agreement does not support the Oversight Board's cramped interpretation.

6.     *First*, the Trust Agreement does not limit the Trustee's and bondholders' recourse to only those moneys that PREPA has "previously credited" to PREPA's Sinking Fund.  *See* First Amended Complaint ("FAC") ¶ 110.  These are revenue bonds, and bondholders lent PREPA large sums of up-front capital in exchange for the right to be repaid out of a stream of revenues that would be directed to them until their bonds matured years later.  To assure that those revenues would in fact be used to repay the bonds, the Trust Agreement gives the Trustee and, separately, bondholders robust rights to compel PREPA's specific performance of its obligations to set rates, bill customers, collect revenue, and credit moneys to the Sinking Fund sufficient to make those payments.  The Trust Agreement also gives the Trustee and bondholders the right to obtain the appointment of a receiver that would enforce PREPA's obligations.  Many of these rights and remedies, including the right to a receiver, are reinforced by Puerto Rico's Authority Act establishing PREPA and enabling its issuance of secured revenue bonds.

7.      The Trust Agreement is clear that whenever—including now—PREPA fails to credit enough money to the Sinking Fund to pay bondholders, the Trustee may then pay bondholders out of *any moneys that later become available* to pay them.  That expressly includes such moneys that the Trustee and bondholders *can make available* to pay the bonds by exercising their respective contractual and statutory remedies.   So even if (counterfactually) the Trust Agreement authorizes the Trustee to pay bondholders only out of moneys that are first credited to the Sinking Fund, then bondholders would still be entitled to all such moneys that can be made available to pay them out of that Fund *in the future*, including through the Trustee's enforcement of PREPA's obligations to collect and credit sufficient pledged revenues to the Sinking Fund.

8.      Section 927 of the Bankruptcy Code, on which the Oversight Board relies (at FAC ¶ 7), does not say otherwise.  Rather, the Oversight Board's invocation of that provision *confirms* the Trustee's right to the continuing stream of PREPA's "special revenues" generated from its ownership and operation of the electricity system.  The Trustee's right to payment on its claim— and therefore bondholders' recovery on the billions of dollars owed to them—is thus not limited only to whatever PREPA has previously credited to the Sinking Fund.

9.      *Second*, the Trustee's and bondholders' liens are also not limited to the moneys already credited to the Sinking Fund.  Under the Trust Agreement, and as authorized by statute in PREPA's Authority Act, PREPA has pledged *to the Trustee* "the revenues of the System" to secure all of PREPA's obligations and covenants under that Agreement, and separately pledged "Revenues" (as defined by the Agreement) as security for PREPA's obligation to pay debt service. The Trust Agreement then also provides "further security," directly *to bondholders*, in moneys that have been credited to the Sinking Fund and other specific accounts.  As the Oversight Board acknowledges, the Sinking Fund and certain of these other accounts are already held by the Trustee to facilitate its payments to bondholders, and so this "further security" protects bondholders' rights

to moneys that are already in their Trustee's control.  The Oversight Board nevertheless argues that this "further security" *to bondholders* supersedes or limits the Trust Agreement's broader revenue pledges *to the Trustee*.  But reading the Trust Agreement's "further security" to bondholders to be the *only security* granted by the Trust Agreement *at all* is directly contradictory to the Agreement's plain and ordinary meaning.

10.     But even if the Trustee's and bondholders' liens *are* limited only to moneys credited to the Sinking Fund, they necessarily include moneys that can be made available for credit to the Sinking Fund *in the future*, including through the Trustee's or bondholders' exercise of their contractual and statutory remedies.  Section 928 of the Bankruptcy Code is clear that the Trustee's and bondholders' liens on what both parties admit are "special revenues" include such special revenues that PREPA acquired (and will continue to acquire) after filing its Title III petition.

11.     Nor is there any merit to the Oversight Board's contention that the Trustee's and bondholders' liens in all of PREPA's revenues are unperfected and subject to avoidance. Section 544(a) of the Bankruptcy Code does not provide for the avoidance of the Trustee's liens even if the liens were unperfected.  But the Trustee's lien, in any event, was timely perfected under the Uniform Commercial Code and, before that, under the Authority Act's provision for the enforceability of the security interests that PREPA granted to the Trustee.

12.     In short, the Trustee and bondholders have a secured claim that is not subject to disallowance, avoidance, limitation, or subordination on any of the grounds advanced by the Oversight Board.  The allowed amount of that claim is equal to the amount of moneys loaned and unpaid, plus interest and other amounts contemplated by the Trust Agreement or bond resolutions. The revenues of PREPA's system serve as collateral securing the claim asserted by the Trustee for the benefit of bondholders.  The value of that collateral will need to reflect rates and billing procedures that satisfy PREPA's statutory and contractual obligations—not the inadequate rates

and leaky collection protocols now in place.  This value is to be determined in connection with a proposed plan of adjustment or as part of the claim-estimation process, where the Oversight Board will have the burden to prove which rates and other revenue-related measures are the most that bondholders can realistically expect after giving effect to the Trustee's and bondholders' rights and remedies under the Trust Agreement and applicable law.

13.    The Oversight Board's Amended Complaint, however, seeks to destroy the Trustee's and bondholders' enforceable, equitable rights to compel PREPA's performance of its covenants in the Trust Agreement—and to do so outside of the process to confirm a plan of adjustment and the creditor protections provided by that process.  As a result, the Oversight Board's implausible assumption that the Trustee and bondholders have somehow already (and permanently) lost their statutory and contractual rights to enforce PREPA's covenants and statutory obligations demonstrates why the complaint raises serious ripeness problems.

14.    Nothing in PROMESA or Commonwealth law gives PREPA license to violate its contracts and existing statutory obligations.  The only reason the Trustee and bondholders cannot cause PREPA to pursue increased rates *now,* and to collect and credit revenues *now*, is that the automatic stay *temporarily* enjoins them from doing so.  The Oversight Board's attempt to convert the automatic stay into legal authority to vitiate creditors' substantive rights finds no home in any statute or case law.  Claims (secured or unsecured) can be lawfully restructured, altered, or impaired only pursuant to a confirmed plan of adjustment.  And obtaining confirmation of such a plan requires a showing that the plan is filed in "good faith," is "fair and equitable," and is in the "best interests of creditors."  The Oversight Board cannot avoid these requirements by recasting PREPA's *ultra vires* attempt to permanently impair creditor rights (while it is protected by the

automatic stay) as a pre-confirmation adversary proceeding.[3]  While the Oversight Board would no doubt welcome an advisory opinion from this Court on whether PREPA *could* somehow lawfully repudiate its contractual covenants and statutory obligations, its complaint seeks judgments based on entirely hypothetical facts.

15.     Accordingly, movants respectfully request that the Court reject the Oversight Board's assertion that the Trustee's and bondholders' liens and recourse are limited to moneys currently credited to the Sinking Fund, as being an attempt to sidestep PREPA's liability for failing to abide by the Trust Agreement and Authority Act.  Movants submit that this Court should either dismiss the Oversight Board's Amended Complaint until such time as its claims are ripe and justiciable, or else grant the PREPA Bondholders' and Trustee's motion for summary judgment dismissing the Amended Complaint's claims and granting Counterclaim Counts I and II.

## BACKGROUND

### A.     The Authority Act

16.     The Commonwealth of Puerto Rico established PREPA as a public corporation to provide electricity to the people of Puerto Rico.  *See* 22 L.P.R.A. §§ 191-217 (the "Authority Act").[4]  PREPA is a "governmental instrumentality of the Commonwealth of Puerto Rico," but has a "legal existence and personality separate and apart from" the Commonwealth.  *Id.* § 193.

17.     The Authority Act authorizes PREPA to generate revenues by giving it the power to "propose and collect just, reasonable, nondiscriminatory rates and fees, and other charges

---

[3] *See* 11 U.S.C. § 362.  The Oversight Board's position would mean that lifting the automatic stay (such that the Trustee could cause PREPA to raise rates and collect and credit ensuing moneys to the Sinking Fund) would increase the value of the secured claim because there would be more moneys in the Sinking Fund after PREPA honors its commitments.  But substantive property rights are not determined by reference to whether or not the automatic stay is in effect.  The automatic stay is neither a permanent injunction nor a discharge.

[4] References to the Authority Act are to its official English translation unless otherwise specified.

approved by the [Puerto Rico Energy] Bureau, for the use of the facilities of the Authority, or for electric power services." Act 33-2019 § 24; *see also* Act 19-1942 § 6(*l*) (original text similar to current law but without the requirement of Energy Bureau approval). The Authority Act provides that PREPA has and must exercise the power to collect such revenues "that are sufficient . . . for the payment of the principal of and interest on its bonds, and for fulfilling the terms and provisions of the agreements entered into with or for the benefit of purchasers or holders of any bonds of the Authority and other creditors." Act 33-2019 § 24.

18.     The Authority Act also empowers PREPA to enter into trust agreements pledging its future revenues to secure the payment of bonds issued pursuant to the Act. Specifically, PREPA can enter into agreements with bondholders that contain provisions "[a]s to the disposition of the entire gross or net revenues and present or future income of the Authority, including the pledging of all or any part thereof to secure payment of the bonds." 22 L.P.R.A. § 206(e)(1); *see also id.* § 195a-1(o) (Spanish) (previously *id.* § 196). The Act further authorizes PREPA to enter into binding trust agreements with bondholders that include provisions "as to the manner of collecting the rates, fees, rentals, or other charges for the services, facilities, or commodities of undertaking of the Authority." *Id.* § 206(e)(13).

19.     In the event that PREPA defaults on its bonds, the Authority Act provides bondholders and their trustee with separate statutory rights to appointment of a receiver. *Id.* § 207.

20.     The Authority Act also gives a bond trustee and bondholders other statutory remedies, including the right "(1) [b]y mandamus or other suit, action, or proceeding at law or in equity to enforce his rights against the Authority and its Board, officers, agents, or employees to perform and carry out its and their duties and obligations under [the Authority Act's relevant provisions] and its and their covenants and agreements with bondholders; (2) by action or suit in equity to require the Authority and the Board thereof to account as if they were the trustee of an

express trust; (3) by action or suit in equity to enjoin any acts or things which may be unlawful or in violation of the rights of the bondholders; and (4) to bring suit upon the bonds." *Id.* § 208.

### B.     The Trust Agreement

21.     Exercising its statutory authority, in 1974, PREPA entered into a Trust Agreement with a predecessor to U.S. Bank as Trustee, pursuant to which PREPA issued billions of dollars of power revenue bonds over the decades since. *Declaration of Matthew M. Madden*, Ex. 1 ("Madden Ex.") (Conformed Trust Agreement).[5]

22.     PREPA's physical assets—*e.g.*, its power plants, substations, poles, and wires— cannot be used as security for its bonds. Instead, as is typical in municipal borrowing, the Trust Agreement secures PREPA's bonds with the power system's present and future revenues and certain other moneys, and contains numerous contractual covenants and remedies, backed by statutory rights, to ensure that the Bonds will be fully secured and repaid.

23.     *First*, the Trust Agreement requires PREPA to generate sufficient Revenues, defined to include "all moneys received" by PREPA, to repay the Bonds. Trust Agreement § 101. PREPA must "fix, charge and collect" rates, and "adjust such rates and charges" as necessary, to provide for Revenues sufficient to pay PREPA's Current Expenses and to cover 120% of the Bonds' principal and interest requirements for the next fiscal year. *Id.* §§ 501, 502. "[I]f at any time the Revenues shall not be sufficient" for these purposes, then PREPA is required to "revise the rates and charges" to customers "so that such deficiency will be made up." *Id.* § 502. Indeed, Section 502 of the Trust Agreement gives the Trustee the right to sue PREPA (upon the request of 10% of PREPA bondholders by principal amount), at any time and without regard to the

---

[5] Exhibit A to the Amended Complaint includes the original Trust Agreement and its supplemental agreements. For convenience, this brief refers to a compiled version of the Trust Agreement, incorporating its amendments, prepared jointly by PREPA's prior counsel and counsel for the Trustee.

occurrence of any event of default, "to compel the Authority to adjust [its] schedule [of rates and charges]" in order to meet its revenue requirement for Current Expenses and 120% of upcoming debt service.  *Id.*  A corresponding right is codified under the Authority Act.  *See* 22 L.P.R.A. § 208.

24.     *Second*, the Trust Agreement requires PREPA to credit its Revenues when received (with one insignificant exception) to a "special fund" created by the Trust Agreement, called the General Fund.  The Revenues and any other moneys credited to the General Fund are held in trust, and must be used first to pay and reserve for budgeted Current Expenses, which may "not exceed an amount which is reasonable and necessary for maintaining, repairing and operating the System in an efficient and economical manner."  *Id.* §§ 505, 601.  Remaining funds are then deposited to the credit of another special fund, called the Revenue Fund, and then are credited to yet another special fund, called the Sinking Fund.

25.     The Sinking Fund, in turn, comprises three defined accounts, each of which is in the control of the Trustee for bondholders' benefit and which together are bondholders' principal source of repayment in the ordinary course.  *Id.* § 507.  One account—the Bond Service Account— is supposed to hold enough Revenues to cover interest and principal accruals through the next month.  *Id.*  A second account—the Redemption Account—is supposed to hold enough Revenues to cover the accrual of upcoming bond redemptions through the next month.  *Id.*  And a third account—the Reserve Account—is supposed to hold enough Revenues to cover the following 12 months of principal and interest payments.  *Id.*

26.     Section 805 of the Trust Agreement provides that, "[a]nything in this Agreement to the contrary notwithstanding, if at any time the moneys in the Sinking Fund shall not be sufficient" to pay principal or interest then due, then "such moneys, *together with any moneys then available or thereafter becoming available for such purpose*" shall be applied, pro rata, to pay bondholders

after payment of the Trustee's fees and expenses. *Id.* § 805 (emphasis added). And Section 805 emphasizes that moneys can be made available to make those payments, beyond what is credited to the Sinking Fund, "*whether through the exercise of the remedies provided for in this Article [i.e.,* the "Remedies" sections of the Trust Agreement] *or otherwise.*" *Id.* (emphasis added). In other words, the Trustee can pay bondholders not only out of the balance currently credited to the Sinking Fund, but rather, when that balance comes up short, also out of other moneys that thereafter become available to pay them—from future revenues, from the exercise of the Trustee's contractual and statutory remedies, "or otherwise." *Id.*

27. By contrast, when the Sinking Fund *is* sufficiently funded to cover upcoming payments to bondholders, then any surplus Revenues are credited to a series of other funds—the Reserve Maintenance Fund, the Subordinate Obligations Fund, the Self-insurance Fund, and the Capital Improvement Fund. *Id.* § 507. Though PREPA can put Revenues credited to these funds to certain designated purposes (*id.* §§ 507, 512, 512A, 512B), the moneys credited to them are nevertheless still held in trust for bondholders (*id.* § 507).

28. *Third*, the Trust Agreement provides the Trustee a panoply of rights and remedies to assert on behalf of bondholders to enforce PREPA's compliance with its covenants such that Revenues and other moneys are, in fact, made available to repay the PREPA Bonds as required:

    a. The Trustee shall, upon the request of 10% of PREPA bondholders (and subject to certain conditions), sue to compel PREPA to adjust its rates to pay Current Expenses and repay the bonds, and PREPA covenants to abide by such a ruling. *Id.* § 502.

    b. After an Event of Default, the Trustee may—and, upon the request of 10% of PREPA bondholders (same conditions), shall—sue to compel "specific performance of any covenant or agreement [by PREPA]" or "for the enforcement of any proper legal or equitable remedy." *Id.* § 804. Moreover, the Trustee may—and, upon the request of 25%

11

of PREPA bondholders (same conditions), shall—proceed "for the appointment of a receiver." *Id.*

    c.    The Trustee is "entitled to sue for, enforce payment of, and receive any and all amounts then or during any default becoming, and at any time remaining, due from [PREPA]," "to recover and enforce any judgment or decree against [PREPA]," and "to collect (but solely from moneys in the Sinking Fund *and any other moneys available for such purpose*) in any manner provided by law, the moneys adjudged or decreed to be payable." *Id.* (emphasis added).

The Authority Act also gives the Trustee and bondholders statutory rights to compel PREPA's performance of its obligations, including by obtaining the appointment of a receiver and suing PREPA for breach of trust and for an accounting. *See* 22 L.P.R.A. §§ 207-08. None of the Trustee's or bondholders' equitable remedies, by contract or statute, are limited by the Trust Agreement's provision requiring that collection on a money judgment be made only from moneys credited to the Sinking Fund or otherwise available for such collection.

    29.    *Finally*, consistent with PREPA's authority under the Authority Act, the Trust Agreement grants multiple overlapping liens in PREPA's revenues and other moneys to the Trustee and bondholders:

    a.    PREPA pledged to the Trustee, "to secure the payment of all bonds" and "the performance and observance of all the covenants," "the revenues of the System, subject to the pledge of such revenues to the payment of the principal of and the interest on the 1947 Indenture Bonds (hereinafter mentioned), and other moneys to the extent provided in this Agreement as security for the payment of the bonds" and "for the satisfaction of any other obligation assumed by it in connection with such bonds." Trust Agreement pp. 11-12.

b.      PREPA also "pledged to the payment" of the Bonds its "Revenues," defined
as "all moneys received" by PREPA" "in connection with or as a result of its ownership or
operation of the System," including all "income derived by" PREPA "from the sale of
electricity generated or distributed" by PREPA, and from insurance proceeds and
investments.  *Id.* §§ 701, 101; *see also id.* §§ 705, 712(a), 516(c), 516(e)(2), 516(e)(3).

c.      PREPA separately provided "further security" directly to the "holders" of
the Bonds in the form of a lien on "moneys" credited to the Sinking Fund, the Reserve
Maintenance Fund, the Self-insurance Fund, the Capital Improvement Fund, and the
Construction Fund.  *Id.* §§ 401, 507.

30.     The liens under the Trust Agreement are perfected by several Uniform Commercial
Code ("UCC") financing statements, filed with the Puerto Rico Department of State, covering the
liens on "the Revenues of the System," "[a]ll the Revenues of the System . . . and other moneys
and accounts to the extent provided in [the] Trust Agreement," and "all Revenues of the System
and all other monies granted under the Trust Agreement."  Madden Ex. 3 (Dep't of State Doc.
No. 2013004449 (Aug. 21, 2013) ("FS 4449")); Madden Ex. 4 (Dep't of State Doc.
No. 2014004304 (Aug. 12, 2014) ("FS 4304")); Madden Ex. 5 (Dep't of State Doc.
No. 2015004173 (June 30, 2015) ("FS 4173")); Madden Ex. 6 (Dep't of State Doc.
No. 2015004174 (June 30, 2015) ("FS 4174")).  Two financing statements further specified that
the collateral included "all liens, security interests and pledges now or hereafter granted  . . . under
the . . . Trust Agreement," "all of the Debtor's rights, title, and interest in and to now-owned or
acquired collateral to the extent provided under the Trust Agreement," and "all of such rights of
[PREPA] in and to any 'Funds' and any proceeds, deposit accounts, security entitlements, other
investment property, accounts, payment intangibles, 'Time Deposits,' supporting obligations, and
general intangibles of any of the foregoing and all related rights arising from or now or hereafter

held in or required to be held in [certain funds created by the Trust Agreement] and any earnings therein, wherever the same shall be held." Ex. A to FS 4173; Ex. A to FS 4174. These financing statements thus perfected the security interests in the "revenues," "Revenues," accounts receivable, and their cash proceeds—to the extent such perfection under the UCC was even necessary in light of PREPA's power under the Authority Act to grant effective, first-priority security interests in all future revenues. The Oversight Board concedes that the Sinking Fund and the Self-insurance Fund are controlled by the Trustee, and that the liens on those Funds are perfected.

C.     **PREPA's Breaches And Defaults**

31.     PREPA has breached, and continues to breach, the terms of the Trust Agreement. It has done so, first and foremost, by failing to make required payments on the Bonds and violating the express covenants and obligations made to guarantee those payments. PREPA has admitted that it "has not made monthly cash deposits into the Sinking Fund through January 2017, and then defaulted on the payments due on July 3, 2017 and January 2, 2018." *See* PREPA, Financial Statements, Required Supplementary Information and Supplemental Schedules, at 124 (June 30, 2015) ("PREPA's 2015 Audited Financial Statements"). The Oversight Board filed PREPA's Title III petition on the day of its first payment default. Ever since then, PREPA has been using Title III as a shield to protect it from the Trustee's exercise of its statutory and contractual remedies to ensure bondholders' payment—and now also as a sword in an attempt to permanently destroy the Trustee's and bondholders' rights.

32.     The Oversight Board has pointed to nothing in PROMESA—and there is nothing— that sanctions PREPA's non-compliance with the Authority Act or Trust Agreement. Indeed, without even purported *Commonwealth* (let alone federal) authorization, PREPA has been misdirecting Revenues *away* from the Sinking Fund in contravention of the Authority Act and its contractual duties. PREPA has failed to credit moneys to the Sinking Fund even though it holds

significant amounts of funds on hand, including over a billion dollars in its operating account as of July 2022.[6]

33.     Instead of crediting Revenues to the Sinking Fund, as required under the Trust Agreement, the Authority Act, and PROMESA, PREPA has been using those Revenues for other purposes.  Only Current Expenses, as defined and limited by the Trust Agreement, may be paid before Revenues are credited to the Sinking Fund.  Trust Agreement §§ 505-507.[7]  Despite this, PREPA continues to use its Revenues to pay capital and other expenditures that do not qualify as Current Expenses before making its required credits to the Sinking Fund.  *See, e.g.*, Madden Ex. 14 at 147 (providing for PREPA's payment of non-federally funded capitalized expenditures of $122 million).

34.     PREPA also has historically failed to appropriately collect fees from municipalities and public instrumentalities, resulting in governmental accounts receivable of over half a billion dollars.  FTI Capital Advisors, Accounts Receivable and CILT Report, 16, 96 (Nov. 15, 2014), *available at* Dkt. No. 17-004780-LTS, ECF No. 2973-21; *Government Agencies Owe Millions to Luma Energy, Telemundo PR* (June 22, 2022), https://www.telemundopr.com/noticias/puerto-rico/agencias-del-gobierno-le-deben-millones-a-luma-energy/2351315.   And  for  many  years, PREPA has simply failed to set rates that will generate Revenues sufficient to pay its Current Expenses and 120% of its upcoming debt service, as contractually mandated.  Madden Ex. 14 at

---

[6] *See, e.g.*, *Summary of Bank Account Balances for the Government of Puerto Rico and its Instrumentalities* (July 29, 2022) at 11, https://emma.msrb.org/P11669624.pdf.

[7] In *Cortland Capital Markets Services LLC v. Financial Oversight and Management Board of Puerto Rico*, Adv. Proc. No. 19-396-LTS, certain fuel line lenders to PREPA have claimed that the Trust Agreement requires PREPA to pay all Current Expenses before the bonds.  That adversary proceeding remains stayed pursuant to the Court's September 29, 2022 Scheduling Order, Dkt. No. 17-3283, ECF No. 22410.  Except as necessary to address the recourse and security issues raised by the Amended Complaint and Counterclaim Counts I & II, the PREPA Bondholders' and Trustee's motion for summary judgment is not intended to address or resolve the subject matter of that separate adversary proceeding.

33 ("PREPA's rates have also been insufficient to cover operating costs, pension costs, and debt obligations.").

35.     The Official Committee of Unsecured Creditors of all Title III Debtors (the "Committee") has asserted that moneys credited to the Sinking Fund totaled less than $9 million as of the petition date.  Committee Objection to Proof of Claim No. 18449, ¶ 21, Dkt. No. 17-4780-LTS, ECF No. 1691 (D.P.R. Oct. 30, 2019).  Post-petition credits of money to the Sinking Fund have been limited to federal subsidy payments on account of two issuances of Build America Bonds that were paid directly by the U.S. Treasury to the Trustee.

36.     As a result of PREPA's many violations of its contractual obligations under the Trust Agreement, bondholders have not been paid for almost *six years*.  Madden Ex. 13 at 59 (PREPA's "repayment obligation relating to its Power Revenue Bonds has been stayed as a result" of the Title III petition.).

> **D.     The Adversary Proceeding**

37.     The Oversight Board initiated this adversary proceeding in 2019.  In its first iteration, the Oversight Board's complaint challenged only the validity and perfection of the Trustee's security interests beyond the Sinking Fund.  *See* ECF No. 1.[8]  The proceeding was immediately stayed at the request of the parties to allow them to proceed with the 2019 RSA.  ECF Nos. 2, 10.

38.     In March of this year, after the Government Parties had, in statements to bondholders and this Court, continuously supported the 2019 RSA for three years, Puerto Rico's Governor abruptly asserted that he had terminated the RSA, with the Oversight Board's support.

---

[8] References to "ECF No." are to docket entries in this adversary proceeding unless otherwise stated.

Dkt. No. 17-3283, ECF No. 20277-2 at 2. After months of mediation resulted in no new agreement, the Oversight Board amended its complaint. ECF No. 26.

39. The Amended Complaint repleads the Oversight Board's original challenge to the validity and perfection of the Trustee's and bondholders' security interests. It also asserts—for the first time—that the Trustee and bondholders have almost no allowable bankruptcy claim *at all* for payment on their $8.3 billion in principal, plus accrued interest and other amounts, beyond the limited amounts currently credited to the Sinking Fund (or to the completely empty Self-insurance Fund).[9] This limited-recourse argument had previously been advanced only by the Committee, and the Oversight Board characterized a similar construction of bond documents as being "fallacious" when it was advanced in the Highways and Transportation Authority's ("HTA") case.[10]

40. The Trustee and PREPA Bondholders answered the Amended Complaint, stated various affirmative defenses, and asserted a Counterclaim Complaint seeking declaratory judgments that, as relevant to this motion, they have recourse beyond moneys that are "currently credited" to the Sinking Fund, and that they hold valid, perfected, priority security interests in "revenues," "Revenues," and certain "other moneys." ECF No. 47.

## **LEGAL STANDARD**

41. Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Feliciano-Muñoz v. Rebarber-Ocasio*, 970 F.3d 53, 62 (1st Cir. 2020) (quoting Fed. R. Civ. P. 56(a)). A genuine

---

[9] Because PREPA's Self-insurance Fund is empty, and the Trust Agreement required moneys to be credited to it only "on the date of the release of the 1947 Indenture," it has little or no practical effect on the claims or counterclaims at issue. Accordingly, this brief will refer only to the Sinking Fund unless further reference to the Self-insurance Fund is necessary.

[10] Brief for Defendants-Appellees at 33, *In re Fin. Oversight & Mgmt. Bd. for PR*, Dkt. No. 18-1165, ECF No. 00117314473 (1st Cir. July 17, 2018).

dispute as to any material fact requires "the nonmoving party [to] produce[] evidence such that a reasonable jury could resolve the point in [its] favor." *Melo v. City of Somerville*, 953 F.3d 165, 168 (1st Cir. 2020) (internal quotation marks omitted). The unambiguous meaning of a contract is a question of law appropriate for summary judgment. *Adria Int'l Grp., Inc. v. Ferré Dev., Inc.*, 241 F.3d 103, 111 (1st Cir. 2001).[11]

## ARGUMENT

42. The thrust of the Oversight Board's Amended Complaint is that the Trustee and bondholders have an allowable recourse bankruptcy claim to, and are secured by, only the minimal funds that PREPA has previously credited to its Sinking Fund. In other words, the Oversight Board claims that PREPA's past and continuing breaches of its covenants to increase Revenues, and to credit such Revenues to the Sinking Fund in amounts sufficient to pay debt service, have wiped out nearly all of the Trustee's claim for $8.3 billion in unpaid bond principal, plus accrued interest and other amounts. That contravenes the plain meaning of the Trust Agreement, which gives the Trustee recourse to, and security in, all of PREPA's present and future revenues, as well as robust remedies for PREPA's breaches by which to cause such revenues or other moneys to be made available to pay the Trustee's claim. The Oversight Board's Amended Complaint, which disregards these equitable remedies, is nothing less than a complete repudiation of PREPA's contractual and statutory obligations under the Trust Agreement, the Authority Act, and PROMESA.

---

[11] In the event that the Oversight Board manages to introduce any ambiguity into the clear meaning of the terms of the Trust Agreement providing for the Trustee's and bondholders' recourse and security interests— which, as this brief explains, the Oversight Board should not be able to do—then the Trustee and the PREPA Bondholders reserve their right to introduce material issues of disputed facts in opposition to the Oversight Board's motion for summary judgment, to seek and obtain discovery on those disputed facts, and to contend (pursuant to Federal Rule of Civil Procedure 56(d)) that the Oversight Board's motion for summary judgment should be denied or deferred so that pertinent discovery can proceed.

I.   **The PREPA Bondholders and Trustee Are Entitled To Summary Judgment That The Trustee's Claim Is Not Subject To Disallowance Beyond The Amount Of Moneys Currently Credited To PREPA's Sinking Fund (Complaint Count VII; Counterclaim Count I)**

43.   The Trustee's Master PREPA Bond Claim ("Trustee's Claim") arises from PREPA's longstanding and continuing failure to pay its bondholders more than $8.3 billion in principal, plus accrued interest and other amounts, in breach of PREPA's obligations to them under the Trust Agreement.  The Oversight Board does not dispute that PREPA borrowed those billions of dollars from bondholders and used them to build and maintain an electricity system.  Nor is there any dispute that PREPA's failure to pay its bondholders is a continuing event of default under the Trust Agreement.  *See* Trust Agreement § 802.

44.   The Trustee has the right—subject only to the automatic stay—to compel PREPA's specific performance of its covenants to increase rates, collect bills, credit Revenues to the General Fund and Revenue Fund, and then credit Revenues to the Sinking Fund for payment to bondholders.  *Id.* § 804; *see also id.* § 502 (rights to enforce rate covenant regardless of any event of default).  If not for the stay, the Trustee could exercise its contractual rights (among other remedies) to "enforce payment of and receive any and all amounts then or during any default becoming . . . due" and "to recover and enforce any judgment or decree against the Authority."  *Id.* § 804.  The Trustee is also authorized "to collect (but solely from moneys in the Sinking Fund and any other moneys available for such purpose) in any manner provided by law, the moneys adjudged or decreed to be payable."  *Id.*

45.   The Oversight Board contends that Section 804's parenthetical limitation on the Trustee's ability to "collect" on any judgment to moneys credited to the Sinking Fund, and to any other moneys available for that purpose, means that the Trustee has no enforceable right to repayment except from minimal amounts that PREPA has *previously credited* to the Trustee-

19

controlled Sinking Fund.   FAC ¶ 110; *see also id.* ¶ 114 (alleging that the Trustee's and bondholders' "right to payment" is limited to moneys "actually deposited to the credit" of the Sinking Fund and Self-insurance Fund).  The Oversight Board's argument, therefore, is this:  by refusing to comply with its covenants, and instead choosing to default on its obligations, PREPA has effectively eliminated its bond debt.  That is absurd on its face, and also plainly wrong for three main reasons, which are further addressed in the sections that follow:

46.   *First*, the Trust Agreement unambiguously provides that the Trustee and bondholders may collect payment out of all moneys that the Trustee can compel PREPA to make available for credit to the Sinking Fund.  The Trust Agreement and Authority Act authorize the Trustee (and, indeed, give it a property right) to compel PREPA's specific performance of its covenants to set rates, collect bills, and (after providing for necessary Current Expenses) credit Revenues to the Sinking Fund in amounts sufficient to pay debt service now and in the future until payment has been made in full.  The automatic stay temporarily prevents the Trustee or bondholders from exercising these rights, but nothing in PROMESA or Commonwealth law has extinguished these rights permanently.

47.   *Second*, the Trust Agreement does *not*, in fact, limit the Trustee's Claim only to moneys credited to the Sinking Fund or other specified funds, but rather also gives the Trustee the right to pay bondholders out of "other moneys" that become available for such payments—including through the Trustee's and bondholders' exercise of their rights and remedies—whether PREPA elects to credit those moneys to the Sinking Fund, some other specific fund, or otherwise.

48.   *Third*, the Oversight Board misplaces its reliance on Section 927 of the Bankruptcy Code as authority for denying the Trustee and bondholders *even an unsecured claim*, corresponding to their billions of dollars of unpaid principal and interest, in excess of the balance currently credited to the Sinking Fund.  Section 927 does not apply for several reasons, the most

important of which is that the Trustee and bondholders have sufficient recourse to moneys through

future credits to the Sinking Fund or through all PREPA revenues.

**A.   The Trust Agreement Grants The Trustee Recourse To All Revenues And Other Moneys Whether Or Not They Are Currently Credited To The Sinking Fund**

49.    Section 804 of the Trust Agreement makes broad remedies available to the Trustee

after an event of default.  The first paragraph of that section provides that the Trustee may (and, in

some circumstances, shall):

> protect and enforce its rights and the rights of the bondholders under applicable laws or under this Agreement by such suits, actions or special proceedings . . . either **for the appointment of a receiver** as authorized by the Authority Act **or for the specific performance of any covenant or agreement contained herein** or in aid or execution of any power herein granted **or for the enforcement of any proper, legal or equitable remedy**.

50.    The second paragraph further provides that:

> **the Trustee shall be entitled to sue for, enforce payment of and receive any and all amounts then or during any default becoming, and at any time remaining, due from the Authority for principal, interest or otherwise under any of the provisions of this Agreement or of the bonds and unpaid**, with interest on overdue payments of principal at the rate or rates of interest specified in such bonds, together with any and all costs and expenses of collection and of all proceedings hereunder and under such bonds, **without prejudice to any other right or remedy** of the Trustee or of the bondholders, **and to recover and enforce any judgment or decree against the Authority**, but solely as provided herein and in such bonds, for any portion of such amounts remaining unpaid and interest, costs and expenses as above provided, **and to collect (but solely from moneys in the Sinking Fund *and any other moneys available for such purpose*) in any manner provided by law, the moneys adjudged or decreed to be payable**.

Trust Agreement § 804 (emphases added).

51.    The Oversight Board alleges that the parenthetical phrase at the conclusion of

Section 804's list of the Trustee's comprehensive remedies and rights—limiting its ultimate right

to "collect" any money judgment to "moneys in the Sinking Fund and any other moneys available

for such purpose"—restricts the Trustee's recourse only to moneys *currently* credited by PREPA

to the Sinking Fund.  But that is not how revenue bonds work (and, more to the point, that is not how the Trust Agreement says *these* revenue bonds work).[12]   Rather, the Trust Agreement expressly provides that the Trustee has recourse on any unpaid sums or judgments in its favor from any Revenues (and from any "other moneys," as discussed below) that become available to pay the bonds, whether or not those Revenues or moneys are credited to the Sinking Fund, including through the Trustee's exercise of its rights and remedies.

52.     The Trust Agreement contains a detailed set of specifically enforceable covenants, which are detailed below.  None is limited in recourse to the Sinking Fund:  PREPA's covenant to raise rates is not limited to recourse against the Sinking Fund.  PREPA's covenant to collect bills is not limited to recourse against the Sinking Fund.  PREPA's covenant to credit moneys to the Sinking Fund is not limited to recourse against the Sinking Fund.  The Trustee's right to appointment of a receiver is not limited to recourse against the Sinking Fund.  These covenants ensure PREPA's collection and credit of Revenues in amounts sufficient to pay bondholders, and the Trust Agreement grants—and does not limit—the Trustee's right to specifically enforce these covenants and exercise any other "proper, legal, or equitable" remedy to make sure that PREPA does so.  Nothing in the Trust Agreement limits bondholders' right to receive payments from amounts collected and credited upon the exercise of these rights and remedies.

---

[12] This Court has rejected similar arguments for limiting the recourse of revenue bonds.  In a case arising out of HTA's Title III proceeding, this Court rejected that the bonds at issue there were "not even payable from sources outside the Bond Revenue Accounts…, [because] *otherwise the Bond Revenue Accounts could never receive contributions*."  *AmeriNational Cmty. Servs. v. Ambac Assurance Corp. (In re Fin. Oversight & Mgmt. Bd. for Puerto Rico)*, 635 B.R. 216, 231 n.11 (D.P.R. 2021) (emphasis added).

1.      **PREPA's Covenants Require It To Make Sufficient Revenues Available To Pay What It Owes To Bondholders**

53.      The Trust Agreement's covenants require that PREPA set rates to generate Revenues that, after accounting for Current Expenses, must be credited to the Sinking Fund in amounts sufficient to pay debt service on a timely basis.

54.      Section 502 of the Trust Agreement requires PREPA to "at all times fix, charge and collect reasonable rates and charges" and "as often as it shall appear necessary, . . . adjust such rates and charges so that the Revenues will at all times be sufficient" to pay PREPA's Current Expenses, pay debt service on the bonds, and retain a 20% cushion on annual debt service.  Trust Agreement § 502.  In the same section, PREPA also covenants that if "at any time the Revenues shall not be sufficient" to cover those requirements, then it will "revise the rates and charges" for its services "so that such deficiency will be made up before the end of the next ensuing fiscal year." *Id.*

55.      Pursuant to these covenants, the Trustee *always* has the right, when requested by at least 10% of bondholders and even "without regard to whether an event of default . . . shall have occurred," to "institute and prosecute . . . an appropriate suit, action or proceeding to compel the Authority to adjust such schedule [of rates]" to ensure that the Revenues are sufficient to pay debt service.  *Id.*  PREPA covenants that, if the Trustee successfully prosecutes such a rate-adjustment action, then PREPA "will adopt and charge rates and charges in compliance with any judgment, order, or decree entered in any such suit, action, or proceeding."  *Id.*

56.      PREPA is required to credit those Revenues to the Sinking Fund.  Specifically, PREPA must credit all Revenues to the General Fund.  *Id.* § 503.  Each month, after those funds are used to pay or reserved for paying necessary Current Expenses, PREPA is contractually obligated to credit remaining moneys from the General Fund to a Revenue Fund.  *Id.* §§ 505, 506.

From there, all of the moneys must be credited to the Sinking Fund and its sub-accounts, where moneys are supposed to be disbursed to bondholders. *Id.* § 507.

57. The Authority Act likewise requires PREPA to propose rates and collect revenues "sufficient . . . for the payment of the principal of and interest on its bonds, and for fulfilling the terms and provisions of the agreements entered into with or for the benefit of purchasers or holders of any bonds of the Authority and other creditors." Act 33-2019 § 24. PREPA, AAFAF, and the Oversight Board must comply with that statutory obligation during the pendency of PREPA's Title III case. *See* 28 U.S.C. § 959(b) (requiring that any "trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof").

**2.      The Trustee Has Multiple Rights And Remedies To Compel PREPA To Perform Its Obligations To Ensure Payment Of The Bonds**

58. Among the various remedies Section 804 authorizes, the Trustee has the right, upon an event of default, to compel specific performance of the Trust Agreement's covenants, to obtain the appointment of a receiver, and to secure other legal or equitable relief. Trust Agreement § 804. Each of these remedies provides the Trustee the ability to access all of PREPA's revenues to cure that default.

59. *First*, upon PREPA's default on its obligation to pay debt service, Section 804 of the Trust Agreement gives the Trustee the right to compel PREPA's "specific performance of any covenant" in the Trust Agreement. The Authority Act reaffirms the Trustee's power to compel PREPA to "carry out its . . . covenants and agreements with bondholders." 22 L.P.R.A. § 208. Thus, the Trustee can seek relief requiring PREPA to set rates in accordance with the obligations

of Section 502 of the Trust Agreement, credit the ensuing revenues to the Sinking Fund pursuant to Section 507, and actually disburse those funds to bondholders in the future.

60. *Second*, Section 804 gives the Trustee the right to cause the appointment of a receiver. Under the Authority Act, a receiver has the power to "collect such rates, fees, rentals, and other charges in connection with such undertakings as such receiver may deem necessary, proper and reasonable." 22 L.P.R.A. § 207(b). The receiver is obligated to collect "all income and revenues" and "apply the income and revenues so collected and received in such manner as the court shall direct." *Id.* And the receiver is required *to continue* collecting and applying all of PREPA's income and revenues until such time that "all that is due upon the bonds, and interest thereon . . . shall have been paid or deposited . . . and all defaults in consequence of which a receiver may be appointed shall have been cured and made good." *Id.* § 207(c). Only then may a court "direct the receiver to surrender possession of such undertakings." *Id.* In other words, upon the appointment of a receiver—a right the Trustee may invoke under Section 804—*all* of PREPA's revenues must be collected and, at the direction of the receivership court, must be used to pay the outstanding bonds until all defaults are cured. There is no limitation as to which of PREPA's revenues a receiver has access to, and the receiver expressly has access to PREPA's future revenues until everything due on the bonds is paid. If the Oversight Board's position were accepted, this contractual and statutory right to a receiver became illusory as soon as PREPA made the unilateral decision to stop crediting Revenues to the Sinking Fund for payment on the Bonds.

61. And, *third*, Section 804 authorizes the Trustee to compel "the enforcement of any proper legal or equitable remedy" it "deem[s] most effectual to protect and enforce" bondholders' rights. Thus, if specific performance of the Trust Agreement's covenants or appointment of a receiver are ineffective for any reason, the Trust Agreement grants the Trustee a broad catch-all of other remedies to ensure bondholders are paid what they are due. *See also* Trust Agreement § 810

(specifying that no remedy is exclusive and "every such remedy shall be cumulative and . . . in addition to every other remedy"); *id.* § 811 (allowing the Trustee to exercise any remedy "as often as [it] may . . . deem[] expedient").

### 3.   The Trustee's Right To Collect Payment On Behalf Of Bondholders Expressly Applies To Revenues And Other Moneys That Become Available Through the Trustee's Exercise Of Remedies Or Otherwise

62.    Each of these express remedies upon an event of default would be meaningless surplusage if, as the Oversight Board claims, the Trustee cannot actually access any Revenues that are generated by their exercise.  The Trust Agreement and Authority Act plainly contemplate that these specific-performance and receivership remedies can provide actual relief to the Trustee and bondholders, including by compelling PREPA to set rates, bill, and collect Revenues necessary to credit to the Sinking Fund or otherwise make available sufficient funds to pay any judgment obtained by the Trustee.

63.    These existing rights and equitable remedies protect bondholders in one of two ways.  The first is that a "right to an equitable remedy for breach of performance" is a "claim," under the Bankruptcy Code, if "such breach gives rise to a right to payment."  11 U.S.C. § 101(5). Therefore, these rights and remedies resulting from PREPA's many breaches of its Trust Agreement covenants can be resolved by this Title III process if—*but only if*—they give rise to a right to the payment of damages in the full amount of the Trustee's Claim.  *See In re Fin. Oversight & Mgmt. Bd. for Puerto Ric*o, 485 F. Supp. 3d 351, 361 (D.P.R. 2020) ("Equitable causes of action are thus 'claims' under the Bankruptcy Code—and therefore are subject to resolution through the Title III claims resolution process—if payment could be substituted for the equitable remedy.").

64.    Alternatively, if the Trustee's equitable remedies cannot be reduced to damages constituting a right of payment that satisfies the Trustee's Claim, then those remedies will survive any plan of adjustment.  *See In re Mach I Aviation, Inc.*, No. Adv. SV-10-01225-VK, 2011 WL

5838520, at *8 (B.A.P. 9th Cir. Sept. 15, 2011) (Equitable remedies "do not constitute claims
within the meaning of § 101(5)(B)" where they "have no precise or viable damages alternatives.");
*Matter of Udell*, 18 F.3d 403, 407 (7th Cir. 1994) ("[R]ights to an equitable remedy for a breach
of performance with respect to which such breach does not give rise to a right to payment are not
'claims' and would therefore not be susceptible to discharge in bankruptcy." (quoting 124 Cong.
Rec. 32393 (1978) (remarks of Rep. Edwards))).

65.     There are, then, only two options:  This Court could recognize that the Trustee's
equitable remedies are reducible to a damages claim in the full amount of the Trustee's Claim, or
it could recognize that these equitable rights to compel PREPA's specific performance of its
covenants, including to charge adequate rates and credit moneys to the Sinking Fund, will survive
after the end of this Title III case.  One way or the other, the Trustee and bondholders are entitled
to full recourse to PREPA's present and future revenues, including as those revenues can be
augmented through the Trustee's exercise of its specific-performance and receivership rights.

66.     Section 805 of the Trust Agreement makes this clear.  That section provides for the
distribution by the Trustee of moneys "if at any time the moneys in the Sinking Fund shall not be
sufficient."  Trust Agreement § 805.  Those moneys include "moneys then available *or thereafter
becoming available* for such purpose, whether through the exercise of the remedies provided for
in this Article or otherwise."  *Id.* (emphasis added); *see also id.* § 811 (Trustee may exercise any
remedy "as often as [it] may . . . deem[] expedient").  Section 805 thus explicitly acknowledges
that the Trustee, through the exercise of its remedies under Section 804, can cause moneys
sufficient to pay bondholders to become available after a time when the Sinking Fund lacks
sufficient funds to do so.  It follows that the moneys available through the exercise of remedies
cannot be limited to moneys already credited to the Sinking Fund, or this contractual language in
Section 805 (like other language in the Trust Agreement) would be rendered ineffective and

superfluous.  *See Caguas Plumbing, Inc. v. Continental Constr., Corp.*, 155 D.P.R. 744, 757 (2001) (explaining that Puerto Rico law "abhors constructions" that render contractual language "unnecessary and redundant").[13]

67.    Importantly, Section 805 begins with a clause noting that this section applies "[a]nything in this Agreement to the contrary notwithstanding."  A "notwithstanding" clause, be it in a contract, a statute, or a court order, broadly operates to nullify or override conflicting provisions.  *See, e.g.*, *Merit Mgmt. Grp. v. FTI Consulting, Inc.*, 138 S. Ct. 883, 893 (2018); *United States v. Hyde*, 497 F.3d 103, 108 (1st Cir. 2007).  Because Section 805 applies notwithstanding "[a]nything in this Agreement," and expressly grants the Trustee recourse through the exercise of its remedies under Section 804 to moneys not presently credited to the Sinking Fund, this Court should reject the Oversight Board's meritless argument that the Trustee's recourse is limited to only the funds previously credited to the Sinking Fund.

**B.    The Trust Agreement Grants The Trustee Recourse To Other Moneys**

68.    Article VIII of the Trust Agreement twice explicitly authorizes the Trustee to access moneys in addition to those credited to the Sinking Fund when exercising its remedies, first in Section 804 itself and subsequently in Section 805.  The plain meaning of those sections confirms that the Trustee's recourse is not limited to moneys currently credited to the Sinking Fund.

69.    Consistent with the Trustee's power to compel the specific performance and fulfillment of the rate covenant after an event of default, Section 804 expressly provides the Trustee with recourse to "other moneys available" outside of the Sinking Fund.  Trust Agreement § 804.

---

[13] The text of Sections 804 and 805 does not limit where these other moneys are to be found. These sections only specify that the Trustee has recourse to funds that are not presently credited to the Sinking Fund and that the Trustee is authorized to seek recourse sufficient to satisfy "any and all amounts" due as a result of an event of default.  Trust Agreement § 804.  Thus, these other moneys could include moneys that should have been credited to the Sinking Fund but were not, and, additionally, these moneys could include *future* moneys that will be credited to that fund, as discussed above (*see supra* § I.A).

To give meaning to every word of the provision, as courts are required to do, there must then *be* "other moneys" that the Trustee has recourse to other than those that are already credited to the Sinking Fund.  *See Crowe v. Bolduc*, 365 F.3d 86, 97 (1st Cir. 2004) ("[W]henever possible, contracts should be construed to give effect to every word, clause, and phrase.").  Those "other moneys available" to pay amounts owing on the bonds may include any of PREPA's "Revenues," which are broadly defined as "all moneys received by the Authority in connection with or as a result of its ownership or operation of the System, including the income derived by the Authority from the sale of electricity generated or distributed by the System."  Trust Agreement § 101; *see also id.* § 701 (providing that the bonds "will be payable solely from the Revenues").  This makes clear that the Trustee's recourse is not subject to manipulation by PREPA's unilateral decisions on whether to honor its rate and collection covenants, and thereafter its covenant to credit the available moneys to its Sinking Fund.

70.    Furthermore, the Oversight Board's proposed interpretation of the Trust Agreement fundamentally misunderstands the Sinking Fund and so distorts the Agreement's text.  The Trustee *already controls* the Sinking Fund and the moneys credited to it.  *Id.* § 507.  The Oversight Board acknowledges as much in its Amended Complaint (at ¶ 77).  The Trustee therefore does not need to "sue" or obtain a "judgment or decree" in order to collect moneys credited to the Sinking Fund.  Trust Agreement § 804.  Instead, the ability to "sue" or obtain a "judgment or decree" only makes sense if it applies to "other moneys available for such purpose."  *Id.*

### C.    The Trustee's Recourse To PREPA's Future Revenues Or Other Moneys Is Not Limited By Bankruptcy Code Section 927

71.    The Oversight Board incorrectly asserts that because, it says, the Trustee has recourse only to moneys currently credited to the Sinking Fund, and because the moneys credited

29

to that fund are "special revenues," the Trustee may not reach any of PREPA's moneys beyond those existing moneys pursuant to Section 927 of the Bankruptcy Code.  FAC ¶¶ 112-13.

72.     Section 927 provides that "[t]he holder of a claim payable solely from special revenues of the debtor . . . shall not be treated as having recourse against the debtor on account of such claim pursuant to section 1111(b)."  11 U.S.C. § 927.  Section 1111(b) in turn allows a lien creditor recourse to the debtor, even if the creditor's contractual recourse was limited to its collateral.  *Id.* § 1111(b).  Section 927 does not apply here for a number of reasons.

73.     For starters, the Trustee already has contractual recourse, *through* the Sinking Fund and its rights to enforce PREPA's covenants (but for the automatic stay), to obtain future revenues sufficient to satisfy its claim.  Nothing in Section 927 limits the *extent* to which the Trustee has recourse to special revenues.  So it is wholly consistent with Section 927 that the Trustee has recourse to those special revenues in the future until its claim is satisfied.

74.     Section 927 also does not apply because the Trust Agreement expressly authorizes the Trustee recourse to *all* PREPA revenues, not just certain revenues.  Section 927 only prevents a creditor from being "treated as having recourse against the debtor on account of such claim *pursuant to section 1111(b)*."  *Id.* § 927 (emphasis added); *see also* 6 COLLIER ON BANKRUPTCY ¶ 927.02 (16th ed. rev. 2022).  But, the clear language of the Trust Agreement allows the Trustee recourse to *all* PREPA revenues that are necessary to cure any default.  The Trustee need not rely on Section 1111(b) to turn any limited recourse to moneys currently credited to the Sinking Fund into recourse to other PREPA revenues credited to other funds.

75.     Furthermore, Section 927 was enacted to "ensure that nonrecourse revenue bonds cannot be converted, under section 1111(b) of the Bankruptcy Code, into recourse, or general obligation debt."  H.R. Rep. No. 100-1011, at 5, 7 (1988); *see also* S. Rep. 100-506, at 8-9, 13-14, 22 (1988) (noting that if a water department files for bankruptcy, funds of the sponsoring

30

municipality should not be reached to pay the revenue bondholders).  In other words, Section 927 exists to prevent recourse beyond "revenues from the project" to "the full faith and credit of the municipality."  S. Rep. 100-506, at 8-9; *see also* 6 COLLIER ON BANKRUPTCY ¶ 927.02 (16th ed. rev. 2022) ("Revenue bonds by their nature are secured obligations which look to a specific source of payment, not the general funds or general taxing power of the municipality.").

76.    There is no concern here that the Trustee's recourse will become a general obligation of PREPA.  *See* FAC ¶ 7.  The only funds that the Trustee has recourse to are PREPA's revenues or other moneys pursuant to unambiguous language in the Trust Agreement and the Trustee's statutory rights.  Accordingly, it would serve no purpose to apply Section 927 in the manner the Oversight Board contends.[14]

77.    Since the Trustee, on behalf of bondholders, has recourse to all PREPA revenues, wherever they are located and whenever they are generated, this Court should grant the PREPA Bondholders and Trustee summary judgment (i) dismissing Count VII of PREPA's First Amended Complaint, which seeks judgment disallowing the Trustee's Claim on limited-recourse grounds, and (ii) granting Count I of the Counterclaim Complaint, which seeks declaratory judgment that the Trustee's recourse is not limited to the funds now credited to PREPA's Sinking Fund.

---

[14] If, however, Section 927 applies as the Oversight Board contends (which it does not), then the Oversight Board would need to establish—as a factual matter—that all Revenues (as well as any "moneys" credited to the Sinking Fund that may not derive from "Revenues"), from all sources, qualify as "special revenues" governed by that section.  *See In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 948 F.3d 457, 475 (1st Cir. 2020) (finding that revenues are not special revenues if they "relate to and support the System's functions, [but] do not originate in them").  If any subset of the revenues from which the PREPA bonds are payable do not qualify as "special revenues," then those bonds are not payable "solely" from special revenues, and Section 927 does not apply.

II.     **The PREPA Bondholders And Trustee Are Entitled To Summary Judgment That The Trustee's Claim Is Not Subject To Disallowance For Lack Of Valid, Perfected, Priority Security Interests In All PREPA Revenues And Despite Covenants And Remedies Assuring Bondholders' Payment From Those Revenues (Complaint Counts I-VI; Counterclaim Count II)**

78.     The Oversight Board asserts that the Trustee's Claim should also be disallowed to the extent it relies on security interests beyond those in the moneys currently credited to the Sinking Fund and (empty) Self-insurance Fund.  The Oversight Board contends that the Trustee was not granted, and in any case did not perfect, any lien beyond those moneys.  Each of these arguments lacks merit.

79.     At the outset, the Oversight Board's disallowance claims should be denied *even if it were right* that the Trustee and bondholders have a perfected lien only on moneys that are first credited to the Sinking Fund.  That indisputably valid and perfected lien continues post-petition, under Bankruptcy Code Section 928(a), and covers all *future* special revenues credited to the Sinking Fund.  As explained above, the Trustee has existing and continuing rights, which it could exercise now but for the automatic stay, to compel specific performance of PREPA's covenants to collect sufficient Revenues to pay debt service and to credit such moneys to the Sinking Fund. Indeed, these rights and remedies are property interests of the Trustee and bondholders in their own right, as explained below.  And so the Trustee's and bondholders' lien on all future special revenues that can be credited to the Sinking Fund is more than enough to secure their right to payment on the Trustee's Claim.

80.     In any event, the Oversight Board is wrong that the scope and perfection of the Trustee's and bondholders' liens do not extend beyond moneys that are credited to the Sinking Fund.  The Trust Agreement pledges "the revenues of the System" and defined "Revenues" to secure PREPA's repayment of the bonds.  These pledges on their face are not limited to such revenues (and Revenues) that PREPA chooses to credit to the Sinking Fund (which, as explained

below, is subject to a lien expressly intended to provide bondholders with "further security" (not their *only* security) and on certain "moneys" (not *revenues* or *Revenues*)).  The Trustee has perfected its security interests in all of PREPA's revenues, and those liens are not avoidable under Section 544(a) of the Bankruptcy Code.

A.     **The Trustee's And Bondholders' Undisputed, Perfected Lien On Moneys Credited To The Sinking Fund Continues On Future Special Revenues**

81.     This brief explains above that the Trustee's Claim is not subject to disallowance on the basis that the Trustee lacks recourse other than to funds *currently credited* to the Sinking Fund. Likewise, and for some of the same reasons, the Trustee's Claim is not subject to disallowance on the basis that the Trustee's and bondholders' undisputed, perfected security interest in the Sinking Fund is limited only to the moneys *currently credited* to that fund.  Even if the Trustee's and bondholders' perfected liens were limited to the Sinking Fund (and Self-insurance Fund)—and they are not, as will be explained in section II.B—those undisputed security interests are in special revenues, and continue to attach to such revenues post-petition as a matter of law.  And, the contractual and statutory rights to compel performance until the bonds are repaid are part and parcel of those property interests.  So even just the Trustee's and bondholders' *undisputed* perfected lien on moneys credited to the Sinking Fund is sufficient to secure (and, indeed, to over-secure) the full amount of the Trustee's and bondholders' claim, which is reason enough to grant summary judgment to the PREPA Bondholders and Trustee on all claims.

1.     **The Trustee And Bondholders Have A Lien On All Future Special Revenues Credited To The Sinking Fund**

82.     The Oversight Board does not dispute that, under Section 507 of the Trust Agreement, the Trustee and bondholders have *at least* a valid, perfected, priority lien on moneys in the Sinking Fund.  *See, e.g.*, FAC ¶ 4.  And the Oversight Board agrees that PREPA revenues (and Revenues) credited to that fund are "special revenues" as defined by Section 902(2) of the

Bankruptcy Code.  *Id.*  The dispute about Trustee's and bondholders' lien on moneys credited to the Sinking Fund is thus limited to whether that lien extends only to the moneys that are credited to the Sinking Fund only *now*, or also *future* revenues that will and must be credited to that Fund.  The Oversight Board adopts the first of those two positions (*see* FAC ¶ 4), but does not explain how that conclusion is plausibly compatible with the Trust Agreement or the Bankruptcy Code.

83.     PREPA's revenues (and Revenues) qualify as special revenues because they are "derived from the ownership, operation, or disposition of projects or systems of the debtor that are primarily used or intended to be used primarily to provide . . . utility . . . services."  11 U.S.C. § 902(2).  When a creditor has a pre-petition lien on special revenues—as the parties agree the Trustee and bondholders have on special revenues credited to the Sinking Fund—any such "special revenues acquired by the debtor after the commencement of the case *shall remain subject to [that] lien*."  11 U.S.C. § 928(a) (emphasis added).  In other words, there is no reasonable dispute that the Trustee and bondholders have liens on every future dollar of special revenues credited to the Sinking Fund, and an existing right to ensure that such crediting actually occurs.

84.     To be sure, PREPA has for years breached its statutory and contractual obligations (1) to set rates at a level sufficient to repay bondholders, and (2) to credit revenues to the Sinking Fund for disbursement to bondholders.  As discussed above, however, the Trust Agreement authorizes the Trustee to obtain, in part, specific performance requiring PREPA to raise rates and make the required credits of ensuing revenues to the Sinking Fund.  Trust Agreement § 804.  And because most of those revenues are concededly "special revenues," and the Trustee and bondholders indisputably have a preexisting lien on those special revenues as soon as they are credited to the Sinking Fund, the Trustee and bondholders have a lien on all future special revenues credited to that Fund, including such credits achieved by the Trustee's and bondholders' exercise

of their contractual and statutory remedies. *See Peaje Invs. LLC v. García-Padilla*, No. 16-2365, 2016 WL 6562426, at *5 (D.P.R. Nov. 2, 2016) (Because "pledged revenues are constantly replenished by an ongoing stream of toll payments, Peaje Investments continues to hold a security interest in a stable, recurring source of income that will eventually provide funds for the repayment of the PRHTA bonds. Though it will not receive the pledged revenues during the stay period, this enduring security interest means that it faces only a delay in recouping such funds, not a permanent loss of them."), *aff'd in relevant part, vacated in part* 845 F.3d 505 (1st Cir. 2017).

85.     On this issue, the Oversight Board's reliance on Section 927 of the Bankruptcy Code (*see* FAC ¶¶ 105-114), misguided though it is (*see supra* § I.C), proves the PREPA Bondholders' and Trustee's point.  By invoking Section 927, the Oversight Board necessarily concedes that moneys credited to the Sinking Fund are special revenues, and therefore also that the undisputed liens on the special revenues credited to the Sinking Fund cover (at the very least) the stream of future revenues that PREPA is contractually obligated to generate and credit to that Fund.

86.     Instead of acknowledging that incontrovertible conclusion, the Oversight Board muddles the issues by focusing on whether the Trustee and bondholders also have liens on revenues beyond those credited to the Sinking Fund.  As this brief explains below, those arguments are misguided and inconsistent with the Trust Agreement.  But they are also beside the point.  This Court should conclude that the Trustee's and bondholders' lien on the Sinking Fund is sufficient to secure the Trustee's Claim in full even if—counterfactually—the Trustee and bondholders have no other perfected liens.

2.   **The Court Should Avoid The Constitutional Problem That Would Arise If PROMESA Were Construed To Allow PREPA And The Oversight Board To Strip The Trustee And Bondholders Of Their Liens On Future Revenues Credited To The Sinking Fund**

87.     The Oversight Board offers no explanation for why the Title III process would allow it to cut off the Trustee's and bondholders' liens over future special revenues, which are expressly preserved in Section 928 of the Bankruptcy Code.  Any interpretation of PROMESA that would authorize PREPA to do so would trigger serious constitutional concerns that this Court should avoid.

88.     Liens constitute "property" protected by the Takings Clause, and so cannot be taken, even in bankruptcy, without just compensation.  U.S. Const. amend. V; P.R. Const. art. II, § 9.; *United States v. Sec. Indus. Bank*, 459 U.S. 70, 76 (1982); *see also Armstrong v. United States*, 364 U.S. 40, 48 (1960) ("The total destruction by the Government of all value of these liens, which constitute compensable property, has every possible element of a Fifth Amendment 'taking.'").  Allowing the Oversight Board to apply PROMESA retroactively to cut off the Trustee's and bondholders' liens to any future special revenues that can be credited to the Sinking Fund would therefore constitute a taking.  Indeed, that is one reason why Section 928 requires that those liens be preserved.

89.     The Court "must consider the necessary consequences of its choice" between plausible statutory interpretations.  *Clark v. Martinez*, 543 U.S. 371, 380-81 (2005).  If one interpretation would involve "grave and doubtful constitutional questions," the Court must avoid it.  *Jones v. United States*, 529 U.S. 848, 857 (2000); *see also In re City of Detroit*, 524 B.R. 147, 270 (Bankr. E.D. Mich. 2014) (using constitutional avoidance canon to "avoid interpreting chapter 9 in such a way that renders it unconstitutional" by allowing creditors' property to be taken).

90.     The First Circuit has employed the constitutional-avoidance canon in similar circumstances.  In *Peaje Investments LLC v. García-Padilla*, 845 F.3d 505 (1st Cir. 2017), the court of appeals considered "whether actions by Puerto Rico that impair or remove the collateral securing the pertinent bonds" were "cause for lifting the stay" imposed prior to a Title III case by Section 405(e)(2) of PROMESA.  *Id.* at 512.  The appellees argued that because Section 405(e)(2)'s definition of "cause" differed from the Bankruptcy Code, by not including "lack of adequate protection," PROMESA should be interpreted as not including "actions impairing the collateral in a manner that leaves the interest in having the debt repaid inadequately protected."  *Id.*  The First Circuit rejected that argument under the constitutional-avoidance canon because the appellees' interpretation would implicate constitutional taking concerns by allowing "the Commonwealth [to] expend every penny of the Movants' collateral, leaving the debt entirely unsecured."  *Id.* at 511-12 (acknowledging that "creditors are constitutionally entitled to protection to the extent of the value of their property" (internal quotation marks omitted)).

91.     PREPA's arguments here would have a similar constitutional consequence.  It argues that it is somehow permitted by the Title III process to reduce the Trustee's and bondholders' liens to almost nothing by continuing to fail to charge sufficient rates and misdirecting ensuing revenues.  And even if PREPA begins to credit moneys to the Sinking Fund as it is required to do, the Oversight Board claims that the Trustee and bondholders cannot receive a single cent of those revenues.  The implausibility of the Oversight Board's construction of the Trust Agreement should make resort to the constitutional-avoidance canon unnecessary.  But in all events, this Court should avoid applying PROMESA to the Trust Agreement in such a way that would vitiate the Trustee's and bondholders' liens.  The same is true of the Trustee's and bondholders' ancillary rights to compel performance by statute and contract—which are

inextricable property interests of the Trustee and bondholders under Commonwealth law—to ensure that other property interests are preserved.[15]

**B.   The Trust Agreement Pledges Liens In All PREPA Revenues, With Covenants, Rights, And Remedies Guaranteeing Their Payment To Bondholders, And Those Liens Are Not Subject To Avoidance, Limitation, Or Subordination**

92.    PREPA's pledges securing its obligations are not limited to the moneys in the Sinking Fund (though that lien is sufficient here, as discussed above). Rather, PREPA has pledged all of the present and future "revenues of the System" and "Revenues." Those liens are perfected, and for that and other reasons they cannot be avoided or subordinated under Section 544(a) of the Bankruptcy Code or Puerto Rico law.

**1.   The Trust Agreement's Granting Clause Pledges A Security Interest In The "revenues of the System"**

93.    The Trust Agreement's granting clause expressly pledges to the Trustee a security interest in all "revenues of the System" to secure PREPA's payment and performance of its covenants. The clause provides that:

> in order **to secure the payment of all bonds** at any time issued and outstanding hereunder and the interest and the redemption premium, if any, thereon according

---

[15] Count III of the First Amended Complaint contends that the Trustee and bondholders have no lien on such ancillary rights because the rights are not "property" of PREPA. FAC ¶¶ 84-88. That contention is irrelevant, and Count III should be dismissed, because the Trustee and bondholders are not asserting an independent security interest in these ancillary rights as property of PREPA. Rather, the Trustee and the bondholders own these rights, and so PREPA's destruction of them would be a destruction of property owned by, not pledged to, the Trustee and the bondholders.

That, in turn, would trigger similar constitutional concerns. Contract rights are also protected by the Takings Clause. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003 (1984). When a party to a contract is permanently prevented from bringing a breach-of-contract action because of government action, its contract rights have been taken in violation of the Takings Clause. *Cross Continent Dev., LLC v. Town of Akron, Colo.*, 742 F. Supp. 2d 1179, 1184 (D. Colo. 2010) (citing *Pi Elecs. Corp. v. United States*, 55 Fed. Cl. 279, 285 (Fed. Cl. 2003)); *see also Lynch v. United States*, 292 U.S. 571, 579 (1934). Here, the Oversight Board argues that the Title III process does not simply *delay* the Trustee's and bondholders' ability to exercise their contractual remedies through the automatic stay, but rather *permanently eliminates* those rights. That argument implicates serious constitutional concerns. This Court can reject the Oversight Board's argument on the merits as discussed above (*see supra* Part I), but it should also refrain from accepting the Oversight Board's argument under the constitutional-avoidance canon.

to their tenor, purport and effect, **and in order to secure the performance and observance of all the covenants, agreements and conditions** therein and herein contained, the Authority has executed and delivered this Agreement and **has pledged and does hereby pledge to the Trustee the revenues of the System**, subject to the pledge of such revenues to the payment of the principal of and the interest on the 1947 Indenture Bonds (hereinafter mentioned), **and other moneys to the extent provided in this Agreement as security for the payment of the bonds** and the interest and the redemption premium, if any, thereon **and as security for the satisfaction of any other obligation assumed by it in connection with such bonds** . . . .

Trust Agreement pp. 11-12 (emphasis added).

94.     The phrase "revenues of the System" is not defined by the Trust Agreement, and is therefore accorded its plain and ordinary meaning.  *See* 31 L.P.R.A. § 6342 (Spanish) (previously 31 L.P.R.A. § 3471); *see also Amyndas Pharms., S.A. v. Zealand Pharma A/S*, 48 F.4th 18, 31 (1st Cir. 2022) ("[C]ontractual terms are accorded their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning." (internal quotation marks omitted)).  The plain and ordinary meaning of "revenues" is broad, and it encompasses all income derived or collected from any source.  *See City of Dallas, Tex. v. F.C.C.*, 118 F.3d 393, 398 (5th Cir. 1997).

95.     Pledges of the revenues of a system are properly understood to include its *future* revenues.  At any given point in time, a utility company's, toll authority's, or the like's *present* revenues would cover only a tiny fraction of its revenue-bond debt.  A revenue pledge thus makes sense, and provides real security for municipal repayment obligations, only by applying to the borrower's dedicated stream of revenues extending into the future.  As this Court has explained in another case, a security interest in pledged revenues would therefore be "constantly replenished by an ongoing stream of toll payments . . . that will eventually provide funds for the repayment of the PRHTA bonds."  *Peaje*, 2016 WL 6562426, at *5.  The First Circuit likewise acknowledged, in the same case, a "security interest in future toll revenues."  *Peaje*, 845 F.3d at 514.

96.     Moreover, "revenues" are generally understood to include not only cash payments that have actually been received, but also other forms of payment and accrued accounts receivable. In municipal finance, a revenue bondholder's "right in revenues" necessarily "implies a right in antecedent collateral," namely the issuer's right to receive those revenues in whatever form they will be received. Gary D. Spivey, *Impact of U.C.C. Article Nine on Revenue Bond Investments*, 44 IND. L. J. 624, 630-31 (1969) (municipal revenue pledge properly characterized as an intangible interest that matures into accounts and yields proceeds). Indeed, PREPA recognizes its revenues as soon as they are earned. *See, e.g.*, Madden Ex. 13 at 29, 40. Accordingly, the "revenues of the System" include (i) PREPA's general right to receive revenues in exchange for provision of electrical service, (ii) PREPA's rights to payment under its individual contractual relationships with its customers, (iii) accounts receivables, and (iv) payments made, wherever located and whenever generated.

97.     Indeed, PREPA has long understood the granting clause to pledge PREPA's revenues, no matter which fund they are credited to. In its 2015 audited financial statements, PREPA stated that, according to the Trust Agreement, "gross revenues, exclusive of income on certain investments, less current expenses . . . should be pledged to repay Power Revenue Bonds principal and interest." PREPA's 2015 Audited Financial Statements at 50. Tellingly, PREPA changed its tune in its latest financial statements, now saying that the Agreement pledges only "[n]et revenues, solely to the extent they are deposited in the 'Sinking Fund' or certain other designated funds." Madden Ex. 13 at 59. The Oversight Board's conspicuously timed change in position goes to show that the litigation arguments it now advances bear little relation to the text of the Trust Agreement, or to how PREPA has long understood it.

98.     The Oversight Board is mistaken that the granting clause's pledge of "the revenues of the System" is qualified by the phrase "to the extent provided in this Agreement." FAC ¶ 19.

That interpretation is inconsistent with the "rule of the last antecedent" that a limiting clause following a list of words or phrases "should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Lockhart v. United States*, 577 U.S. 347, 351 (2016) (internal quotation marks omitted); *see also FTC. v. Mandel Bros., Inc.*, 359 U.S. 385, 389 (1959) (holding that rule of last antecedent applied and modified only noun "any other person" instead of preceding nouns).   Under that fundamental canon of contractual interpretation, the phrase "to the extent provided in this Agreement" modifies only the noun immediately preceding it—"other moneys"— and not also the phrase "the revenues of the System," which appears almost thirty words earlier before another clause that is set off by commas.   *See Lockhart*, 577 U.S. at 351 (explaining that the rule of the last antecedent is "particularly" applicable "where it takes more than a little mental energy to process the individual entries in the list, making it a heavy lift to carry the modifier across them all"); *see also United States v. Cmty. Health Sys., Inc.*, 666 F. App'x 410, 414 n.2 (6th Cir. 2016) (per curiam) (applying rule of last antecedent to contract interpretation).

99.    The rule of the last antecedent can "be overcome by other indicia of meaning" that make application of the series qualifier canon—which applies a modifying phrase to all nouns in a series—more appropriate.   *Lockhart*, 577 U.S. at 352 (internal quotation marks omitted).   Those indicia are limited, however, to where "[1] a modifier is applicable as much to the first as to the last words in a list, [2] a set of items form a single, integrated list, and [3] the application of the rule [of last antecedent] would require acceptance of an unlikely premise."   *Id.* at 355-56 (internal quotation marks omitted).   None of those indicia is present here.

100.    *First*, the modifier "to the extent provided in this Agreement" does not apply equally to "revenues of the System" as it does to "other moneys."   The latter noun phrase, "other moneys," has no meaning except by virtue of the provisions of the Agreement.   Without the modifying phrase, it would be wholly unclear which moneys the clause was pledging.   All "other

moneys," or just some of them?  And if just some of them, then which ones?  There would be no way to answer those questions were it not for the modifying phrase directing the reader to other provisions in the Trust Agreement.  By contrast, that kind of ambiguity does not infect the phrase "the revenues of the System," which has a discernible, ordinary meaning standing on its own.

101.    *Second*, the two noun phrases—"the revenues of the system" and "other moneys"— do not form a single, integrated list.  A single, integrated list is one that uses "simple and parallel" structure.  *Lockhart*, 577 U.S. at 352.  For example, the phrases "wall or fence that is solid" and "corporation or partnership registered in Delaware" each qualifies as a single, integrated list to which the series qualifier canon applies.  A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 147-48 (2012).  No such simple and parallel structure exists in the granting clause.  The clause refers to "the revenues of the System," then detours through a separate clause to make that term "subject to the pledge of such revenues to the payment of the principal of and the interest on the 1947 Indenture Bonds (hereinafter mentioned)," before then invoking "other moneys to the extent provided in this Agreement."

102.    In this respect, the granting clause here is a far cry from the closest comparable language at issue in HTA's Title III case, *In re Financial Oversight & Management Board for Puerto Rico*, 618 B.R. 619 (D.P.R. 2020).  There, the Court considered resolutions providing that HTA's bonds would be "payable solely from Revenues and other moneys deposited to the credit of the Revenue Fund" and payable solely "from Revenues and from any funds received by the Authority for that purpose."  *Id.* at 627.  The Court determined that the modifying phrases ("deposited to the credit of the Revenue Fund" and "received by the Authority for that purpose") applied to both preceding nouns ("Revenues and other moneys") pursuant to the series qualifier canon because the phrases were "equally applicable to both nouns."  *Id.* at 639-40 (internal quotation marks omitted).  Unlike the Trust Agreement's granting clause, however, the provisions

at issue in HTA were single, integrated lists.  There, the modifying phrases followed *directly* after both nouns, the list of which was not interrupted by any other modifying phrases or caveats.

103.    *Third*, applying the rule of the last antecedent here does not require accepting any unlikely premise.  It is entirely consistent with the structure of the Trust Agreement, the text of the granting clause, and how revenue bonds are generally issued that PREPA intended to pledge the entirety of "the revenues of the System" to secure payment to the bondholders that financed the construction and maintenance of that System.  *See, e.g.*, *Florida v. City of Lakeland*, 16 So. 2d 924, 925 (Fla. 1943) (A revenue pledge "creates a lien or charge upon the specific revenues designated, whether then or thereafter collected."); *see also Peaje*, 845 F.3d at 512, 514 (Commonwealth argued adequate protection can be satisfied by reference to future revenues); *Pierce Cnty. v. Washington*, 148 P.3d 1002, 1008 (Wash. 2006) ("The Sound Transit Bonds are payable from and secured solely by the pledge of Sound Transit's MVET and sales tax.  The pledge constitutes a prior lien and charge upon the taxes superior to all other charges of any kind or nature."); *Goreham v. Des Moines Metro. Area Solid Waste Agency*, 179 N.W.2d 449, 458 (Iowa 1970) (statute pledging a project's revenues "creates a lien upon those revenues derived from the operation of that project").

104.    But even if the phrase "to the extent provided in this Agreement" *could* fairly be understood to modify "the revenues of the System"—which it cannot—PREPA tellingly never cites any language in the Agreement limiting the granting clause's "revenues" pledge.  That is because none exists.  Nor can the Oversight Board fill that textual gap by equating "the revenues of the System" with the Trust Agreement's defined term "Revenues" (on which the Trust Agreement also, but separately, pledges a security interest, *see infra* § II.B.2).  *See* FAC ¶ 31.  "[W]hen the same term appears in different sections of the agreement and is capitalized in one section but not the other, the non-capitalized term will have its 'ordinary, plain meaning.'"  *Sapp*

43

*v. Indus. Action Servs., LLC*, No. 19-912-RGA, 2020 WL 2813176, at *3 (D. Del. May 29, 2020)

(quoting *Derry Fin. N.V. v. Christina Cos.*, 797 F.2d 1210, 1214 (3d Cir. 1986)); *see also Derry*,

797 F.2d at 1214 (distinguishing between "default" and "Event of Default," in an agreement,

because "when the parties intended to create a term of art or to incorporate specific definitions

from other documents, they capitalized the referencing term"); *In re Hertz Corp.*, 637 B.R. 781,

788-89 (D. Del. 2021) (distinguishing between "maturity" and "Maturity" in an agreement).[16]

Provisions in the Trust Agreement about "Revenues" therefore do not limit the granting clause's

pledge of "the revenues of the System."

### 2.     The Trust Agreement Provides A Security Interest In "Revenues"

105.     The Trust Agreement also pledges PREPA's "Revenues" as security for repayment

of the bonds.  Section 701 provides:

> The Authority covenants that it will promptly pay the principal of and the interest
> on each and every bond issued . . . at the places, on the dates and in the manner
> specified herein and in said bonds and in the coupons . . . . Until the 1947 Indenture
> Bonds have been paid or provision has been made for their payment and the release
> of the 1947 Indenture, such principal, interest and premium are payable solely from
> moneys in the Renewal and Replacement Fund and said moneys are hereby pledged
> to the payment thereof in the manner and to the extent hereinabove particularly
> specified.  After the 1947 Indenture Bonds have been paid or provision has been
> made for their payment and the release of the 1947 Indenture, **such principal,
> interest and premium will be payable solely from the Revenues and said
> Revenues are hereby pledged to the payment thereof in the manner and to the**

---

[16] Nor could any later provision contradict the granting clause's broad pledge.  Granting clauses customarily
identify the property interest being conveyed in an agreement.  *See, e.g.*, ROBERT I. LANDAU & ROMANO
I. PELUSO, CORPORATE TRUST ADMINISTRATION AND MANAGEMENT 47 (6th Ed. 2008) ("Following the
recitals come the granting clauses that set forth the specific security for the obligations to be issued.").
Accordingly, the granting clause is the best place to determine the scope of the interest that the parties
intended to pledge, and it should control over any other language in the Agreement that would undermine
the granting clause's pledge.  *See, e.g.*, *BlackRock Allocation Target Shares: Series S. Portfolio v. Wells
Fargo Bank, Nat'l Ass'n*, 247 F. Supp. 3d 377, 413 (S.D.N.Y. 2017) (rejecting argument that "would require
the Court to read the sweeping language of the Granting Clause to have limits that it lacks on its face");
*Reese Expl., Inc. v. Williams Nat. Gas Co.*, 983 F.2d 1514, 1519 (10th Cir. 1993) ("Although all parts of
the instrument are to be considered[,] the granting clause is, of course, paramount in determining what
interest was intended to be granted." (internal quotation marks omitted)).  The granting clause language
thus controls here.

**extent hereinabove particularly specified**.  Nothing in the bonds or in this
Agreement shall be deemed to constitute the bonds a debt or obligation of the
Commonwealth of Puerto Rico or any of its municipalities or other political
subdivisions, and neither the Commonwealth of Puerto Rico nor any such
municipalities or other political subdivisions shall be liable for the payment of the
principal of or the interest on the bonds.

Trust Agreement § 701 (emphasis added).

106.    That pledge of Revenues is unrestricted to any particular fund or account.  For four
reasons, the Oversight Board is mistaken that the phrase "in the manner and to the extent
hereinabove particularly specified" limits PREPA's Revenues pledge to only the scope of its
separate pledges to bondholders of "further security" in the moneys in certain specified accounts.

107.    *First*, Section 507 of the Trust Agreement cannot possibly limit Section 701's
"Revenues" pledge.  Recall that Section 507 provides that the "*moneys*" credited to the Sinking
Fund (and certain other specified funds) "shall be subject to a lien . . . for the *further* security of
such holders" of the bonds.  *Id.* § 507 (emphasis added).  According to the Oversight Board,
Section 507 provides the *only* manner and extent of the "Revenues" pledge.  *See* FAC ¶ 30.  But
by that section's own plain language, there must be some other security interest created by the
Trust Agreement on top of which Section 507 is providing "further security" to bondholders.
Otherwise the inclusion of the word "further" would be superfluous.  *See* Further, MERRIAM-
WEBSTER DICTIONARY ("to a greater degree or extent" or "in addition").  Moreover, the pledge in
Section 507 is expressly made to *bondholders*, while the unqualified pledge to PREPA's revenues
in the granting clause is made to *the Trustee*.  Thus, Section 507 says nothing about the scope of
the Trustee's liens under the Trust Agreement.

108.    *Second*, the phrase "in the manner and to the extent hereinabove particularly
specified," in Section 701, does not restrict the pledge of Revenues at all, but rather it modifies
only the immediately preceding phrase, "the payment thereof."  Indeed, the manner of PREPA's

payment of the bonds is detailed in numerous sections earlier in the Trust Agreement.  Those
provisions provide, for instance, detailed instructions for how much moneys PREPA must allocate
to pay outstanding bonds' principal and interest and when those allocations must be made.  Trust
Agreement § 507.

109.    Section 701 uses very similar "in the manner" phrasing just two sentences earlier,
where it very clearly refers to the Trust Agreement's provisions governing the manner of PREPA's
payments of the bonds.  The first sentence of that same section refers to PREPA's payment of
principal and interest "at the places, on the dates *and in the manner specified herein*."  (emphasis
added).  The same section's strikingly similar references to payment "in the manner specified
herein" and to "the payment thereof in the manner and to the extent hereinabove particularly
specified" should be read to be consistent with one another.

110.    Not only that, but the parties consistently refer to "the manner" of *payment*—not of
*pledges*—throughout the Trust Agreement.  For instance, the Agreement defines "Deposit Day"
as "the date specified in the first paragraph of Section 507 . . . by which all the moneys then held
to the credit of the Revenue Fund shall be withdrawn by the Treasurer and deposited in *the manner*
set forth in said Section."  *Id.* § 101 (emphasis added).  And the form of the bond states that "[t]he
moneys in the Sinking Fund . . . shall be allocated to all series of bonds . . . *in the manner* provided
in the Agreement," and redemption "shall be made *in the manner* and under the terms and
conditions provided in the Agreement."  *Id.* at p.6 (emphasis added).  These usages of the phrase
"in the manner" each also clearly refer to how the bonds are to be paid—not to what moneys are
being pledged to paying them.  Accordingly, the identical phrasing in Section 701 should be
understood the same way.  *See Omni MedSci, Inc. v. Apple Inc.*, 7 F.4th 1148, 1152-53 (Fed. Cir.
2021) ("In general, the identical phrase in two paragraphs of a provision of a contract should be
read identically.").

111.    While this Court concluded, in a preliminary ruling on a lift-stay motion in HTA's Title III case, that a similar "in the manner" phrase, as used in the different bond documents at issue in that case, modified those documents' reference to pledged revenues, it should not reach the same conclusion here. *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 618 B.R. at 638. The agreements at issue in HTA—its 1968 and 1998 Bond Resolutions—were different in at least one material respect: they did not contain a separate granting clause in favor of a trustee, because there was no trustee for HTA's bonds.  Dkt. No. 17-3283, ECF Nos. 10107-2, 10107-3 (HTA's 1968 and 1998 Bond Resolutions).  Accordingly, once this Court concluded that a provision's phrase "in the manner and to the extent hereinabove particularly specified" altered the scope of the pledge, it necessarily concluded that phrase referred back to the only other pledge in the documents—*i.e.*, their lien on moneys credited to HTA's sinking fund.  618 B.R. at 638.

112.    But here, unlike in HTA, the Trust Agreement has a clear granting clause at the beginning of the Agreement, which pledges all of "the revenues of the System" to the Trustee without qualification.  *See Reese*, 983 F.2d at 1519 (holding that granting clauses are "paramount" in determining the granted interest).  The fact that PREPA's broad pledge of "the revenues of the System" in the Trust Agreement's granting clause comes before Section 701 is yet another reason not to read Section 701's "Revenues" pledge as being somehow limited to any prior pledges made by the Agreement "hereinabove."[17]

113.    The *third* reason that Section 701's "Revenues" pledge cannot be read merely to cross-reference bondholders' "further security" in moneys credited to the Sinking Fund is found in Section 701's differentiation between what moneys are pledged to payment of bonds before

---

[17] In any event, the Court's HTA decision was merely a preliminary lift-stay ruling, and the First Circuit held on appeal that such a "summary determination" was not "conclusive" even in HTA's case (let alone binding in PREPA's case).  *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 989 F.3d 170, 182 (1st Cir. 2021).

versus after PREPA satisfied its 1947 Indenture Bonds. Before those older bonds were paid in full, the newer bonds were "payable solely from *moneys* in the Renewal and Replacement Fund *and said moneys* are hereby pledged to the payment thereof." Trust Agreement § 701 (emphasis added). In other words, the pledge was expressly limited to moneys in the Renewal and Replacement Fund only. By contrast, after the older bonds were paid in full, the pledge is expressly to all *Revenues* and not circumscribed to the moneys credited to any particular fund.

114. The parties thus demonstrated that they knew how to specify the pledge of only the moneys in a specific fund, and they expressly chose not to so limit the pledge of *Revenues* in Section 701. Under Puerto Rico law, the parties' decision to use "particular language . . . in one section but omit[ it] in another" indicates "that the drafter acted intentionally in the disparate inclusion or exclusion" so that the change in language "should be construed as a meaningful variation." *Marmolejos v. United States*, 283 F.R.D. 63, 67 (D.P.R. 2012) (internal quotation marks omitted); *see also Russello v. United States*, 464 U.S. 16, 23 (1983) (holding that exclusion of language within statute is deemed intentional); *Rosenthal-Zuckerman v. Epstein, Becker & Green Long Term Disability Plan*, 39 F. Supp. 3d 1103, 1107 (C.D. Cal. 2014) (inclusion of language in one contract provision demonstrated that defendants "knew how to do it" so omission of language in different provision was intentional); *MicroStrategy Inc. v. Acacia Rsch. Corp.*, No. 5735-VCP, 2010 WL 5550455, at *7 (Del. Ch. Dec. 30, 2010) (same).

115. *Fourth*, and finally, other provisions of the Trust Agreement repeatedly confirm that Section 701's pledge of "Revenues" means exactly what it says. For instance, Section 516 provides that the pledge and payment right of "amounts in the Subordinate Obligations Fund" granted to holders of certain subordinated obligations "shall be . . . subordinate and junior in all respects *to the lien and charge of the bonds secured hereby upon the Revenues*." Trust Agreement § 516(c) (emphasis added). Not only does that provision expressly invoke the Trustee's and

bondholders' liens, under Section 701, "upon the Revenues," but this part of Section 516 would be nonsensical if, in fact, those liens were instead only "upon the moneys in the Sinking Fund." If the Trustee's and bondholders' liens were limited only to the latter (as the Oversight Board contends), then those liens would not extend to any moneys in the Subordinated Obligations Fund, and there would be no reason for Section 516 to subordinate the junior holders' lien on those moneys.   Section 516 thus makes sense only if—as it actually says—the Trustee's and bondholders' lien is "upon the Revenues," including such Revenues that PREPA credits to the Subordinate Obligations Fund.

116.    Likewise, Section 705 provides that PREPA will pay all governmental charges and "will not create or suffer to be created *any lien or charge . . . upon the Revenues ranking equally with or prior to the bonds, except the lien and charge of the 1947 Indenture Bonds and the bonds secured hereby upon the Revenues*." *Id.* § 705 (emphasis added).  So too Section 712(a), which requires PREPA not to permit a lien "on the Revenues ranking equally with or prior to the charge or lien on the Revenues of the bonds issued under and secured by this Agreement."  The language in each of these sections would be mere surplusage if the Agreement did not pledge all of PREPA's Revenues. *UBS Fin. Servs., Inc. of P.R. v. XL Specialty Ins. Co.*, 929 F.3d 11, 24 (1st Cir. 2019); *In re Advanced Cellular Sys., Inc.*, 483 F.3d 7, 12 (1st Cir. 2007) (courts "should avoid interpretations that render a provision of an agreement surplusage").

117.    In sum, and simply put, the liens provided in the granting clause contain different language, cover different collateral, secure different obligations, and secure different parties from the liens granted elsewhere in the Trust Agreement.  The granting clause's pledge of "*revenues . . . and other moneys*" to the *Trustee* to secure *all obligations* is not limited to Section 507's lien on "*moneys*" for the "*further* security" of *bondholders*.  By the same token, the lien provided in

Section 701 covers different collateral ("Revenues") from the lien provided in Section 507 ("moneys"); the latter does not limit the former.

### 3.     The Trust Agreement's Covenants, Rights, And Remedies Determine The Value Of The Trustee's Security Interests In PREPA's Revenues

118.     The Oversight Board also claims (at FAC Counts IV-VI) that the Trustee's Claim should be disallowed to the extent it asserts priority, perfected security interests in the Trust Agreement's covenants, rights, and remedies. Those arguments misunderstand the nature of the Trustee's Claim. The Trust Agreement's covenants, rights, and remedies are inseparably bound up with the Trustee's liens in all PREPA Revenues. The value of the Trustee's liens on PREPA Revenues must be determined by reference to PREPA's covenant to raise rates (Section 502) and the Trustee's contractual and statutory rights to enforce the Trust Agreement and to the appointment of a receiver if PREPA fails to comply with it (Section 804, 22 L.P.R.A. §§ 207-08).

119.     The covenants, rights, and remedies, therefore, are what prevent PREPA from rendering the Trustee's liens mere empty vessels. *See City of Santa Monica v. Grubb*, 245 Cal. App. 2d 718, 727 (Dist. Ct. App. 1966) ("Without these covenants the bonds would not be merchantable."); *Oswald v. City of Blue Springs*, 635 S.W.2d 332, 334 (Mo. 1982); Rhonda C. Thomas, *The Hancock Amendment: The Limits Imposed on Local Governments*, 52 UMKC L. REV. 22, 36 (1983) ("[R]evenue bonds are necessarily and statutorily secured by a rate covenant."). As a result, the Trustee has property interests in the Trust Agreement's covenants, rights, and remedies. *See Dimino v. Sec'y of Commonwealth*, 695 N.E.2d 659, 663-64 & n.4 (Mass. 1998) (holding that eliminating tolls would "unconstitutionally depriv[e] the bondholders of their security interest" because it would conflict with rate covenant securing bonds); *First Nat'l Bank of Boston v. Maine Turnpike Auth.*, 136 A.2d 699, 718-22 (Me. 1957) (amendment to a turnpike authority's enabling act, affecting covenants regarding the use of its revenues, transferred "vested

50

property right from one person to another by the pure fiat of the Legislature" in violation of

Fourteenth Amendment); *see also U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 19 n.16 (1977)

("Contract rights are a form of property" that can be taken only if "just compensation is paid.").

Because the Trustee's liens on PREPA's revenues cannot be separated from its rights in the Trust

Agreement's covenants, rights, and remedies (and, in any event, constitute property interests in

their own right), this Court should grant summary judgment dismissing Counts IV-VI of the

Oversight Board's Amended Complaint.

> **4.      The Trustee Perfected Its Security Interests In All PREPA Revenues,
> Which In Any Event Are Not Subject To Avoidance**

120.     The Oversight Board claims that, even if the Trustee *has* security interests in

revenues outside of those credited to the Sinking Fund, then those interests had to be, but were not,

perfected in accordance with Article 9 of the UCC, because those interests are in cash or depository

accounts and cannot be perfected by UCC financing statements.  FAC ¶ 65; *see also id.* ¶ 48

(asserting that Article 9 applies).  The PREPA Bondholders and Trustee do not concede that the

UCC governs liens granted to the Trustee and bondholders under the Authority Act, or that it can

be applied retroactively to strip the Trustee's and bondholders' property rights or impair their

contractual rights without raising serious constitutional concerns.  But even if the UCC does apply

here, the security interests in all PREPA revenues were appropriately perfected by the filing of

four UCC financing statements.  For that and other reasons, the liens cannot be avoided.

> **a.      The Trustee's Financing Statements Perfected Its Security
> Interests In All PREPA Revenues**

121.     Under Article 9 of the UCC, as incorporated into Puerto Rico law, as a general rule,

financing statements must be filed to perfect security interests.  19 L.P.R.A. § 2260(a).  Such

financing statements must (1) provide the name of the debtor, (2) provide the name of the secured

party or a representative of the secured party, and (3) indicate the collateral covered by the financing statement.  *Id.* § 2322(a).

122.  As the Oversight Board acknowledges (FAC ¶¶ 58-62), four financing statements were filed in favor of the Trustee, each of which meets the requirements of 19 L.P.R.A. § 2322(a). FS 4449; FS 4304; FS 4173; FS 4174.

123.  *First*, each of the financing statements named PREPA as the debtor, using either its Spanish name or its English name.

124.  *Second*, all four statements state the name of the secured party (the Trustee, for all holders of bonds issued and to be issued).  FS 4449 at 1; FS 4304 at 1; FS 4173 at 1; FS 4174 at 1.

125.  *Third*, the financing statements sufficiently state that all of PREPA's revenues constitute the collateral covered.  Two of the financing statements (FS 4173 and FS 4174) describe the collateral covered as:

> [a]ll liens, security interests and pledges now or hereafter granted by the Debtor to the Secured Party . . . which Trust Agreement is hereby incorporated herein by this reference. . . . Without limiting the foregoing, this financing statement covers all of the Debtor's rights, title, and interest in and to *now-owned or acquired* collateral to the extent provided under the Trust Agreement . . ., including without limitation, in all Revenues of the System and all other monies granted under the Trust Agreement, including without limitation, all of such rights of the Debtor in and to any "Funds" and any proceeds, deposit accounts, security entitlements, other investment property, accounts, payment intangibles, "Time Deposits," supporting obligations, and general intangibles of any of the foregoing and all related rights arising from or now or hereafter held in or required to be held in the "Construction Fund," "Sinking Fund," "Reserve Maintenance Fund," "Self-insurance Fund," "Capital Improvement Fund," and "Subordinate Obligations Fund," and any earnings therein, wherever the same shall be held . . . .

Ex. A to FS 4173 (emphasis added); Ex. A to FS 4174 (emphasis added).  Earlier financing statements similarly described the collateral as "the Revenues of the System (as each such term is defined in the Agreement) and other moneys to the extent provided in the Agreement" (FS 4449 at 1), and  as "[a]ll the Revenues of the System (as defined in the Trust Agreement . . .) and other

moneys and accounts to the extent provided in such Trust Agreement" (FS 4304 at 1).  The latter

financing statement also includes the Trust Agreement as an attachment.  Financing statements

need not be "so comprehensive" as to allow an interested party to "determine exactly what the

specific collateral is."  *In re Amex-Protein Dev. Corp.*, 504 F.2d 1056, 1061 (9th Cir. 1974) (per

curiam).[18]  Each of these financing statements meets that requirement, and the more detailed

description of the collateral in the later statements can supplement the prior statements'

descriptions.  *See In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 914 F.3d at 714 (financing-

statement amendments can update outdated or incorrect information in earlier financing

statements).  All creditors were thus put on notice of the Trustee's security interests granted in the

Trust Agreement through its financing statements.

   **b.** **The Trustee Does Not Need A Deposit Account Control
Agreement To Perfect Its Security Interests In All PREPA
Revenues**

 126. The Oversight Board asserts that because the Trustee has not produced a deposit

account control agreement ("<u>DACA</u>") with either PREPA or the other depositary banks used by

PREPA, it has not perfected security interests in any moneys held in deposit accounts other than

those that hold moneys credited to the Sinking Fund and that are controlled by the Trustee.  FAC

¶¶ 64-65.  But DACAs are not necessary to perfect the Trustee's liens on revenues beyond those

credited to the Sinking Fund.

 127. Under the UCC, "a security interest attaches to any identifiable proceeds of

collateral," and "[a] security interest in proceeds is a perfected security interest if the security

---

[18] *See also In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 914 F.3d 694, 714 (1st Cir. 2019) (holding
that detailed definition of "Pledged Property" in financing statement was sufficient description of
collateral); *In re I80 Equip., LLC*, 938 F.3d 866, 874 (7th Cir. 2019) ("[T]he UCC allows a financing
statement to indicate collateral by reference to the description in the underlying security agreement."); *In
re Hyperion Enters., Inc.*, 158 B.R. 555, 565 (D.R.I. 1993) ("The financing statement is not required to
indicate the amounts secured or include the security agreement itself.").

interest in the original collateral was perfected." 19 L.P.R.A. §§ 2265(a)(2), (c). That means that "[i]n the event that the proceeds constitute identifiable cash proceeds of the secured creditor's collateral, then there is no need to have a deposit account control agreement to perfect the secured creditor's security interest in the cash transferred into the account." *In re Se. Stud & Components, Inc.*, No. 14-32906-DHW, 2016 WL 2604535, at *8 (Bankr. M.D. Ala. May 3, 2016); *see also In re Delco Oil, Inc.*, 599 F.3d 1255, 1261-62 (11th Cir. 2010) (Because funds in debtor's bank account were the "proceeds of [the creditor's] collateral," the creditor "need not have had a deposit account control agreement to perfect its security interest in the cash [that had been in the account].").[19] Here, the Trustee's security interests in PREPA's revenues and defined Revenues extend automatically to, and are properly perfected in, the identifiable cash proceeds of its collateral. 19 L.P.R.A. § 2265(d)(2).

128.    By way of example, once PREPA bills a customer for services, the billed sum becomes an account receivable, payment intangible, or general intangible—in all events subject to the Trustee's and bondholders' perfected security interest under the financing statements. *E.g.*, Ex. A to FS 4173 (describing collateral as "Revenues of the System and all other monies granted under the Trust Agreement, including . . . accounts, payment intangibles, . . . and general intangibles"). When that customer later pays its bill, by cash, check, or otherwise, the resulting proceeds of the account receivable, payment intangible, or general intangible remain subject to these perfected security interests, no matter the account to which such proceeds are credited (and

---

[19] Making the latter determination of the extent to which PREPA's accounts contain identifiable cash proceeds would require discovery. *See In re Darin*, 631 B.R. 301, 309 (Bankr. W.D. Mich. 2021) (holding that secured creditor could have perfected security interest based on "the likelihood[] that the funds in the deposit accounts were identifiable cash proceeds of its collateral"). For present purposes, however, it is sufficient for the Court to reject the Oversight Board's argument that perfection of the Trustee's and bondholders' liens is limited to moneys credited to the Sinking Fund or Self-insurance Fund, and that the Trustee's Claim can be almost entirely disallowed on that basis.

whether such account is subject to a DACA). *See In re 3PL4PL, LLC*, 619 B.R. 441, 460 (Bankr. D. Colo. 2020) ("Even though the Lenders failed to acquire a lien on 3PL4PL's deposit accounts as their original collateral, the Lenders nonetheless obtained such a lien as proceeds of the instruments which served as their original collateral."); *In re J. Silver Clothing, Inc.*, 453 B.R. 518, 532 (Bankr. D. Del. 2011) (holding that lender with "a valid, perfected security interest in Debtor's inventory," had "valid perfected security interest in all proceeds from inventory sales" in the relevant account).[20]

129.    Accordingly, the financing statements perfected the Trustee's security interests in PREPA's "revenues" and "Revenues," and, consequently, the cash proceeds thereof.  And because these revenues are mostly special revenues, as defined by Bankruptcy Code Section 902(2), Bankruptcy Code Section 928(a) requires that the Trustee's perfected security interests in these revenues and Revenues apply to post-petition identifiable proceeds as well.

### c.    The Trustee's Liens On All PREPA Revenues Are Effective And Perfected Pursuant To The Authority Act

130.    If the Trustee and bondholders were deemed not to have satisfied the UCC's requirements (which they have), the Puerto Rico's enactment of the UCC nevertheless could not alter the Trustee's and bondholders' lien rights previously established under the Trust Agreement because, under Puerto Rico law, "[i]n no case shall the retroactive effect of a law operate to the prejudice of rights acquired under previous legislative action."  31 L.P.R.A. § 3.  The Authority Act allowed PREPA "to *secure* payment of its bonds and of any and all other obligations by

---

[20] Consider an even more concrete example:  When some PREPA customers pay their monthly bills by check, that check is undoubtedly within the Trust Agreement's definition of Revenues and the plain and ordinary meaning of "the revenues of the System."  The Trustee permissibly perfected its lien on such revenues (and Revenues) in its UCC financing statements.  *See* 19 L.P.R.A. § 2262.  The cash proceeds of those checks are therefore proceeds of a perfected security interest, no matter where in PREPA's accounting system they may end up.

*pledging or placing a lien* on all or any of *its contracts, revenues, and income only*." 22 L.P.R.A. § 195a-1 (Spanish) (previously 22 L.P.R.A. § 196) (emphasis added). The Act further authorized PREPA to issue resolutions regarding the disposition of the "entire gross or net revenues and present or future income of the Authority, including the pledging of all or any part thereof to secure payment of the bonds." *Id.* § 206. The Authority Act, by empowering PREPA to secure the payment of the bonds by pledging and placing liens on revenues, contracts, and income, authorized PREPA to create and perfect security interests, including in its current and future revenues. The Authority Act also authorized PREPA to include in its contracts with bondholders provisions "as to covenanting against pledging all or any part of the revenues and income of the Authority to which its right then exists or the right to which may thereafter come into existence." *Id.* Thus, the liens and negative pledge were "rights acquired under previous legislative action," and none could be prejudiced by the retroactive effect of the later-enacted Uniform Commercial Code.

### d. In All Events, The Trustee's Liens On All PREPA Revenues Are Not Subject To Avoidance Or Subordination

131.   Even if the Trustee's liens on all PREPA revenues, Revenues, and any cash proceeds thereof were not perfected, then Bankruptcy Code Section 544(a)(1) *still* would not allow the Oversight Board to avoid the Trustee's and bondholders' liens. Section 544(a)(1) allows a trustee to avoid certain security interests as of the petition date, but *only* as to "property on which a creditor on a simple contract could have obtained . . . a judicial lien." 11 U.S.C. § 544(a)(1). Section 544(a) "does not give the [debtor's trustee] any greater rights than he, or any person, would have as a bona fide purchaser or judicial lien creditor under applicable state law." *In re Trask*, 462 B.R. 268, 273 (B.A.P. 1st Cir. 2011); *see also In re Vt. Toy Works, Inc.*, 82 B.R. 258, 293 (Bankr. D. Vt. 1987) ("Simply stated, Federal law bestows the hypothetical lien status, State law determines its parameters.").

132.     Under Puerto Rico law in effect on the petition date, "[n]o lien whatsoever may be placed on the assets of the Authority insofar as the Trust Agreement with the bondholders or other agreements with the creditors of the Authority do not allow."  22 L.P.R.A. § 196(o) (language added in 2016 and subsequently amended by Act 17-2019 § 2.6, 22 L.P.R.A. § 195a-1, to read as follows: "No lien whatsoever may be placed on the assets of the Authority insofar as the agreement or agreements entered into with the bondholders or other agreements entered into with the creditors of the Authority do not allow under PROMESA."); *see also* Trust Agreement § 601 (stating that moneys received and deposited in any bank by PREPA "shall not be subject to lien or attachment by any creditor of the Authority").[21]  Accordingly, no PREPA creditor could have obtained a judicial lien against PREPA's revenues as of the commencement of this Title III case.  Any avoidance powers under Section 544(a) are therefore unavailable to the Oversight Board here.  *See In re Airadigm Commc'ns, Inc.*, 519 F.3d 640, 652 (7th Cir. 2008) (holding that avoidance of Federal Communications Commission's lien on debtor's licenses was not permitted under

---

[21] Even apart from the Authority Act, Puerto Rico law otherwise forbids the attachment of judicial liens to the collateral in this Title III case.  *See Whitfield v. Mun. of Fajardo*, No. 01-2647 2007 WL 6894782, at *3-4 (D.P.R. May 29, 2007) ("[G]overnmental entities are exempt from attachment procedures, . . . as a matter of public policy." (internal quotation marks omitted)).  The Puerto Rico Supreme Court has repeatedly held that it may not attach the funds of public entities to satisfy judgments against them.  *See, e.g.*, *Librotex v. AAA*, 138 D.P.R. 938, 939-41 (1995) *available at* Dkt. No. 17-00155-LTS, ECF No. 123-1; *Commoloco de Caguas Inc. v. Benítez-Díaz*, 126 D.P.R. 478, 493 (1990) *available at* Dkt. No. 17-00155-LTS, ECF No. 123-2; *see also* 3 L.P.R.A. § 9142 (codifying such precedent).  Because Puerto Rico law does not allow attachment of judicial liens on public funds, a judgment creditor's only remedy against PREPA would be to seek a repayment plan to be included in the public corporation's next annual budget.  *See Librotex*, 138 D.P.R. at 942-43.  The First Circuit has squarely held that these permissible repayment plans do "*not create an attachment of public funds.*" *Burgos-Yantín v. Mun. of Juana Díaz*, 909 F.3d 1, 9 (1st Cir. 2018) (per curiam) (emphasis added); *see also Acevedo-García v. Vera-Monroig*, 368 F.3d 49, 56 (1st Cir. 2004).

While this Court held in connection with the Title III proceeding for the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") that, "under Puerto Rico law, a judgment creditor could have obtained a lien against ERS's assets[,]" *Fin. Oversight Mgmt. Bd. for Puerto Rico v. Altair Glob. Credit Opportunities Fund, LLC*, 590 B.R. 577, 594 (D.P.R. 2018), *aff'd in part, vacated in part, rev'd in part*, 914 F.3d 694 (1st Cir. 2019), *cert. denied sub nom. Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Andalusian Glob. Designated Activity Co.,* 140 S. Ct. 47 (2019), the relevant portion of the Court's decision was later vacated by the First Circuit, and therefore has no precedential effect.

Section 544(a) because, under the applicable non-bankruptcy law, no judgment creditor could have

obtained a superior lien against the debtor's property); *In re Fluge*, 57 B.R. 451, 456 (Bankr.

D.N.D. 1985) ("A trustee as hypothetical holder of a judicial lien under Section 544(a)(1) can

avoid a superior interest only if an actual creditor could have obtained a judicial lien against the

property.").[22]

133.    PREPA is also incorrect that the Trustee's and bondholders' liens are subject to

avoidance under 19 L.P.R.A. § 2267(a)(2).  FAC ¶ 104.  That section provides that a security

interest "is subordinate to the rights of . . . a lien creditor," including a "trustee in bankruptcy."

But Section 2267 does not provide a trustee with greater authority to avoid liens than is provided

in Bankruptcy Code Section 544, because both statutes are limited by what liens are allowed by

the applicable law.  *See, e.g.*, *LMS Holding Co. v. Core-Mark Mid-Continent, Inc.*, 50 F.3d 1520,

1523 (10th Cir. 1995) (debtor's rights for purposes of the UCC's priority provisions are its rights

as a hypothetical judicial lien creditor under Bankruptcy Code Section 544(a)(1)).   And, once

again, Puerto Rico law precludes *any* creditor from obtaining a lien on Trust Agreement collateral,

and prevails over Puerto Rico's enactment of the UCC both because (1) the relevant portion of

Section 196(o) post-dates the UCC's enactment (a later statute modifies an earlier one, *see United

States v. Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 10 (1st Cir. 2005)), and (2) it applies specifically to

PREPA (a general statute gives way to a specific one, *see Edmond v. United States*, 520 U.S. 651,

657 (1997)).  *See* Act 4-2016 § 8 (adding language cited above).  Section 2267 thus does not

---

[22] Even if Section 544(a)(1) could be applied, it would only allow for avoidance of liens on all property as of the commencement of the Title III case.  Section 544(a)(1) does not avoid liens on any property acquired after the Title III case began.  5 COLLIER ON BANKRUPTCY ¶ 544.01 (16th ed. rev.) ("The section 544(a) powers and section 544(b) powers are limited by their terms and may not be used by the trustee to avoid postpetition transfers.  Avoidance of postpetition transfers is governed by section 549."); *Morton v. Kievit (In re Vallecito Gas, LLC)*, 440 B.R. 460, 469 (Bankr. N.D. Tex. 2010) ("The Trustee can only succeed here if § 544(a)(3) applies to both pre-petition and post-petition transfers.  And, while there is conflicting case law with respect to this issue, the Court concludes that the majority, and better, view is that § 544 may only be used to avoid pre-petition transfers." (collecting citations)).

provide authority to avoid the Trustee's and bondholders' liens for the same reasons Section 544 does not apply.[23]

134.    Because the Trustee has valid and perfected liens over all of PREPA's revenues and Revenues, including those outside the moneys currently credited to the Sinking Fund, which are not subject to avoidance, this Court should grant the PREPA Bondholders and Trustee summary judgment (i) dismissing Counts I-VI of the Oversight Board's First Amended Complaint, which together seek judgments disallowing the Trustee's assertion of priority, perfected security interests in the Trustee's Claim, and (ii) granting Count II of the Counterclaim Complaint, which seeks declaratory judgment that the Trustee and bondholders have priority, perfected security interests in all PREPA revenues.

## III.    The Amended Complaint's Claims Are Not Yet Ripe, And So Should Be Dismissed For Lack Of Subject Matter Jurisdiction

135.    As shown above, the Trust Agreement unambiguously provides the Trustee and bondholders recourse to moneys sufficient to satisfy the Trustee's Claim, whether or not that recourse extends past the Sinking Fund.  Likewise, the Agreement grants the Trustee and bondholders more than sufficient liens both under the Sinking Fund alone and under the clauses granting the Trustee liens on all PREPA revenues and Revenues to secure the full amount of the Trustee's Claim.

136.    But for the same reasons that favor granting the PREPA Bondholders and Trustee summary judgment on all counts, this dispute is not ripe for decision and therefore this Court lacks jurisdiction to decide it now.  "A claim is not ripe for adjudication if it rests upon contingent future

---

[23] The Oversight Board also cannot use Section 2267 because although PROMESA gives the Oversight Board the powers of a "trustee" under incorporated provisions of the Bankruptcy Code, it does not deem the Oversight Board to be a "trustee in bankruptcy" under Puerto Rican law.  PROMESA was enacted under the Territorial Clause, not the Bankruptcy Clause of the U.S. Constitution—it is therefore not a "bankruptcy act" and the Oversight Board cannot qualify as a "trustee in bankruptcy" under Section 2267.

events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks omitted).  There are two separate, but mutually reinforcing, reasons for this lack of ripeness:

137.    *First*, PREPA is obligated to raise rates and collect revenues sufficient to pay its bonds.  Were it not for the temporary impediment of the automatic stay, the Trustee could enforce those covenants now.  If the stay were lifted, the Trustee may be able to access future revenues credited to the Sinking Fund to repay bondholders in full, in which case there would be no need to adjudicate whether the Trustee or bondholders have recourse to or a lien on any moneys beyond those in the Sinking Fund.

138.    If, instead, the Oversight Board is trying to achieve a *permanent* restructuring, alteration, or diminishment of those covenants, then it can accomplish that, if at all, only through the confirmation of a plan of adjustment after a hearing in which the Oversight Board carries its burden of proving compliance with requirements for confirmation, as set forth below.

139.    Further, the text and legislative history of Bankruptcy Code Section 506(a) show that those counts of the First Amended Complaint aimed at determining the Trustee's secured claim are not ripe—which the First Amended Complaint tacitly admits by ignoring Section 506(a).[24]  Section 506(a)(1) provides in relevant part as follows:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . . Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

---

[24] Other than listing Section 506(a) in headings, the First Amended Complaint cites Section 506(a) only once, in Count III seeking to deny the Trustee a security interest in the Trust Agreement's covenants—a security interest that the Trustee and PREPA Bondholders do not assert in their counterclaims or in this motion for summary judgment.

140.    The legislative history to Section 506(a)(1) states:

[Subsection (a)(1)] makes it clear that valuation is to be determined in light of the purpose of the valuation and the proposed disposition or use of . . . [such] property or on a plan affecting the creditor's interest.  This determination shall be made in conjunction with any hearing on such disposition or use of property or on a plan affecting the creditor's interest.  To illustrate, a valuation early in the case in a proceeding under sections 361-363 would not be binding upon the debtor or creditor at the time of confirmation of the plan.

S. Rep. No. 95-989, at 68 (1978); H. Rep. No. 95-59, at 356 (1977); *see also* 124 Cong. Rec. H. 11,095 (Apr. 24, 1978); 124 Cong. Rec. S. 17,411 (June 13, 1978) ("[D]eterminations for purposes of adequate protection [are] not binding for purposes of 'cram down' on confirmation in a case under chapter 11.").  Thus, the Trustee and bondholders are entitled to a determination of the value of their secured claim at confirmation, and this adversary proceeding's attempt to do so before confirmation is premature and not ripe.

141.    *Second*, the Amended Complaint is also not ripe because it seeks to limit liens and recourse to an amount credited to the Sinking Fund, when the amount credited to the Sinking Fund today is the consequence not of the terms of the Trust Agreement but of PREPA's pre- and post-Title III violations of the Trust Agreement and the Authority Act.  PREPA has no legal authority to refuse to raise rates, to refuse to bill and collect revenues, and to refuse to deposit those revenues to the credit of the Sinking Fund.

142.    Notwithstanding its lack of legislation or other authority, PREPA violated its contractual and statutory obligations in reliance on pre-Title III standstill and restructuring support agreements (which it ultimately repudiated) and the automatic stay, which only protects PREPA during the pendency of its Title III case.  As noted above, the stay has no permanent impact on the rights of the Trustee or bondholders.  Only a plan of adjustment can have a permanent impact on the rights of the Trustee or bondholders, and such a plan would have to meet confirmation standards, including, among other things, PROMESA Section 314(b)(3) (plan cannot violate

Puerto Rican law), PROMESA Section 314(b)(6) (bondholders can receive no less than what they would receive from enforcement of their "available remedies under the non-bankruptcy laws"), and, if bondholders reject the plan, their rights to fair and equitable treatment under Bankruptcy Code Section 1129(b).

143.    In the absence of a determination of PREPA's ability under a plan to repudiate its obligations to fund the Sinking Fund notwithstanding the absence of any other lawful authority to do so, and in the absence of any judicial determination of whether such repudiation is *ultra vires* under Puerto Rican law or its consequences, the Amended Complaint's attempt to limit recourse and liens to amounts previously credited to the Sinking Fund is premature and should be dismissed as not ripe.

## <u>CONCLUSION</u>

This Court should grant the PREPA Bondholders and Trustee summary judgment dismissing PREPA's First Amended Complaint and awarding declaratory judgment on Counterclaim Counts I and II.

We hereby certify that, on this same date, we electronically filed the foregoing with the clerk of the Court using the CM/ECF system, which will notify the attorneys of record.

Dated:  San Juan, Puerto Rico
        October 24, 2022

**TORO COLÓN MULLET P.S.C.**

*/s/ Manuel Fernández-Bared*
Manuel Fernández-Bared
USDC-PR No. 204,204
P.O. Box 195383
San Juan, PR 00919-5383
Tel.: (787) 751-8999
Fax: (787) 763-7760
E-mail: mfb@tcm.law

*/s/ Linette Figueroa-Torres*
Linette Figueroa-Torres
USDC-PR No. 227,104
E-mail: lft@tcm.law

*/s/ Nayda Perez-Roman*
Nayda Perez-Roman
USDC–PR No. 300,208
E-mail: nperez@tcm.law

*Counsel for the Ad Hoc Group of PREPA Bondholders*

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**

*/s/ Amy Caton*
Amy Caton*
Thomas Moers Mayer*
Gary A. Orseck*
Matthew M. Madden*
Alice J. Byowitz*
1177 Avenue of the Americas
New York, New York 10036
Tel.: (212) 715-9100
Fax: (212) 715-8000
Email:  acaton@kramerlevin.com
        tmayer@kramerlevin.com
        gorseck@kramerlevin.com
        mmadden@kramerlevin.com
        abyowitz@kramerlevin.com

*\*Admitted Pro Hac Vice*

*Counsel for the Ad Hoc Group of PREPA Bondholders*

**CASELLAS ALCOVER & BURGOS P.S.C.**

By: */s/ Heriberto Burgos Pérez*
    Heriberto Burgos Pérez
    USDC-PR No. 204,809
    Ricardo F. Casellas-Sánchez
    USDC-PR No. 203,114
    Diana Pérez-Seda
    USDC–PR No. 232,014
    P.O. Box 364924
    San Juan, PR 00936-4924
    Tel.: (787) 756-1400
    Fax: (787) 756-1401
    E-mail:  hburgos@cabprlaw.com
            rcasellas@cabprlaw.com
            dperez@cabprlaw.com

*Counsel for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.*

**CADWALADER, WICKERSHAM & TAFT LLP**

By: */s/ William J. Natbony*
    Howard R. Hawkins, Jr.*
    Mark C. Ellenberg*
    Casey J. Servais*
    William J. Natbony*
    Thomas J. Curtin*
    200 Liberty Street
    New York, New York 10281
    Tel.: (212) 504-6000
    Fax: (212) 406-6666
    Email:  howard.hawkins@cwt.com
           mark.ellenberg@cwt.com
           casey.servais@cwt.com
           bill.natbony@cwt.com
           thomas.curtin@cwt.com

*Admitted Pro Hac Vice

*Counsel for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.*

**ADSUAR MUÑIZ GOYCO**
**SEDA & PÉREZ-OCHOA, P.S.C.**

By:   */s/ Eric Pérez-Ochoa*
Eric Pérez-Ochoa
(USDC-PR No. 206314)
Luis Oliver-Fraticelli
(USDC-PR No. 209204)
Alexandra Casellas-Cabrera
(USDC-PR No. 301010)
PO BOX 70294
San Juan, PR 00936
Telephone: 787.756.9000
Facsimile:  787.756.9010
Email:  epo@amgprlaw.com
        loliver@amgprlaw.com
        acasellas@amgprlaw.com


*Attorneys for National Public Finance
Guarantee Corporation*

**WEIL, GOTSHAL & MANGES LLP**

By:   */s/ Robert Berezin*
Matthew S. Barr*
Jonathan Polkes*
Robert Berezin*
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile:  (212) 310-8007
Email: matt.barr@weil.com
        jonathan.polkes@weil.com
        robert.berezin@weil.com

Gabriel A. Morgan*
700 Louisiana Street, Suite 1700
Houston, TX 77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511
Email: gabriel.morgan@weil.com

*\* Admitted Pro Hac Vice*

*Attorneys for National Public Finance
Guarantee Corporation*

**REICHARD & ESCALERA, LLC**

By: */s/ Rafael Escalara*
    Rafael Escalara
    USDC-PR No. 122,609

    */s/ Sylvia M. Arizmendi*
    Sylvia M. Arizmendi
    USDC-PR No. 210,714

    */s/ Carlos R. Rivera-Ortiz*
    Carlos R. Rivera-Ortiz
    USDC–PR No. 303,409
    255 Ponce de León Avenue
    MCS Plaza, 10th Floor
    San Juan, PR 00917-1913
    Tel.: (787) 777-8888
    Fax: (787) 765-4225
    E-mail:  escalara@reichardescalera.com
             arizmendis@reichardescalera.com
             riverac@reichardescalera.com

*Counsel for Syncora Guarantee, Inc.*

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By: */s/ Susheel Kirpalani*
    Susheel Kirpalani*
    Daniel Salinas
    USDC-PR No. 224,006
    Eric Kay*
    51 Madison Avenue, 22nd Floor
    New York, New York 10010-1603
    Tel.: (212) 849-7000
    Fax: (212) 849-7100
    Email:  susheelkirpalani@quinnemanuel.com
           danielsalias@quinnemanuel.com
           erickay@quinnemanuel.com

*\* Admitted Pro Hac Vice*

*Counsel for Syncora Guarantee, Inc.*

**RIVERA, TULLA & FERRER LLC**

/s Eric A. Tulla
Eric A. Tulla
USDC-DPR No. 118313
Email: etulla@riveratulla.com

Rivera Tulla & Ferrer Building
50 Quisqueya Street
San Juan, PR 00917-1212
Tel: (787)753-0438
Fax: (787)767-5784 (787)766-0409

*Counsel for U.S. Bank National Association,
in its Capacity as Trustee*

**MASLON LLP**

/s/ Clark T. Whitmore
Clark T. Whitmore*
Michael C. McCarthy*
John Duffey*
Jason M. Reed*
90 South Seventh Street, Suite 330
Minneapolis, MN 55402
Tel.: (612) 672-8200
Fax: (612) 672-8397
Email: clark.whitmore@maslon.com
        mike.mccarthy@maslon.com
        john.duffey@maslon.com
        jason.reed@maslon.com

*\* Admitted Pro Hac Vice*

*Counsel for U.S. Bank National
Association, in its Capacity as Trustee*